AMY M. KARLIN (Bar No. 150016)
Interim Federal Public Defender
ANGELA C. C. VIRAMONTES (Bar No. 228228)
(E Mail: Angela_Viramontes@fd.org)
Deputy Federal Public Defender
CRAIG A. HARBAUGH (Bar No. 194309)
(E Mail: Craig_Harbaugh@fd.org)
Deputy Federal Public Defender
3801 University Avenue, Suite 700
Riverside, California  92501
Telephone:  (951) 276-6346
Facsimile:  (951) 276-6368

Attorneys for Defendant
JOHN JACOB OLIVAS

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>  v.<br><br>JOHN JACOB OLIVAS,<br><br>  Defendant. | Case No. ED CR 18-231-JGB<br><br>**EX PARTE APPLICATION TO CONTINUE TRIAL**<br><br>**CURRENT TRIAL DATE:  06/30/20 at 8:30 a.m.**<br><br>**PROPOSED TRIAL DATE: 10/27/2020 at 8:30 a.m.** |

1

1  Defendant John Jacob Olivas, by and through Deputy Federal Public Defenders
2  Craig A. Harbaugh and Angela C. Viramontes, hereby applies *ex parte* for an order
3  continuing his trial date from June 30, 2020 to October 27, 2020. This application is
4  based on the instant application, the separately filed *in camera* declaration of counsel,
5  all files and records in this case, and any other evidence or argument presented to the
6  Court. The government objects to this application and will be filing an objection.

Respectfully submitted,

AMY M. KARLIN
Interim Federal Public Defender

DATED: May 11, 2020    By  /s/ Craig A. Harbaugh
CRAIG A. HARBAUGH
Deputy Federal Public Defender

# INTRODUCTION

Since the Court granted the last continuance, the defense was on track to complete its preparation and proceed to trial on the scheduled date. Then the unthinkable happened: a once-in-a-century plague swept the globe. It has completely upended every facet of society, from our criminal justice system to everday human interaction. Since March 16, 2020, California has been effectively shuttered. Social distancing requirements have precluded all non-essential activity. Consistent with state and local laws, as well as the directive of the Acting Federal Defender, Olivas's defense team has been teleworking and ceased all face-to-face interactions to include all witness interviews.

Even under the best of circumstances --- government officials ease restrictions, the pandemic does not see a resurgence, and the defense team were able to devote itself full-time to this case --- it would still be impossible for the defense to complete investigation by June 30th. As set forth in counsel's *in camera* declaration filed contemporaneously with this application, the modest continuance is warranted to complete the investigation and prepare his defense for trial.

Olivas's constitutional right to a fair trial substantially outweighs the alleged victim's purported interest against delaying the trial by a mere four months. Olivas faces a severe sentence if he were convicted of the charges. Disallowing this modest continuance would severely prejudice Olivas.

On the other hand, any hardship to the alleged victim-witnesses resulting from a four-month delay would be *de minimus*. The alleged victims will have their "day in court," just at a time when the nation will likely have the pandemic under control and the district will be able to conduct jury trials in a safe and responsible manner.

Consequently, because a four-month continuance is necessary and appropriate, the Court should continue the trial to October 27, 2020 or a later date that is convenient for the Court and parties.

# ARGUMENT

Generally, courts consider four factors in determining whether the defendant's request for a continuance is appropriate:

(1) whether the defendant was diligent in preparing his defense;
(2) the usefulness of the continuance, asking how likely it was that the purpose of the continuance would have been achieved had it been granted
(3) the extent to which granting the continuance would have inconvenienced the court and the opposing party, including witnesses; and
(4) the extent to which the appellant might have suffered harm as a result of the district court's denial.

*United States v. Kloehn*, 620 F.3d 1122, 1127 (9th Cir. 2010) (quoting *United States v. Flynt,* 756 F.2d 1352, 1358-59 (9th Cir. 1985). "[T]he weight given to any one [factor] may vary from case to case." *Armant v. Marquez*, 772 F.2d 552, 556 (9th Cir. 1985) (explaining that whether a district court abused its discretion in denying a continuance is a "case-by-case inquiry ... bound by no particular mechanical test"). Although the defendant must establish some prejudice, F*lynt*, 756 F.2d at 1359, "[n]one of the first three factors is ordinarily dispositive." *United States v. Rivera-Guerrero*, 426 F.3d 1130, 1139 (9th Cir. 2005).

