EXHIBIT 1

# PARK DIETZ & ASSOCIATES, INC.

Forensic Consultants in Medicine and the Behavioral Sciences

**Janine Shelby, Ph.D.**

**Administrative Offices**

| | |
|---|---|
| Case Name: | United States of America v. Olivas |
| Case Number: | ED CR18-00231-JGB |
| Date of Report: | 10/13/2019 |
| Forensic Expert: | Janine Shelby, Ph.D. |

## I.   Purpose, Scope, and Parameters of Report

This report is written to opine upon topics related to intimate partner violence (IPV), sexual assault/rape, posttraumatic stress and related disorders, and typical behaviors and psychological patterns of both individuals who perpetrate IPV and their victims. This report was generated pursuant to the United States of America indictment against John Jacob Olivas and was written at the request of the U.S. Attorney's Office, Central District of California. This report does not constitute an independent mental examination (IME). Because I did not conduct an examination of the parties in this case, I did not draw diagnostic conclusions about these individuals. Rather, in this report I will address overarching issues related to IPV and discuss the Defendant's and Victims' reported behaviors as they pertain to known IPV characteristics and behavioral patterns.

The opinions and conclusions contained within this report are based on data available to me at this time. I reserve the right to supplement this opinion and alter the information, conclusions, or findings of this report, including via a future, rebuttal report.

## II.   Biographical Summary

I am a trauma psychologist, with expertise derived from a career dedicated to the study, assessment, and treatment of trauma survivors. I am an Associate Clinical Professor in the School of Medicine at UCLA and a part-time faculty member at California State University, Long Beach. Recently, I was honored to serve as the 2017-2018 Drake Guest Professor and Distinguished Fellow at Kobe College in Hyogo, Japan. In addition to my trauma-focused academic, supervisorial, and clinical employment, I work as a forensic consultant and expert witness, primarily in areas related to psychological trauma. In former professional roles I served

00100749

as the Clinical Director of the Santa Monica-UCLA Rape Treatment Center, the Director of Training and Lead Forensic Interviewer in the child advocacy service at Harbor-UCLA Medical Center, and the Founder/Director of Harbor-UCLA's Child Trauma Clinic. At Harbor-UCLA, I taught and supervised psychology and psychiatry trainees in trauma-focused diagnosis and treatment. In my 50 peer-reviewed presentations and publications, as well as in more than 30 additional publications, my work has focused on research-based approaches to clinical care of trauma survivors. Following my doctorate from the University of Miami in Coral Gables, Florida, I completed a post-doctoral fellowship in Child and Adolescent Psychology through the Division of Child and Adolescent Psychiatry at Harbor-UCLA Medical Center. I have been licensed in the state of California since 1997, and I am a trained child abuse forensic interviewer, a Registered Play Therapist-Supervisor, and certified in the practice/supervision of several evidence-based treatments for trauma survivors.

See also the attached c.v.

## III.   Data Sources

A. Indictment (8/1/2018)

B. Transcripts, Interviews, and Conversations

1. N████ B████ transcript (10/31/2013)
2. Transcript of conversation between Detective Tutwiler and Ms. B████ (12/19/2013)
3. Transcript of recorded conversation between Special Agent Olivas and Detective Tutwiler (11/20/2013)
4. Transcript of Special Agent Staab's recorded conversation with K████ L████ (9/16/2014)
5. Interview between Detective Bob Isaac, Detective Ken Tutwiler, and N████ B████ (10/31/2013) - audio
6. Transcript of conversation between Detective Ken Tutwiler and John Olivas (11/20/2013)
7. Interview between Detective Isaac and N████ B████ (11/19/2013) - audio
8. Transcript of interview of N████ B████ with SA David Staab, AUSA Jay Robinson, and ICE OPR SSA Troy Jacobs (8/11/2014)
9. Transcript of interview SA David Staab, SA Fred Grimm, Salinas Flores and John Olivas (07/20/2016)
10. Transcript of interview with N████ B████ by Detective Bob Isaac and Detective Kurt Tutwiler (11/07/2013)
11. Transcript of call/interview between Ms. D████ B████r, Ms. N████ B████, and Detective Tutwiler (11/12/2013)
12. Interviews of R████ O████ and John Olivas by Detective Ken Tutwiler (12/17/2013) - audio
13. Interview of K████ L████ by SA David Staab and Troy Jacobs (09/09/2014) - audio
14. Interview of K████ L████ by SA David Staab and SA C.J. Sanders (8/12/2016) - audio

15. Interview of Ms. R████ A██ (09/17/2014; 10/13/2014) - audio
16. Interview of C███ B██ (11/05/2013) - audio
17. Interview of D██ and N██ B███ (11/12/2013) - audio
18. "B███ Interviews" (10/31/2013, 11/07/2013, 11/19/2013, 11/20/2013, 12/19/2013, 08/11/2014) - audio
19. Olivas Custody Interviews (08/15/2018) - audio-video
20. M███ H███ Interview (10/04/2017) - audio
21. Ms. C███ R████ Interview (02/05/2015) - audio
22. John Jacob Olivas Interviews (11/20/2013; 07/26/2016) - audio
23. K█████ L██████ Interviews (09/09/2014, 09/16/2014, 09/22/2014, 11/20/2014, 08/12/2016) - audio
24. J███ O██ interview (11/08/2013) - audio
25. J██ and R██ O██ interview (11/20/2013) - audio

C. 911 Call transcript from Ms. B███'s call (10/18/2012)
D. Medical Records
   1. N██ B██'s records from Riverside Medical Clinic, ████████, DO (11/8/12)
   2. N██ B██'s records from Riverside Medical Clinic, ████████, MD and/or ████████, DO (11/15/12)
E. B██r videos (2012-2013)
F. B████ iPhone extraction report
G. References
   1. Ahrens, C. & Mechanic, M. (2013). *Cultural influences on women's experiences of intimate partner violence*. Grant 2013-MU-CX-0038. National Institute of Justice.
   2. American Psychiatric Association. (2013). *Diagnostic and statistical manual of mental disorders* (5th ed.). Arlington, VA: Author.
   3. Black, M. C., Basile, K. C., Breiding, M. J., Smith, S .G., Walters, M. L., Merrick, M. T., … Stevens, M. R. (2011). *The National intimate partner and sexual violence survey: 2010 summary report*. Retrieved from the Centers for Disease Control and Prevention, National Center for Injury Prevention and Control: http://www.cdc.gov/ViolencePrevention/pdf/NISVS_Report2010-a.pdf
   4. Breiding, M.J., Chen J., & Black, M.C. (2014). *Intimate partner violence in the United States — 2010*. Atlanta, GA: National Center for Injury Prevention and Control, Centers for Disease Control and Prevention.
   5. Creamer, M., Burgess, P., & McFarlane, A.C. (2001). Post-traumatic stress disorder: findings from the Australian National Survey of Mental Health and Well-being. *Psychological Medicine*, *31(7)*, 1237-1247.
   6. Heise, L., Ellsberg, M., & Gottemoeller, M.(1999). *Ending violence against women*. Baltimore, MD: Johns Hopkins University School of Public Health, Center for Communications Programs.