## I. Olivas's Defense Team Exercised Reasonable Diligence in Preparing For the Current Trial Date Prior to the Unprecedented Global Pandemic.

A defendant's counsel need only exercise "due diligence" in preparing for trial. *United States v. Dubin*, 133 F.3d 929 (9th Cir. 1998) (considering "due diligence of the movant"). This does not require "maximum feasible diligence." *United States v. Patterson*, 277 F.3d 709, 712 (4th Cir. 2002) (quoting *Wims v. United States*, 225 F.3d 186, 190 n. 4 (2d Cir.2000) (holding that a "due diligence" standard "does not require the maximum feasible diligence, only 'due,' or reasonable, diligence"). The primary concern behind this factor is to ensure defendant is not seeking the continuance as a "delaying tactic." *Kloehn*, 620 F.3d at 1127.

As set forth in the separately *in camera* declaration, Olivas's defense team has exercised due diligence in preparing his case for trial. But much of those efforts have been halted as a result of the pandemic. It is important to take stock of the situation,

4

not only the paralyzing effect of the pandemic on daily life but how our society will function in the new normal in the coming months.

### A. Following the Court's Granting of the Most Recent Continuance, the COVID-19 Pandemic Emerged as a Global Threat

The novel coronavirus pandemic is a global emergency that is unprecedented in modern history. As data from both the Centers for Disease Control and the California Department of Public Health reflect, the virus is spreading through the United States community at an alarming rate.[1] The death toll, across the nation and the world, is staggering.

In December 2019, COVID-19, a novel coronavirus, surfaced in Hubei Province, China.[2] COVID-19 spread from there, infecting at least 3.5 million people in at least 177 countries, and causing 249,200 deaths, as of May 4, 2020.[3] The United States is particularly impacted, with COVID-19 infecting close to 1.3 million people.[4] So far, 77,212 have died in the United States.[5] This rate likely underestimates the actual number of COVID-19 cases, though, because testing is not yet widely available. Tellingly, in China, "undocumented infections were the infection source for 79% of documented cases."[6]

---

[1] Coronavirus Disease 2019 (COVID-19) in the U.S., Centers for Disease Control and Prevention (updated daily), available at https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-inus.html; Coronavirus Disease 2019 (COVID-19), California Department of Public Health (updated daily), available at https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Immunization/ncov2019.aspx.

[2] World Health Org., *Q&A on Coronaviruses (COVID-19), available at* https://tinyurl.com/u4pepnl (last accessed Apr. 18, 2020),

[3] *Coronavirus Map: Tracking the Global Outbreak,* N.Y. TIMES, *available at* https://tinyurl.com/wdp4dym (last accessed May 4, 2020).

[4] *Id.*

[5] *Id.*

[6] Ruiyun Li, *et al*, *Substantial undocumented infection facilitates the raped dissemination of novel coronavirus (SARS-CoV2)*, Science, American Ass'n for Advancement of Science (Mar.16, 2020), *available at* https://tinyurl.com/tpx4css.

On March 4, 2020, there were only *seven* confirmed cases of COVID-19 in Los Angeles County and no deaths.[7] On May 4, 2020, the county had identified 26,217 positive COVID-19 cases in Los Angeles County, and 1,256 deaths.[8] In California, there are 55,000 confirmed cases—and 2,250 deaths.[9]

The reason for its prolific spread: it passes from person-to-person so easily. An infected person exhales, releasing droplets that others inhale.[10] Or, an infected person exhales, releasing droplets that land on surfaces—say, a doorknob, a grocery store checkout counter, a gas pump—and survive for hours, even days, until healthy people touch that surface, then their eyes, nose, or mouth.[11] It is as simple as it is menacing. The virus is also quietly insidious: people infected with the coronavirus can be asymptomatic for between two to fourteen days during the COVID-19 incubation period.[12] Thus, infected people are, unknowingly, capable of spreading the coronavirus.[13] Many people infected with the coronavirus never develop symptoms (or develop only very minor symptoms) and are unwitting carriers of the disease.[14]

---

[7] *News Release: Public Health Identifies Six New Cases of Confirmed Covid-19 in Los Angeles County*, L.A. County Dep't of Public Health, Mar. 4, 2020, *available at* https://tinyurl.com/ybuesk5h.