7. James, L., Brody, D., & Hamilton, Z. (2013). Risk factors for domestic violence during pregnancy: A meta-analytic review. *Violence and Victims, 28*(3), 359-380. doi:http://dx.doi.org/10.1891/0886-6708.VV-D-12-00034

8. Logan, T. K., Shannon, L. & Walker, R. (2005). Protective orders in rural and urban areas: A multiple perspective study. *Violence Against Women, 11(7)*, 876–911. doi:10.1177/1077801205276985

9. National Institute of Justice (October, 2007) *Overview of intimate partner violence*. http://nij.ojp.gov/topics/articles/overview-intimate-partner-violence

10. Bureau of Justice Statistics. Washington, DC: Office of Justice. https://www.bjs.gov/

11. Shelby, J.S. (1998*). Secondary stress among sexual assault survivors: Interactions with law enforcement personnel.*  Poster session presented at the Annual meeting of the International Society for Traumatic Stress Studies, Washington, D.C.

12. Smith, S.G., Zhang, X., Basile, K.C., Merrick, M.T., Wang, J., Kresnow, M., & Chen, J. (2018) *The national intimate partner and sexual violence survey (NISVS): 2015 data brief – updated release*. Atlanta, GA: National Center for Injury Prevention and Control, Centers for Disease Control and Prevention.

13. Tjaden, P., & Thoennes, N. (November, 2000*). Full Report of the Prevalence, Incidence, and Consequences of Violence Against Women: Findings from the National Violence Against Women Survey. Research Report*. Washington, DC, and Atlanta, GA: U.S. Department of Justice, National Institute of Justice, and U.S. Department of Health and Human Services, Centers for Disease Control and Prevention. NCJ 18378.

14. World Health Organization (2012). *Understanding and addressing violence against women: Intimate partner violence*. Geneva, Switzerland: World Health Organization. Retrieved from https://apps.who.int/iris/bitstream/handle/10665/77432/WHO_RHR_12.36_eng.pdf;jsessionid=F7DB9F5C7823290A1EB275F6B3C69B67?sequence=1

## IV.    Summary of Indictment

According to the Indictment, Defendant John Jacob Olivas attempted to engage in vaginal intercourse with K▇▇▇▇ L▇▇▇▇▇ without her consent and by using force against her in or about January of 2012. The Indictment also indicates that Mr. Olivas engaged in vaginal intercourse with N▇▇▇ B▇▇ without her consent and by using force against her, in or about September and November of 2012. The indictment further states that The Defendant used his position as a federal law enforcement officer to communicate to Ms. L▇▇▇▇▇ and Ms. B▇▇ that other law enforcement officers would not be responsive to any reports they might make about his behavior.

## V.      Opinion

Historically, violence against women has not always been considered a criminal justice concern. Instead, it has historically been regarded as a family matter, best dealt with privately (Starheim, 2019). However, during the last five decades, societal views of violence against women and children have shifted, leading to both changes in the criminal justice system and broader recognition of this issue as a significant public health and safety concern. Greater awareness of this issue has promoted research and intervention efforts, which have advanced understanding of the factors related to violence perpetrated by an intimate partner or spouse.

Intimate Partner Violence (IPV), also referred to as domestic violence, partner abuse, dating violence, and interpersonal violence, is defined by the Centers for Disease Control and Prevention (CDC) as physical, sexual, and psychological harm inflicted by a current or former partner. According to the National Institute of Justice, IPV includes physical and sexual violence, as well as threats of physical or sexual violence. The World Health Organization (WHO) defines IPV as any behavior within an intimate relationship that causes, "physical, psychological or sexual harm to those in the relationship." It may be difficult for some to understand how sexual violence can occur within a relationship where consent for sexual activity has been given in the past. Yet, individuals always retain their right to determine whether and how to engage in sexual activity, irrespective of past sexual decisions, behaviors, and partners. That is, a person never forfeits the right to determine whether or not to engage in sexual activity. A persistent myth is that sexual violence within a relationship is less damaging than sexual assault perpetrated by a stranger. In fact, intimate partner sexual violence may evoke a particularly painful form of betrayal, given that the perpetrator of the sexual assault is often someone loved and trusted by the victim. In addition to acts of physical or sexual violence, IPV can entail psychological or emotional aggression (e.g., name-calling or behaviors designed to humiliate the victim), controlling behaviors (e.g., isolating the victim from social support, monitoring the victim's movements or denying access to resources), or coercive tactics (e.g., psychological pressure through methods such as wearing the victim down, making untrue promises, threatening to end a relationship, spreading rumors, or sexual pressure due through influence or authority [Smith et al., 2018]). Many definitions of IPV specifically include stalking, being compelled to engage in sexual acts with others, and being denied control over reproductive health issues. For example, in their widely cited national survey for the CDC, Breiding, Chen, and Black (2014) identified the following forms of intimate partner violence: physical violence, sexual violence, stalking, expressive aggression, coercive control, and control of reproductive or sexual health.

In terms of IPV frequency, a large national survey revealed that more than 1 in 3 (36%) women experienced contact sexual violence, physical violence, and/or stalking by an intimate partner during their lifetimes (Smith et al., 2018). Regarding specific subtypes of intimate partner violence, Smith and colleagues found that about 18% of women experienced contact sexual violence, 30% experienced physical violence, 21% experienced severe physical violence, and

10% experienced stalking during their lifetimes. During the 12 months prior to the survey, an estimated 1 in 18 (6%) of women in the U.S. experienced contact sexual violence, physical violence, and/or stalking by an intimate partner, and more than one-third of women (36%) experienced psychological aggression by an intimate partner. In another large survey, Breiding et al. (2014) found that more than 1 in 7 women (14.8%) and 1 in 25 men (4.0%) in the United States had experienced rape, physical violence, or stalking by an intimate partner. The victims reported at least one injury related to these incidents. Lifetime prevalence of rape-related IPV was found to be high, with almost 1 in 10 women reporting they had been raped by an intimate partner during their lifetimes. Approximately 1 in 6 women said they experienced sexual violence other than rape; approximately 1 in 4 reported experiencing severe physical violence; nearly 1 in 3 disclosed they had been slapped, pushed, or shoved; and almost 1 in 2 women said they had experienced psychological aggression in their intimate relationships. Ahrens and Mechanic (2013) found much higher rates of psychological aggression, with almost all IPV victims in their study endorsing that their perpetrators had used some form of psychological aggression.

### A. Common responses, reactions, and behaviors of sexual assault and interpersonal violence victims

*These include testimony about the reasons why many victims do not report sexual assault or interpersonal violence (e.g., fear they will not be believed by authorities, their families, or their friends; fear of retaliation; desire to avoid stigmatization as a sexual assault or domestic violence survivor; reluctance to face public scrutiny; desire to avoid distress from acknowledging the reality of the abuse) as well as similar reasons why victims often delay reporting, report in a piecemeal fashion, or never report these crimes. These responses include internally and externally derived fears, such as fear of unwanted or frightening emotional repercussions, as well as fear of physical or emotional retaliation by the abuser.*

The responses of IPV victims are complex; they are related to and occur within several contexts at once. Some victim responses are influenced by factors specific to each individual (e.g., the victim's history, psychological status, coping repertoire, attitudes and beliefs, and other characteristics). Other responses are influenced by factors related to the perpetrator (e.g., level and type of aggression, strategies used to inflict abuse, and power differential). Victim reactions are also related to specific aspects of the victimization experience(s) (i.e., peritraumatic factors associated with the specific characteristics of each abusive episode, such as whether the victim believes she/he or others will die). Beyond these contexts, victims' responses also involve variables related to their socio-cultural environments, including familial relationships and beliefs, cultural issues, religious ideology, and broader community attitudes, including the acceptance of, reactions to, and resources available for IPV. All of these factors influence the ways in which victims respond. Developmental factors that affect both perpetrator and victim responses (e.g., formative experiences and exposure to IPV) will be discussed in section B of this report,

Environmental, Historical, and Mental Health Influences on Victims' Responses. Issues related to disclosure and reporting are addressed in section E, Delayed, Piecemeal, and Non-Reporting. Although there are no single or universal responses to IPV, there are common reactions and sequelae. Below, I will describe several common ways in which IPV survivors react during and following IPV. Among the most prevalent initial response patterns is to "shelter in place" or remain involved with the perpetrator until a certain threshold is reached or the victim loses hope that the perpetrator will change. During this period, many victims refrain from disclosure to authorities.