[8] *COVID-19 in Los Angeles County*, L.A. County Dep't of Public Health, Apr. 19, 2020, *available at* http://publichealth.lacounty.gov/media/Coronavirus/locations.htm (last accessed May 4, 2020).

[9] *Tracking coronavirus in California*, L.A. TIMES, *available at* https://tinyurl.com/qu79hu7 (last accessed May 4, 2020).

[10] *Supra*, n. 2.

[11] *Supra,* n. 2.

[12] Ctrs. for Disease Control & Prevention, *Symptoms of Coronavirus* (Mar. 20, 2020), https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html.

[13] Ctrs. for Disease Control & Prevention, *Healthcare Professionals: Frequently Asked Questions and Answers* (Mar. 30, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html.

[14] Apoorva Mandavilli, *Infected but Feeling Fine: The Unwitting Coronavirus Spreaders*, NY TIMES, Mar. 31, 2020, *available at* https://tinyurl.com/u722o7m.

And COVID-19 is far more deadly than some first assumed. The president compared COVID-19 to the common flu.[15] COVID-19 is ten times deadlier than the flu.[16] One in six people who contract COVID-19 become seriously ill and develop difficulty breathing.[17] No one is safe from COVID-19. While older people and those with pre-existing conditions are the most vulnerable to COVID-19-related mortality, substantial numbers of young people without preexisting conditions have also required hospitalization, intensive care, and ultimately succumbed to the virus.[18] According to the CDC, there is not yet any vaccine or treatment for COVID-19.[19]

Given COVID-19's high mortality rate, and the finite number of ventilators and medical personnel available, health experts recommended basic, essential preventative measures. These included the following: (1) washing hands; (2) avoiding contact with your eyes, nose, and mouth; (3) practicing good respiratory hygiene (covering your mouth when you cough or sneeze;[20] and (4) wearing facemasks in public.[21] The CDC also encouraged "social distancing," advising that "[l]imiting face-to-face contact with others is the best way to reduce the spread of" COVID-19.[22] Per the CDC, "social

---

[15] Domenico Montanaro, *Fact Check: Trump Compares Coronavirus to The Flue, But it Could be 10 Times Deadlier*, NPR (Mar. 24, 2020), *available at* https://tinyurl.com/t95wzgh.

[16] *Supra*, n. 2.

[17] *Id.*

[18] Ctrs. for Disease Control & Prevention, *Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19) - United States, February 12–March 16, 2020*, 69 MMWR Morb Mortal Wkly Rep 343, 343-46 (Mar. 26, 2020), *available at* https://tinyurl.com/rrorxg5 (finding that 20 percent of COVID-19 hospitalizations, 12 percent of COVID-19 ICU admissions, and 20 percent of COVID-19 deaths were of persons between ages 20 and 44).

[19] Ctrs. for Disease Control & Prevention, *Situation Summary* (updated Apr. 19, 2020), *available at* https://tinyurl.com/yb8qombn.

[20] World Health Org., *Coronavirus disease (COVID-19) advice for the public* (updated Mar. 31, 2020), *available at* https://tinyurl.com/vr9owsn.

[21] World Health Org., *Use of Cloth Face Coverings to Help Slow the Spread of COVID-19*, *available at* https://tinyurl.com/uxphvl2.