As discussed in later sections of this report, a victim's history, psychological status, coping repertoire, attitudes and beliefs, and other individual characteristics influence her/his responses and reactions to IPV. The role of childhood exposure to violence is particularly potent in forming a victim's expectations regarding intra-relationship violence. That is, a victim who was exposed to parental IPV as a child may view violence as a normal element of relationships. Mental health symptoms can also impair a victim's ability to assess and leave abusive relationships. These symptoms, combined with psychological, physical, and sexual abuse, can overburden survivors' coping resources. Particularly when the victims' coping resources were modest or underdeveloped prior to the IPV, abuse-related stressors and emotions can leave many victims feeling overwhelmed and confused. Further, it can be cognitively taxing to try to understand why a beloved and trusted partner is behaving abusively, and victims may become preoccupied with trying to make sense of the seemingly irrational violence, control, and humiliation they endure. Moreover, many victims expend their cognitive resources trying to manage or conceal their distress from the perpetrator or from others. As a result, it is common for victims, absorbed in managing their ongoing state of crisis, to have few psychological or cognitive resources left to assess, plan, and fully navigate their options to escape the violence. Substance use often compounds this difficulty.

In terms of general response patterns, most victims experiment with a variety of strategies to manage or reduce abusive incidents or the severity of the aggression. In doing so, they typically develop responses tailored to the perpetrator's behaviors, demands, and abuse cycles. Strategies such as placating or "cooperating" are commonly used by victims who believe these methods offer the best likelihood of survival and/or the least physical or psychological impact. Many survivors' reactions are guided by their fear of retaliation, which may have been explicitly or implicitly communicated. Threats to "take away" children or harm family members pose real dangers in the minds of victims who are already terrified by their perpetrators. Furthermore, many victims have been groomed by perpetrators to expect and accept control over their bodies, decisions, and futures. As a result, victims may believe they have little agency to leave their relationships. For some, the experience of IPV is so traumatic, victims use pronounced avoidance strategies to try to prevent themselves from thinking of or recalling incidents of the IPV. These victims may avoid acknowledging the reality of the abuse to themselves, as well as to others. Additional victim responses, such as those specifically related to

perpetrator characteristics and methods of control/aggression, are discussed later in sections H and I of this report.

In addition to the ongoing stressors and stress reactions they experience, many victims develop posttraumatic stress disorder (PTSD), other trauma-related disorders, or symptoms of these disorders. PTSD is diagnosed when people develop a particular constellation of symptoms that cause clinically significant distress and/or impairment in important areas of functioning after their exposure to a qualifying traumatic stressor. Sexual violence is specifically identified in the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM 5; 2013) as a qualifying traumatic stressor. Symptoms for adults and children older than six years of age include intrusive re-experiencing of the stressor, persistent avoidance of stimuli associated with the event, negative alterations in thoughts or mood, and physiological changes. Symptoms may be particularly severe or long-lasting when the stressor is interpersonal and intentional. Although not all trauma survivors develop PTSD, some traumatic experiences are known to result in higher rates of PTSD (e.g., rape, military combat and captivity, and ethnically or politically motivated internment and genocide). Some common predictive variables for increased PTSD symptoms include the following: trauma of greater magnitude, perception of life threat, personal injury, interpersonal violence, and war-related exposure to atrocities. In several studies, women who experienced rape, physical violence, or stalking by an intimate partner reported fearfulness and a majority had at least one PTSD symptom (e.g., Ahrens & Mechanic, 2013; Black et al., 2011; Breiding, et al., 2014). One study found that 81% of women developed PTSD and related symptom(s) following sexual violence (Black et al., 2011). In addition, there is well-known comorbidity between trauma exposure and depression symptoms among sexual assault survivors. Further, victims with chronic traumatic event exposure, particularly when the adverse events began in childhood and involved interpersonal violence, may suffer other long-term effects. These include but are not limited to symptoms of borderline personality disorder, which is characterized by difficulty tolerating distress, regulating affect, maladaptive interpersonal relationship patterns, self-harm behaviors, and other symptoms. Individuals with these and other mental disorders may find it particularly difficult to detect the detrimental aspects of their relationships, recognize that they are entitled to psychological and physical safety, use healthy coping behaviors, feel empowered to enact change, and make changes important to their safety.

During traumatic incidents, the body's response to stress is altered in several ways. For example, the hypothalamic-pituitary-adrenal (HPA) axis becomes dysregulated, which results in neural, endocrine, and immune system changes. Cortisol, a stress hormone, is released. Although survivors may immediately feel an increased ability to fight or flee, cortisol dysregulation can also result in initial responses that cause a victim to have a "freeze" response (i.e., tonic immobility), in which they feel numb and/or unable to move. Unfortunately, this leaves them even more vulnerable during victimization experiences. Further, victims commonly find that it is difficult to cognitively process what is occurring as it is occurring.

Community and cultural factors often impact victims' beliefs and behaviors. Relatively few victims of IPV immediately report the abuse to authorities. Many victims' life experiences have promoted the false idea that they deserve to be maltreated or that violence and/or psychological abuse is part of all relationships. Some also fear they will not be believed by authorities or their families/friends, or that they will be blamed for the abuse perpetrated on them. Particularly in families, cultures, or communities with a high degree of IPV-supportive beliefs, victims often avoid disclosing IPV to prevent the stigmatization they anticipate. Some victims may feel so horrified by the humiliation they feel, they conclude it is easier to either hide the IPV from others or minimize it to themselves. For these and many other reasons, it is common for victims to delay disclosure or reporting, or report in a piecemeal fashion. As they process the overwhelming experience, build psychological tolerance to the violence they endured, and develop trust in others' responses, victims commonly supplement their disclosures with additional experiences or elements of their narratives. It is noteworthy that many victims never report these crimes.

**B. The influence of mental health, culture, knowledge of rights/education, as well as childhood, familial, personal, and prior relationship experiences on how victims respond to sexual assault and traumatic events**

*These may include, but will not be limited to, testimony that some cultural/subcultural experiences can lead to victims' silence, responses that appear to be passive, or behaviors that seem supportive toward those to whom the victim has made a commitment; sometimes individuals with less knowledge, education, or less familiarity with healthy relationships and/or their entitlement to relationships free from abuse are less likely to report abuse/assault; and that prior childhood, familial, personal, or interpersonal relationship experiences, such as being disbelieved when reporting abusive experiences, being or seeing others ostracized, shamed, or stigmatized following abusive experiences/disclosures, or expecting abuse as an inevitable part of a relationship may lead individuals to abstain from reporting, delay reporting, minimize information in reports, engage in piecemeal reporting patterns, and/or continue interactions with their abusers.*

Several variables have been found to correlate with increased risk for IPV, such as female gender, younger age, non-white race, lower socioeconomic status, lower educational level, sexual orientation, and immigration status, as well as history of traumatic event exposure and mental health concerns. These variables not only influence risk for IPV, but can shape response styles following IPV.