[22] World Health Org., *Social Distancing, Quarantine, and Isolation, available at* https://tinyurl.com/sxhar75.

distancing" means to (1) stay at least six feet from other people, (2) not gather in groups, and (3) stay out of crowded places and avoid mass gatherings.[23]

### B. Officials Have Imposed Severe Social Distancing Restrictions Have Precluded the Defense From Conducting a Thorough Investigation

Government and judicial officials have taken aggressive steps to curb the impact of the virus. On March 13, 2020, following the President's declaration of a national emergency in response to COVID-19, the Court entered a General Order suspending jury selection and jury trials scheduled to begin before April 13, 2020. C.D. Cal. General Order No. 20-02, In Re: Coronavirus Public Emergency, Order Concerning Jury Trials and Other Proceedings (Mar. 13, 2020). The Court subsequently continued that suspension through June 1, 2020. C.D. Cal. General Order No. 20-05, In Re: Coronavirus Public Emergency, Further Order Concerning Jury Trials and Other Proceedings (Apr. 13, 2020). Also on March 13, 2020, the Court imposed health- and travel-related limitations on access to Court facilities. C.D. Cal. General Order No. 20-03, In Re: Coronavirus Public Emergency, Order Concerning Access to Court Facilities (March 13, 2020). On March 19, 2020, by Order of the Chief Judge, the Court instituted its Continuity of Operations Plan ("COOP"), closing all Central District of California courthouses to the public (except for hearings on criminal duty matters) and taking other emergency actions. C.D. Cal. Order of the Chief Judge No. 20-042 (March 19, 2020). On March 29 and 31, recognizing COVID-19's continued spread in the community, the Court took further action: implementing video-teleconference and telephonic hearings and suspending all grand-jury proceedings. C.D. Cal. Orders of the Chief Judge Nos. 20-043 (March 29, 2020) and 20-044 (March 31, 2020).

These orders were imposed based on (1) the California Governor's declaration of a public-health emergency in response to the spread of COVID-19, as well as (2) the Centers for Disease Control's advice regarding reducing the possibility of exposure to

---

[23] *Id.*

the virus and slowing the spread of the disease. See General Order 20-02, at 1. The Chief Judge has recognized that, during the COVID crisis, all gatherings should be limited to no more than 10 people and elderly and other vulnerable people should avoid person-to-person contact altogether. See Order of the Chief Judge No. 20-042, at 1-2.

On March 19, 2020, both Los Angeles Mayor Eric Garcetti and California Governor Gavin Newsom issued emergency orders requiring residents to "stay home," subject to limited exceptions. California Executive Order N-33-20 (March 19, 2020); accord Safer at Home, Public Order Under City of Los Angeles Emergency Authority ¶ 1 (March 19, 2020). Subject to similarly limited exceptions, all travel is prohibited. Safer At Home ¶ 4. Non-essential businesses requiring in-person attendance by workers have been ordered to cease operations. Id. ¶ 2. All schools in the Los Angeles Unified School District are closed through the summer of 2020.

Although the Olivas defense team has continued to work on the case, the lockdown restrictions have impeded preparation and even halted certain aspects of the investigation. The process for obtaining records from government and private entities is severely hampered because most government agencies have also adopted a telework policy. Moreover, the defense has been unable to perform any witness interviews during this time. While the Government was able to conduct all of its witness interviews in-person, the defense has been unable to conduct any interviews without violating strict social distancing requirements. This does not even take into account the substantial familial burden imposed by the closure of schools. Like the rest of the nation, most of the members of the Olivas's defense team have been thrust into the role of home-school teacher or full-time caregiver while struggling to complete their work duties.

### C. Even After Restrictions Are Eased, Olivas's Defense Will Not Be Able to Work at Full Capacity and Full-Time on this Matter

Modest restrictions have begun to ease in some parts of California. It is unclear when or even to what extent this will occur in Los Angeles. With almost half of the

state's infections and deaths,[24] Los Angeles is expected to lag far behind the rest of the state in terms of reopening.[25] Even when some restrictions are lifted, it is safe to assume that the defense investigation will be slow and laborious as the defense tries do its job while maintaining social distancing requirements.