1.    Cultural Factors

Victims' responses and reactions to IPV are often affected by cultural beliefs and values, such as the acceptance of violence in intimate relationships, interpretation that the perpetrators' controlling behaviors are demonstrations of love, male-dominance ideologies, or sense that men are entitled to behave aggressively in intimate relationships. The term, *rape culture,* has been used to refer to a specific variant of culture-related influence on interpersonal aggression, as follows:

> "a set of values and customs that minimize the impact of rape, that limit the definition of rape, and that relegate women to the status of sex objects whose only value is to serve men sexually. Fundamental to the concept of a rape culture is the belief that rape is, in fact, very uncommon and that in most cases of 'actual rape' the victim deserves it. In rape culture, women are blamed for being raped regardless of the circumstances" (James, Brody, & Hamilton, 2013, p. 33).

When victims grew up or live in communities with strong rape cultures, it is easy for them to retain or adopt similar ideas. They may have observed or encountered victims in their communities who were disbelieved, blamed, humiliated, ostracized, and marginalized for experiences perpetrated on them. When these observers become victims themselves, they may assess that their community's response to their plight would be so punitive or damaging that they would fare better by remaining in their violent relationships. Thus, some victims may find little incentive to disclose IPV and believe there is little community support for doing so.

According to the WHO, norms and beliefs that support violence against women include the belief that men are socially superior to and have power over women, men have the right to physically discipline women for 'incorrect' behavior, violence is an acceptable conflict resolution strategy, sexual intercourse is a man's right in marriage, women should tolerate violence in order to keep their families together, a woman deserves to be beaten, sexual activity (including rape) is a marker of masculinity, and women are responsible for controlling a man's sexual urges. Cultural beliefs and attitudes related to increased risk for IPV also include stigmatization, blame, marginalization of victims, or other viewpoints that assign shame to the victims rather than the perpetrators and/or seek to preserve marriages despite IPV. In one study funded by the National Institute of Justice (Ahrens & Mechanic, 2013), IPV victims from Mexican, Korean, Vietnamese, and European heritage groups were surveyed. They reported that their interpretation of the IPV they experienced was highly influenced by cultural values. Specifically, they reported that taboos toward disclosure, acceptance of violence, belief in victim responsibility for the IPV, gender roles, and maintaining marriage/avoiding divorce were cultural values that highly influenced the way they thought of their victimization experiences. Moderate-level influences were reported for the variables, prioritization of others [over self] and respect for privacy. The victims of Latino heritage

reported that the responses they received from others were influenced by the following: disclosure taboos, acceptance of violence, belief in victims' responsibility for the violence, maintaining marriage/avoidance of divorce, and gender roles. European-heritage participants reported similar influences but with somewhat greater emphasis placed on marriage maintenance/divorce avoidance and respect for privacy. More moderate level cultural influences were reported for both groups related to prioritization of others and respect for privacy. Survivors also responded to questions about cultural influences on their decision to remain in their abusive relationships. Those of Mexican heritage reported loneliness, lack of support, and embarrassment as the top three barriers to leaving, whereas those of European heritage reported embarrassment, loneliness, and issues related to their children as top barriers.

Some religious victims may feel ensnared between the violence they are experiencing and religious traditions, religious values, or congregation members' expectations that discourage divorce and/or expect women to submit to their husbands' will. When these victims directly or indirectly seek guidance, victims may be told that family preservation should be valued above their own well-being or that leaving the relationship is inconsistent with religious doctrine.

2.      Relationship and Familial Factors

Victims' reactions to current episodes of IPV are often influenced by familial factors, both related to victims' experiences in their families of origin and their current familial interactions. Direct or vicarious victimization experiences during childhood can impact victims' current reactions to violence, both by increasing acceptance/normalization of aggression and producing trauma response triggers that may interfere with their self-protective capacities. Other research has consistently found that a history of childhood exposure to IPV has a weak- to moderate-relationship with involvement in a violent marital relationship. Apart from early childhood experiences, victims often experience concerns related to their current family members. A commonly reported concern is loss of access to their children or concern that ending the relationship would negatively impact the children. Other commonly reported fears involve loss of financial security, or disapproval/blame by extended family members.

When victims experience emotional neglect or unmet emotional needs during their childhoods, their yearning for a relationship may be so great it supersedes the quality and safety of the relationship. For example, Ahrens and Mechanic's survey revealed that one of victims' primary reasons for remaining in abusive relationships was fear of loneliness.

3.      Psychological Health

Mental health status influences victims' responses to IPV in both direct and indirect ways. Depression, anxiety, and/or PTSD have been widely found to be strong correlates for IPV victimization. Victims with depression-related disorders or symptoms may have difficulty concentrating, feel hopelessness about future possibilities, and lack the energy needed to take active steps to leave the relationship. Other symptoms of depression involve low self-esteem or a sense of worthlessness, which can be exacerbated by the messages they often receive from their perpetrators. Victims with anxiety symptoms may experience heightened or disabling fears that increase the anxiety they already feel in  their abusive environments. Thus, individuals with anxiety disorders may have an extra layer of difficulty taking steps to disclose victimization experiences, reporting victimization experiences to law enforcement, or ending their relationships with their perpetrators. Survivors with PTSD and other trauma-related disorders may respond to recurrent violence with intense distress and fear, by "freezing" or dissociating, or by avoiding thoughts of their victimization experiences in ways that disrupt safety and help-seeking behaviors. Although victims are not at fault for the violence they endure, these and other mental health issues make victims less able to take steps towards self-protective actions and may indirectly contribute to a relationship climate where violence can continue and escalate.  For all of these and other reasons, some victim responses may appear passive, minimizing, or supportive of the perpetrator/relationship with the perpetrator.

It is common for victims to remain silent about IPV or disclose in a partial, incomplete, or minimized manner. Individuals with less knowledge, education, or exposure to healthy relationships may face additional disadvantages in their ability to weigh options and assess the global level of dysfunction in their relationships. Particularly when victims hold beliefs that IPV is inevitable/acceptable or reporting would result in others' disbelief, victims are less likely to take steps to disclose IPV. Some victims fear that disclosing the abuse will lead to worsening of abuse or danger to others, rather than an increase in safety. So, these help-seeking behaviors do not appear to be viable courses of action to some victims. Finally, cultural norms such as ostracizing, shaming, blaming, or stigmatizing victims, as well as acceptance of IPV and male dominance ideologies, promote secrecy and may lead individuals to abstain from reporting, delay reporting, minimize information in reports, engage in piecemeal reporting patterns, and/or continue interactions with their abusers.