What's more, the Olivas matter is not the only case that defense counsel must handle once the restrictions are lifted. In addition to Olivas's case, defense counsel[26] is preparing for trials in the following cases:

| Date | Case Information |
| --- | --- |
| Jun. 23, 2020 | United States v. Steven Corricelli, CR 19-365-RGK (custody) |
| Jul. 7, 2020 | United States v. Lee Anthony, 5:18-cr-00146-FMO (custody) |
| Jul. 14, 2020 | United States v Joseph Anthony Castro, CR 18-507-AB |
| Jul. 21, 2020 | United States v. Christopher Juarez, ED CR 19-286-JGB (custody) |
| Jul. 21, 2020 | United States v. Frank Power CR 20-15-FMO |
| Jul. 28, 2020 | United States v. Charles Kertesz, ED CR 20-12-JGB (custody) |
| Aug. 4, 2020 | United States v. Mark Domingo, CR 19-313-SVW |
| Aug. 18, 2020 | United States v. Jeffrey Langford  CR 18-195-GW |
| Sep. 8, 2020 | United States v. Roger Harris, CR 18-306-PSG |
| Sep. 29, 2020 | United States v David Solano CR 19-103-FMO |
| Oct. 20, 2020 | United States v Matthew Gatrel CR 19-36-JAK |

Finally, Olivas has no incentive to seek the continuance as a delaying tactic. Like the complaining witnesses, Olivas wants his day in court. His only motive is to obtain the time necessary to prepare his defense. Therefore, because the defense has

---

[24] Coronavirus: California surpasses 62,000 cases, records 83 new deaths. https://www.mercurynews.com/2020/05/08/coronavirus-california-surpasses-62000-cases-records-83-new-deaths/

[25] https://www.latimes.com/california/story/2020-05-07/reopening-california-coronavirus-stay-home-rules-los-angeles-bay-area.

[26] The cases are listed for both counsel of record assigned to Olivas's defense.

been diligent in carrying out its obligation to investigate the case, this factor weighs in favor of a continuance.

## II. The Requested Continuance Would Serve a Useful Purpose By Allowing Olivas to Present Evidence in His Defense

A continuance is useful "if it would permit the [defendant] to introduce evidence relevant to the issue at hand." *accord United States v. Mejia*, 69 F.3d 309, 315 (9th Cir. 1995). Nothing more is required. *United States v. Pope*, 841 F.2d 954, 957 (9th Cir.1988) (noting that Flynt required showing that "testimony would be relevant" and that "[n]othing more should be required" to demonstrate usefulness of continuance). *United States v. Mejia*, 69 F.3d 309, 315 (9th Cir. 1995).

In this case, a four-month continuance would be useful. As set forth in the declaration, the evidence the defense seeks through its investigation is relevant to the issues in this case.

## III. Any Inconvenience to the Alleged Victims Would Result, Not From a Continuance, But From the Trial Process Itself.

It is difficult to imagine how a four-month continuance (as opposed to a two-month continuance, which is the most the Government is willing to accept) would be disruptive to the alleged victims in this case. This is particularly so in the case of N.B., where the state filed criminal charges based upon related allegations she made against Olivas back in 2015. He was convicted and sentenced to 4 years in prison.

## IV. Olivas Will Be Prejudiced By the Denial of the Continuance.

Where, as here, the defense does not seek a continuance to obtain discovery from the Government, the prejudice standard is "less stringent." *Mejia*, 69 F.3d at 318 n. 11 (rejecting the "actual and substantial prejudice" requirement applied to denials of continuances in civil matters where discovery remains outstanding). The defense need only show that the "right to present his defense has been affected." *United States v. Kloehn*, 620 F.3d 1122, 1128 (9th Cir. 2010).

11

A survey of Ninth Circuit decisions illustrates just how low the prejudice threshold is. For example, in *United States v. Rivera-Guerrero*, 426 F.3d 1130, 1142-43 (9th Cir. 2005), the Ninth Circuit found prejudice when the denial of the continuance denied the defendant the opportunity to contact and then, potentially, present expert witness testimony about the effect of proposed medications on the defendant's competency. The defendant did not have to produce evidence of what the experts would have testified about to demonstrate prejudice.