**C. The roles that power imbalances and control dynamics in interpersonal relationships play in how victims may respond to sexual assault and interpersonal violence**

*These may include, but will not be limited to, testimony that victims with power deficits relative to their partners in a relationship--whether it be due to significant*

*discrepancies in financial stability, social power,  physical power, mental health, or education/knowledge--may continue to interact with their abusers.*

Power imbalances in intimate partner relationships create an atmosphere that is conducive to the misuse of power. These imbalances include systemic patriarchal social structures that promote male domination over women, as well as other types of imbalance, such as discrepancies in education, social status, access to economic resources, physical strength/size, differences related to status as an authority figure, and other variables. When the power differentials are intense and rigid, conflicts are often resolved based upon the preferences of the person with a greater degree of power. Thus, the victim must exist in an intrarelationship "system of justice" whereby the person wielding power determines codes of behavior and adjudicates justice, with little oversight or accountability. For example, during her interviews Ms. B████ reported several examples of how the imbalance of power in her relationship with Mr. Olivas contributed to her thoughts and behaviors, including the following:

- " I would try and call the police and he would take away, he'd snatch my cell phone out of my hand and he'd unplug our house phone and then he'd park his G ride behind me so I couldn't move.  So I had no way to call my family, no way to call 911, no way to do anything. Probably around 10 times… 10, 15 times.  And every time I did he'd grabbed his work phone and call Sector and identify himself as Alpha1294 and he would um ask for the watch commander to call his phone immediately from Riverside PD and then he'd hang up and his phone would ring and then he would ask who was on duty.  And then he would like hang up the phone and laugh and say, 'Go ahead and call them.  They're my friends. They're not gonna do shit'… Pretty much every time, yeah.  So I never could report anything because he would take my phone. He took my phone numerous times."

- "…he worked for the Department of Homeland Security. And that he was going to go into the computer and put in false criminal charges against me so that I could never be hired by any law enforcement agency…"

- "He told me that I could never file for domestic violence because he never hit me close fisted. So, that my case would never go anywhere anyways even if I were to come after him."

During her interview, Ms. L████████ also provided incidents in which Mr. Olivas reportedly misused his power, saying that he was "law enforcement [and] that they won't go after each other." She further reported that Mr. Olivas threatened to make her "lose your [Ms. L████████'s] kids in a heartbeat" and that he would have her arrested. Similarly, Ms. A████ offered examples illustrative of how the power imbalance between her and Mr. Olivas

worked to maintain her silence. Specifically, she reported that Mr. Olivas appeared to feign calls to a law enforcement agency to reduce the impact of any potential contact she might make with authorities. She further stated that Mr. Olivas asked her whether she knew "it was against the law for anyone to threaten me [Mr. Olivas]." During Ms. H▮▮▮▮▮'s interview, she described an occasion when she said she was going to call the police because Mr. Olivas was not letting her leave. Per her report, Mr. Olivas told her, "They won't believe you. I'll call the police right now for you." Ms. H▮▮▮▮ went on to state that he then pretended to place a call to "RPD," saying he was Special Agent Olivas and "if you get any phone calls regarding my house tonight, just disregard." Ms. H▮▮▮▮ said she later learned from Mr. Olivas that he had merely called his own house phone.  During her interview, Ms. H▮▮▮ reported that she avoided calling the police because "…I was intimidated by the fact that he was a Fed. I thought he had more pull…and I didn't think anyone would ever believe anything I had to say." Ms. H▮▮▮▮ further voiced her concern that "he was gonna switch it around," to seem like she rather than he had done something wrong.

## D.  The roles that stigma and sense of victim-related shame play in how sexual or interpersonal violence victims interact with their abusers

*These may include, but will not be limited to, testimony that fear of being labeled a victim leads some victims to continue to interact with their abusers, in attempt to avoid stigmatization and an overwhelming sense of shame. The testimony may further include explanations that the desire to avoid stigmatization and shame can provide an incentive for survivors to continue their interactions with abusers.*

As described earlier, many victims are sensitive to issues that may seem worse than or equally distressing to the physical or sexual violence perpetrated on them. For some victims, the scrutiny, rejection, or stigma they fear they will experience by their families or communities is so overwhelming, they rationalize that it is easier to remain with their abusive partners—often hoping to change or attempting to alter the perpetrator's behavior from within the relationship. According to Ahrens and Mechanic's survey, a prominent reason survivors reported remaining in IPV relationships was embarrassment about the abuse, which had near 75% endorsement by victims. Although it may be difficult for others to comprehend why embarrassment would trump safety, victims often have developmental and cultural reasons for this perspective. Many victims interpret the abuse perpetrated on them as aggression they caused or deserved. Although this is a misattribution, many victims— particularly those who learned during early childhood to blame themselves for abuse—may continue to believe that they are at fault for their own victimization and that by altering their behavior or tolerating greater levels of control by the perpetrators they can reduce abusive incidents. Many victims have an underdeveloped sense of self-worth, lack the belief that they are entitled to bodily integrity, and experience unhealthy relationship characteristics as familiar. They may be oriented toward others to get their needs met rather than finding

resources within themselves to satisfy their psychological needs. This may lead to situations in which victims have heightened motivation to appease their perpetrators and/or to appear acceptable in the eyes of others, lest they lose the approval they believe they need from others to maintain their delicate self-esteem. For these survivors, it can be intensely distressing and humiliating to disclose the violence they have endured. During her interview Ms. B█████ reported that she had wished to avoid others' reactions. She said, "I didn't want anyone to know. I didn't want to be looked at like a victim.  I didn't want people to feel pity for me. I didn't want anyone to know that he did that…"

### E. Reasons why a victim of sexual assault and interpersonal violence might delay or forego reporting or engage in selective reporting or piecemeal reporting over time

*The reasons may include, but will not be limited to, the following: fear of retaliation; belief that reporting will accomplish little to bring about safety; desire to avoid  stigma; few mental health resources to cope with the demands of reporting; intense distress when remembering abusive episodes/avoidance of trauma-related topics; dissociative coping responses that interfere with memory processes; other neurobiological responses to trauma; desire to re-interpret sexual assault as a consensual act to avoid facing the reality of the abusive nature of the relationship; fear of not being believed; belief that one cannot change one's circumstances but must merely endure them; and other reactions related to childhood, multiple, or extreme experiences of sexual assault/traumatic events.*

The idea that most victims of IPV immediately seek law enforcement or medical intervention and fully disclose the events related to their victimization is not supported by research evidence. In fact, only a minority of victims of IPV react in this manner. In the National Intimate Partner and Sexual Violence Survey (NIPSVS; Breiding et al., 2014) only 36.3% of female victims and 12.6% of male victims reported the incidents to police. Similarly, Ahrens and Mechanic's study revealed only a third of the women in the study had contacted law enforcement. Of those who reported, most did not do so immediately following abusive incidents. Sylaska and Edwards (2013) noted that disclosure can be helpful but may also lead to an increased sense of stigma, negative reactions (e.g., victim-blaming, pressure to leave, or minimizing the abuse), or fear of retaliation. As discussed in Section C of this report, issues related to stigma, culture or family disapproval/scrutiny may also play a role in precluding some victims from seeking law enforcement assistance. In terms of negative reactions, it is important to realize that reporting IPV to law enforcement authorities does not necessarily mean victims have positive experiences doing so. Sylaska and Edwards reported that 33.7% of female victims and 52% of male victims found disclosure to the police to be "not at all helpful," and Ahrens and Mechanic found that more than 66% endorsed having negative reactions from interactions with the legal system (though they also reported a similar rate of positive experiences). In my own study at a rape treatment center, victims' experiences with law enforcement remained fairly constant across twenty years of data, with

about a third of victims reported by their advocates to have negative experiences with law enforcement officers (Shelby, 1998). These negative experiences often involved officers' victim-blaming statements, expressed disbelief of victims' report of rape, questioning victims' behavior/choices, or insensitive interview methods. Also, victims may not understand why investigators are posing certain questions or may misunderstand the purpose of these questions. Victims commonly face barriers to seeking assistance from the legal system, including limited knowledge about protective orders, problems with system bureaucracy, perceptions that reporting will not help, and  gender role stereotypes in the criminal justice system. In one survey, rural IPV victims reported lack of resources, costs associated with the protective order process, concerns over confidentiality, and local politics in which law enforcement officers may be known to the perpetrator and/or victim (Logan et al., 2005). In addition to these issues, many victims fear retaliation from the perpetrator, who may have threatened them or their loved ones either directly or indirectly. Heise and colleagues (1999) contended that what might appear to be a victim's inaction may in fact be the result of a calculated assessment about how to protect herself and her children.