In contrast, in *United States v. Mitchell*, 744 F.2d 701, 705 (9th Cir. 1984), the defendant had made no showing whatsoever of why a continuance was warranted and, consequently, the denial of the continuance was affirmed. Similarly, in *United States v. de Cruz*, 82 F.3d 861, 861 (9th Cir. 1996), the defendant referenced only a single new disclosure (reports from the Department of Labor) that had been produced in the days before trial, and simply asserted that more time was needed to review the reports. The Ninth Circuit found the defendant's general claim of prejudice insufficient. *Id*.

Finally, in *United States v. Kloehn*, 620 F.3d 1122 (9th Cir. 2010), the trial court denied a continuance, which had been requested so that the defendant could visit his son on his deathbed. After the continuance was denied, the defendant testified as scheduled; thereafter, he waived his appearance at trial to attend to his son, who indeed died. The Ninth Circuit reversed, in part, because it recognized that the defendant's demeanor on the stand was a critical factor in the jury's evaluation of that testimony and the Court found it "self-evident that an individual's demeanor would be affected by the knowledge that his son was on the brink of death." *Id*. at 1128-29.

In the *in camera* declaration, counsel thoroughly explains how the denial of the continuance will hinder Olivas's defense. When juxtaposed with these Ninth Circuit cases, the defense easily demonstrates prejudice.

In sum, given the unprecedented nature of the pandemic, and the severe penalties that Olivas faces if convicted at trial, a modest four-month continuance is appropriate and no more than adequate to accommodate the defendant's right to prepare for tria

## V. Courts Have Granted Continuances Based Upon the Defendant's Inability to Prepare for Trial

The current pandemic, like natural disaster or other emergency, grants this Court the discretion to order an ends-of-justice continuance. "Although the drafters of the Speedy Trial Act did not provide a particular exclusion of time for such public emergencies (no doubt failing to contemplate, in the more innocent days of 1974, that emergencies such as this would ever occur), the discretionary interests-of-justice exclusion" certainly covers this situation. *United States v. Correa*, 182 F. Supp. 326, 329 (S.D.N.Y. 2001) (addressing September 11 attacks); *see Furlow v. United States*, 644 F.2d 764, 767-69 (9th Cir. 1981) (affirming Speedy Trial exclusion after eruption of Mount St. Helens); *accord United States v. Stallings*, 701 F. App'x 161, 170-71 (3d Cir. 2017) (same, after prosecutor had "family emergency"); *United States v. Hale*, 685 F.3d 522, 533-36 (5th Cir. 2012) (same, where case agent had "catastrophic family medical emergency"); *United States v. Scott*, 245 F. App'x 391, 394 (5th Cir. 2007) (same, after Hurricane Katrina); *United States v. Richman*, 600 F.2d 286, 292, 293-94 (1st Cir. 1979) (same, after a "paralyzing blizzard" and the informant was hospitalized). The pandemic, like natural disaster or other emergency, justifies an ends-of-justice continuance.

Perhaps not surprisingly, numerous courts have granted to continuances based upon the unprecedented pandemic. The basis for these continuances solely due to the difficulty of conducting the trial in the current circumstances. As one court aptly noted, "[i]will be difficult to avoid personal contact should the trial proceed as planned, particularly with respect to preparing for said trial as that would necessitate in-person witness interviews and preparation." *United States v. Crownover*, No. 19-CR-00018-DAD, 2020 WL 1816068, at *2 (E.D. Cal. Apr. 10, 2020).

Given the unique circumstances that confronts the defense, it is entirely reasonable, indeed, responsible for the defense to seek a continuance, not only to protect members of the defense team but potential witnesses.

13

## **CONCLUSION**

For all of the foregoing reasons, Olivas respectfully requests that the Court grant a continuance until October 27, 2020 or such later date appropriate for the Court and the parties.

Respectfully submitted,

AMY KARLIN
Acting Federal Public Defender

DATED: May 11, 2020          By  */s/ Craig A. Harbaugh*
                                                    CRAIG A. HARBAUGH
                                                    Deputy Federal Public Defender