Reporting IPV to authorities does not ensure victims' safety. At times, perpetrators harm victims who report, attempt to report, or consider disclosure to authorities. Some victims who wish to report may face perpetrators' attempts to exert coercive control over victims to prevent reporting (e.g., threatening harm to others, threatening to reveal embarrassing information, convincing the victim that she is to blame, providing misinformation to victims about the legal system, or other methods). During their interviews, women formerly involved with Mr. Olivas reported several examples of attempts to thwart their efforts to contact authorities. For example, Ms. B███ disclosed the following:

> "I would try and call the police and he would take away, he'd snatch my cell phone out of my hand and he'd unplug our house phone and then he'd park his G ride behind me so I couldn't move.  So I had no way to call my family, no way to call 911, no way to do anything...Probably around 10 times…10, 15 times. And every time I did he'd grabbed his work phone and call Sector and identify himself as Alpha1294 and he would um ask for the watch commander to call his phone immediately from Riverside PD and then he'd hang up and his phone would ring and then he would ask who was on duty.  And then he would like hang up the phone and laugh and say, 'Go ahead and call them.  They're my friends. They're not gonna do shit'…Pretty much every time, yeah. So I never could report anything because he would take my phone. He took my phone numerous times."

Ms. L███████ reported a similar scenario, in which Mr. Olivas reportedly claimed he "works for the police so that nothing can ever happen to him, like he's invisible, and that he will tell them that I hit him." Ms. L███████ further stated that Mr. Olivas told her law enforcement officials are "not gonna go after their own people."

Both Ms. B█████ and Ms. A█████ revealed other coercive behaviors that prevented them from reporting. Ms. B█████ said, "He kept using the threat if you tell anybody what happened, then I will show your father the [sexually graphic] videos…and the pictures. So, for four months I stayed quiet, and I didn't tell anybody what happened I just stayed quiet." Ms. A█████ also provided explanations as to why she did not report the IPV, saying she was "ashamed," did not want anyone to know, and was "terrified" he would "come back and do something to me [Ms. A█████]." Also, Ms. A█████ reported that Mr. Olivas threatened to send a sexually explicit video to her workplace.

In addition to these barriers, victims commonly face internal impediments to reporting instances of IPV. For example, survivors' attitudes, beliefs, and other cognitions can negatively impact the likelihood victims will seek law enforcement interventions. Some victims, for reasons described earlier, do not regard the IPV as abusive. Others believe they are responsible for their perpetrator's behaviors or hold higher regard for the perpetrator's well-being over their own. Many victims do not report IPV because of a sense of love, loyalty, or a desire to prevent negative consequences from befalling the perpetrator. For example, Ms. R█████ indicated during her interview that she did not report Mr. Olivas' abusive behavior because she "didn't want to get him in trouble with the military." Yet, others have been told—and come to believe—that reporting the violence will be of no avail or that the incidents are not considered criminal behavior. In addition to these barriers, many victims also employ cognitive strategies in which they reframe their experiences as normal, less malevolent than they actually are, or part of their marital/spousal duty.

Despite these barriers, many abused women eventually do leave their partners, often after multiple attempts and years of violence. In the WHO survey, 19% to 51% of women who were physically abused by their partner had left home for at least one night, and 8% to 21% had left two to five times. Factors associated with a woman leaving an abusive partner permanently include escalating violence, realizing that her partner will not change and recognizing that the violence is affecting her children. Many victims do not report until they experience a crucial, watershed moment or realization. Some victims need time to process what has happened to them, why it has occurred, and whether reporting is the best way for them and/or their children to proceed. Victims with trauma-related symptoms may have pronounced avoidance or may not have clear memories of all the incidents. When victims report IPV to law enforcement officials, service-providers, or family members, it is common for survivors to report after a delay, to report only a portion of IPV incidents, or to disclose one incident at a time over a period of time.  Gradual reporting or piecemeal reporting occurs as victims come to terms with what has happened to them, but also as they assess their own feelings about disclosure and note the reactions they receive from others—including the perpetrator. With supportive reactions, many victims supplement their initial disclosures with a more detailed account of the aggression they have endured. Victims are particularly likely

to delay reporting of incidents they regard as humiliating or embarrassing, as well as any episodes in which they continue to feel a sense of shame or self-blame.

**F.  Reasons why a victim of sexual assault and trauma might remain in a relationship, romantic or otherwise, where the victim continues to suffer at the hands of the abuser**

*The reasons may include, but will not be limited to, staying in relationships because of fear of further physical, sexual, or emotional abuse and/or retaliation for leaving; having mental health conditions that make it more difficult for a person to end the relationship; holding the maladaptive belief that violence/abuse is part of all relationships; hoping that the abuser will stop and change for the better; having a reduced sense of personal agency, such as the belief that there is little or nothing the victim can do to escape the relationship; vulnerability to dependency on the abuser, in cases where the abuser has isolated the victim and cultivated a strong sense of dependency on the abuser; and holding cultural/religious beliefs that a person should remain in a relationship despite the shortcomings or mistakes made by the person's romantic partner.*

Victims remain in relationships with IPV for a variety of reasons, including fear for themselves or their children, depleted coping resources due to mental disorders or stress, beliefs about their worthlessness or inability to function on their own, IPV-supportive beliefs, maladaptive beliefs about IPV, naïve hopefulness that the perpetrator will change, community or cultural pressure to remain in the relationship, inadequate financial or community resources, and a range of additional reasons. In several studies, women endorsed external reasons for remaining in these relationships. For example, Ahrens and Mechanic reported that more than 50% of women acknowledged that they stayed because of concerns for their children and finances, and 40% reported they feared they would be harmed if they left their abusive relationships. Higher percentages were reported for staying because of fear of loneliness and embarrassment. This conveys the deep sense of emptiness and orientation toward others' opinions that characterizes many survivors' underdeveloped sense of self and capacity for self-direction.

In this case,  Ms. B███ described both internal and external reasons she feared leaving her relationship. During her interview, she described encountering threats and danger as she attempted to leave. For example, she stated, "…he'd flip out and he would grab my bag and dump my bags out and just like lose it.  That's when he would throw stuff at me, that's when he would grab me by my hair.  He would just pretty much do anything to get me to make sure that I didn't leave, so I just tried to stay calm and deal with it the best that I could." She also said, "when I was trying to pack one time he walked over to where he keeps his gun on the nightstand and came up behind me and said if you put one more in that bag I'm going to blow your fuckin' brains out. So, I put my hands up like a criminal and stood

up, I was afraid he was going to shoot me…" During her interview, Ms. A███ stated that she feared Mr. Olivas' behavior and/or threats, including fear that her son would be taken, that her brother(s) would be injured by Mr. Olivas, or that he would send a graphic video with sexual content to her workplace.

### G. Coping mechanisms used by victims of sexual assault and other forms of trauma

*This includes but is not limited to denial, wishful thinking, avoidance of the assault- and trauma-related topics due to significant distress associated with these recollections; use maladaptive problem-focused coping (e.g., trying to enhance safety by acquiescing, or complying, or attempting to appease the abuser), maladaptive use of emotion-focused coping (e.g., using strategies to endure one's suffering), and other cognitive strategies, such as minimizing or rationalizing the abuser's behavior as less egregious than is true or as beyond the control of the abuser.*

The coping literature often divides types of coping into two broad categories, problem-focused coping and emotion-focused coping. In problem-focused coping, strategies are used in attempt to *solve* the problem or reduce distress associated with a problem. This is most helpful when the problem can be solved. Emotion-focused coping involves using strategies focused on *enduring* the traumatic event, including thinking of it differently, talking to someone about one's feelings, or expressing one's emotions. This type of coping is most helpful when there is no escape from the situation or the problem cannot be solved. Victims, like other individuals, engage in a range of coping behaviors, but because many victims perceive that the IPV is beyond their control, they may engage in active coping efforts focused on *managing* the abuse (i.e., altering the frequency, severity, impact, or duration of the IPV) rather than escaping from it. Victims may also use emotion-focused coping to *endure* rather than change it. For example, victims may attempt to appease or placate the perpetrators, comply with the perpetrator's demands, refrain from behaviors associated with perpetrator's aggressive reactions, or try to bring the episode of aggression to an end as quickly as possible. Ahrens & Mechanic, (2013) found the most commonly used strategy among victims in their study was "making efforts to manage the abuse." Both "resistance" and "safety planning" were also endorsed, but at a lesser level. Of these, only safety planning was judged to have been helpful in changing the violent behavior. Several common, but typically unhelpful, coping strategies used by IPV victims while they remain in their relationships are described as follows:

1. Denial- Overlooking the issue, blocking or rebuffing the reality of the dangers being faced, or not noticing the negative impact of the violence

2. Wishful Thinking- Naïve or unrealistically hopeful outcomes projected from data that do not support those conclusions. That is, hoping, without realistic cause, that things will get better
3. Reverse Filtering- Using a single, positive aspect or event to draw conclusions without accurately considering or weighting negative aspects of the relationship or aggressive episodes
4. Minimization or Rationalization- Reducing the seriousness or dangerousness of a violent episode or developing inaccurate excuses to explain why the abuse occurred
5. Self-Blame- Attributing the behavior of the perpetrator to one's own actions
6. Guilt- Remorse based upon a victim's misattribution that she/he caused the perpetrator's actions
7. Resignation- Giving up or accepting the situation as unsolvable, unchangeable, or deserved
8. Excessive Anger- Excessively discharging negative emotions
9. Dissociation- Response to stress involving a narrowing of one's experience, typically including reduced awareness of external stimuli, sense of numbness, and reduced connection to thoughts, behaviors, sensory experiences, or the external environment.

      Ms. A███ said that during her childhood, she was exposed to intra-familial conflict, and learned that people were simply supposed to "get over it" in these situations. Ms. A███ further reported that she did not come to regard IPV as "dangerous" or "not healthy" until she was pregnant, when she realized the potential impact of IPV on her own child. During one of her interviews, Ms. Br███ described how she adjusted her coping techniques over time in response to Ms. Olivas' actions. She stated, "towards like the beginning or the middle of the relationship because I still felt like I had that fight in me to keep standing up to him and then I just realized the more I fought back the more I made it worse.  So just shut your mouth and let him say whatever he wants to say.  Let him call you names, let him do whatever and if you just stay quiet it's better for you. When you open your mouth that's when you get hurt.  So just be quiet."

      Many victims eventually engage in active coping methods and restructure their cognitions about IPV. As they come to view the situation differently, many survivors see the potential for longer-term, adaptive outcomes and may engage in alternate coping behaviors and actions, such as reporting the violence to authorities or leaving the relationship.

## H. Characteristics shared by domestic violence perpetrators

      *These include but are not limited to mental health/personality disorders involving antisocial traits, mental health/personality disorders involving borderline traits,*

*acceptance of male dominance ideology, lack of empathy, narcissism, preoccupation with the desire to control or to have power over others, sexual arousal linked to aggression/violence, and exposure to family-of-origin interpersonal violence.*

Although there is no single type or profile of individuals who perpetrate intimate partner violence, a wealth of research has revealed variables commonly associated with IPV perpetration. These factors are often categorized as individual characteristics, sociocultural variables, and issues related to intergenerational transmission of violence. Specific individual correlates include demographic variables, such as male gender, age, and socioeconomic status, as well as beliefs, such as holding IPV-supportive attitudes, espousing traditional gender roles, having tolerant attitudes toward use of violence in intimate relationships, and endorsing male-dominance ideologies. In addition, a number of psychological factors have been shown to be related to IPV. These include psychological functioning and psychiatric status, substance use or substance disorders, high hostility and aggression levels, specific psychological characteristics (e.g., anger, jealousy), and personality disorders (i.e., particularly borderline or antisocial). Sociocultural issues include cultural, religious, or socio-political attitudes that support or condone IPV, living in high risk communities, and living in neighborhoods with norms favorable to violence. Intergenerational transmission of violence includes witnessing interparental violence, exposure to violence perpetrated by other family members, and/or experiencing child abuse.

In addition to shared characteristics of IPV perpetrators, the use of substances likely to increase aggression and/or decrease behavioral inhibition are known to increase the likelihood of violence. Ms. H█████ reported that Mr. Olivas consumed Xanax and combined it with alcohol. Mr. Olivas was further reported to have been inebriated from alcohol use during several of the IPV incidents described by his former partners. Ms. L██████ noted that he was particularly prone to aggressive incidents after drinking.

I. **Typical methods by which some perpetrators of domestic violence and sexual assault gain and maintain power and control over victims**

*These include but are not limited to creating emotional, financial, physical, and/or some other type of dependence; isolating the victim from family members and friends; repeatedly attempting to undermine the victim's self-esteem, and gradual escalation of abuse and trauma.*

As described earlier, intimate partner violence includes physical violence, sexual violence, stalking, coercive control, and psychological aggression. These forms of abuse may be episodic or continuous but typically escalate in frequency and intensity over time. The most frequent type of IPV is not physical or sexual violence, but psychological

aggression. Although it may be least recognized as abuse, several studies reveal that psychological aggression is the most prevalent form of IPV abuse (Ahrens and Mechanic, 2013; Breiding et al., 2014). **Psychological aggression/abuse** includes systematic attempts to degrade the victim, such as acting angry in a manner that seems dangerous; calling the victim names, like ugly, fat, crazy, or stupid; humiliating the victim, saying "no one else would want you"; and repeatedly voicing that the victim is a failure or inadequate.  Below, several possible examples of psychological aggression were described.

- From Ms. B█████'s interviews: "…he told me that I was damaged goods and that he can be with an abled-body woman" and "he would put me down a lot and he'd tell me, you know, 'You're worth nothing.  You're a whore.  You're nothing but a slut.'"

- From Ms. B█████'s interviews: "He would literally go to the bars or places, he would ask people, like about me.  Who, who I have been with, who I have dated. He would tell people I was a whore."

- From Ms. B█████'s interviews: "He would put me down also in front of his son. Like he would tell me, I was a 'stupid bitch' like in front of his son."

- From Ms. Av███'s interview: "He would call me a 'stupid bitch.'"

- From Ms. H██████'s interview: Mr. Olivas made demeaning comments, such as "let the adults talk [excluding her from conversation]."

**Coercive control** is another common method perpetrators use to retain power and constrain victims' autonomies. Coercive control includes attempting to limit or prevent the victim's contact with family or friends, making decisions for the victim, monitoring or demanding to know what the victim is doing, the perpetrator threatening to hurt him/herself, injuring or threatening to harm someone the victim loves, threatening to take the victim's child away, threatening to hurt pets or abduct them, taking steps to prevent the victim from leaving, preventing the victim from accessing money, destroying something important to the victim, and saying things like "If I can't have you, then no one can."

- From Ms. B█████: "I'd be packing to go home and I would grab like a dress and some boots or something and he would accuse me and saying I was gonna go to a bar and go out and meet another man and he'd flip out and he would grab my bag and dump my bags out and just like lose it."

- ▪ From Ms. H█████'s interview: Ms. H█████ reported that Mr. Olivas restricted her ability to leave, including picking her up and carrying her upstairs to prevent her from physically leaving.

- ▪ From Ms. B███'s interview: "I wasn't um allowed to talk to other men I was…and if I did and they called me then I had to explain to him how I handled the situation and just asinine things that…made him feel better."

- ▪ From Ms. L█████'s interview: She believed he tracked her movements.

- ▪ From Ms. H█████'s interview: Ms. H█████ reported that Mr. Olivas restricted her ability to leave by blocking the door with either his body or a couch, and blocking her car by parking his cars behind her car.

- ▪ From Ms. B███'s interview: "I would leave his house I'd pack a bag of clothes. And like he would go in there [UI] make sure everything [UI] if I like if I threw anything in there that he didn't approve of he'd take it out, and say I couldn't take it home."

- ▪ From Ms. B███'s interview: "Because he knows if I [UI] that I can't bend over packing stuff and then like the minute he just grabbed the bottom and [UI] over everything falls back out. And I had to sit there and put it all back in. And then I'd wake up in the morning with like my bag would be packed in the morning. I'd wake up in the morning and my bag would be emptied. And everything would be hung up back in the closet the way it was. Everything would be back in the drawers. Like he'd put everything away while I was sleeping. Cause then he knew that it would stress me out to go back and grab it all to put it back in the bag to take it in the car, to drive a 100 miles. He knew that it would put too much stress on me and I'm physically just I'm unable to do that."

- ▪ From Ms. L█████'s interviews: "He literally would control every single aspect of your life, like everything."

- ▪ From Ms. B███'s interview: Mr. Olivas reportedly sought to control Ms. B█████'s by demanding compliance with guidelines on a written document regarding her behavior. She stated, "…he made me follow a contract he typed up."

- ▪ From Ms. H█████'s interview: Mr. Olivas picked her up in a bear hug and held her over a pool during an argument when she did not want to go on a trip with him.

- ▪ Ms. B███ and Ms. A███ reported efforts to restrict their reproductive rights, such as access to birth control pills and/or tampering with prophylactics.

Yet another control tactic is **stalking**, which is usually defined as repeated behaviors (i.e., typically surveillance) directed toward an individual who perceives those behaviors as unwelcome and intrusive. There were multiple reports across several witnesses in this case that Mr. Olivas engaged in physical and cyber stalking.

- Per Ms. B████'s interviews: Mr. Olivas "would just call and text obsessively, obsessively and that's also on my phone screen shots of my call log of him calling, calling, calling, calling, and it's literally like every other minute;  calling, calling, calling, harassing me and I'm just like leave me alone."
- Per Ms. B████'s interviews: "…the night that he kept calling me, and calling and calling and calling and would not leave me alone.  She was sitting next to me at the bar and then I met this uh guy Eric who was her friend who John ended up finding out about when he went to my phone and he stole it and then repeatedly called this man like a million times.  Found out where he worked."
- Per Ms. L██████'s interview: She reported her belief that Mr. Olivas had entered her car and/or property without permission on several occasions, including at one point in which she thought he wrote her nickname.
- Ms. H█████ reported an occasion in which Mr. Olivas asked for the location of an orientation she was attending and drove to the location to verify her whereabouts.
- Per Ms. H██████'s interview: On one occasion after an argument, Ms. H██████ left to stay with her mother for a few days. She reported that Mr. Olivas appeared at her mother's doorstep and remained outside for a significant amount of time, which Ms. H█████ believed preventing her from leaving. She further reported that Mr. Olivas appeared uninvited at a Starbuck's coffee shop she and her mother were visiting.

**Physical violence** is a widely recognized tactic to gain and assert power over survivors. It can take many forms, including both direct and threatened harm. For example, Ms. R██████ reported that Mr. Olivas "cracked" her ribs, which caused her to seek medical attention. Ms. B████ also reported multiple incidents of physical violence, including Mr. Olivas throwing batteries at her from the television remote control, elbowing her between her ribs, choking her, and squeezing her. When asked during one of her interviews, Ms. B████ stated that Mr. Olivas "pulled a gun" on her twice and threatened to "shoot my [Ms. B████'s] dad in the head." In addition, Ms. B████ reported that Mr. Olivas had thrown a kitten against a wall three times. Ms. L██████ said of Mr. Olivas, "Like he was very violent.  Like really violent." She went on to describe Mr. Olivas grabbing her face such that he left both of her eyes with bruises, grabbing her body, throwing her against a wall, choking her with his arm, hitting her with the back of his hand, and threatening to make her disappear "like Jacob's [the son of Mr. Olivas] mother did." During her interview, Ms. H██████ reported an instance in which she intended to leave, and told Mr. Olivas to "get out of

my [Ms. H████s] car." Then, she said Mr. Olivas held up his gun, pointed it at her, and said, "you're not going anywhere" or "you're gonna die before you're gonna go anywhere."

The use of **sexual aggression** to humiliate and control victims is a particularly personal form of aggression. This type of aggression includes rape and sexual assault, as well as forcing a victim to engage in sexual activities with others. Ms. A██, Ms. R████, and Ms. B██ reported that Mr. Olivas committed acts of sexual aggression and rape. Ms. B██ described a dynamic in which she succumbed to unwanted sexual advances in order to prevent other aggressive behaviors. She stated, "So I would just give in and then he would like start and then he would say, 'Oh do you want me to stop?' And a few times I said 'yes.' Well when I would say 'yes,' all hell would break loose. He would flip out, throw stuff, uh slam doors. He would get ver[sic]…like super, super angry and so when he would say that, 99% of the time I'd want him to stop but I wouldn't say 'yes' because I knew the response that would happen if I said 'yes' so I would just say 'no'…" Ms. B██ further described being videotaped and sodomized while under the influence of Ambien. Additionally, Ms. A██ described Mr. Olivas raping her a few days after giving birth via C-section.

## VI.    Summary

This report is written to summarize issues and research relevant to intimate partner violence. I did not conduct examinations of Mr. Olivas or his former partners and did not draw conclusions related to their individual psychological symptoms or issues. Further, it was beyond the scope of my work to draw conclusions about whether the events described in the claim occurred or did not occur as reported. Rather, this report is intended to provide information about common victim and perpetrator responses and to opine on those commonalities in light of the reported behaviors and feelings of the individuals involved in this case. Given those parameters, I find with a **high degree of psychological certainty**, that the reported behaviors of the victims named in this case conform closely with known patterns of IPV victims. Less information was available to form an opinion related to Mr. Olivas' behavior patterns, and the information available was primarily reported by others about him. Based upon the information available, Mr. Olivas' reported behavioral patterns were also consistent with known patterns of IPV perpetrator behavior.

Janine Shelby PhD                          10/13/19

Janine Shelby, Ph.D.                        Date
Park Dietz & Associates