TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
ELI A. ALCARAZ (Cal. Bar No. 288594)
Assistant United States Attorney
Riverside Branch Office
    3403 Tenth Street, Suite 200
    Riverside, California 92501
    Telephone: (951) 276-6938
    Facsimile: (951) 276-6202
    Email:   Eli.Alcaraz@usdoj.gov
FRANCES S. LEWIS (Cal. Bar No. 291055)
Assistant United States Attorney
Deputy Chief, General Crimes Section
    312 North Spring Street, 15th Floor
    Los Angeles, California 90012
    Telephone: (213) 894-4850
    Facsimile: (213) 894-0141
    Email:   Frances.Lewis@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ED CR No. 18-231-JGB |
|---|---|
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS WITHOUT PREJUDICE AND RECUSE THE USAO, OR IN THE ALTERNATIVE, TO DISMISS WITHOUT PREJUDICE AND RECUSE AUSA JOSEPH WIDMAN (DKT. 102); DECLARATIONS OF ELI A. ALCARAZ AND JOSEPH B. WIDMAN; EXHIBITS 1-3 |
| v. | |
| JOHN JACOB OLIVAS, | |
| Defendant. | |
| | [EXHIBIT 4 FILED UNDER SEAL] |
| | Hearing Date: November 15, 2021 |
| | Hearing Time: 2:00 P.M. |
| | Location:   Courtroom of the Hon. Jesús G. Bernal |

    Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorneys Eli A. Alcaraz

and Frances S. Lewis hereby files its opposition to defendant's "motion to dismiss without prejudice and recuse the USAO, or in the alternative, to dismiss without prejudice and recuse AUSA Joseph Widman" (dkt. 102).

This opposition is based upon the attached memorandum of points and authorities and supporting exhibits 1-4, where exhibit 4 will be filed under seal; the declarations of Eli A. Alcaraz and Joseph B. Widman; the files and records in this case; and such further evidence and argument as the Court may permit.

Dated: October 26, 2021         Respectfully submitted,

                                TRACY L. WILKISON
                                Acting United States Attorney

                                SCOTT M. GARRINGER
                                Assistant United States Attorney
                                Chief, Criminal Division

                                  /s/
                                _____
                                ELI A. ALCARAZ
                                FRANCES S. LEWIS
                                Assistant United States Attorneys

                                Attorneys for Plaintiff
                                UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

I.    INTRODUCTION.....................................................1

II.   FACTUAL BACKGROUND..............................................3

      A.   *United States v. Ramirez*.................................3

      B.   *United States v. Olivas*.................................9

III.  LEGAL STANDARD.................................................10

IV.   ARGUMENT.......................................................12

      A.   THERE IS NO ACTUAL CONFLICT OF INTEREST JUSTIFYING
           RECUSAL OF MR. WIDMAN, LET ALONE THE ENTIRE CENTRAL
           DISTRICT USAO.............................................12

      B.   JUST AS THERE IS NO ACTUAL CONFLICT OF INTEREST, THE
           FACTS DO NOT SUGGEST THE APPEARANCE OF A CONFLICT.......14

      C.   IN ANY CASE, DEFENDANT MUST ESTABLISH "ACTUAL
           PREJUDICE" AND HE HAS NOT DONE SO, NOR CAN HE...........18

V.    CONCLUSION.....................................................20

# **Table of Authorities**

Page(s)

**Cases**

Young v. United States ex rel. Vuitton et Fils S.A
  481 U.S. 787 (1987) ............................................. 13

Marshall v. Jerrico,
  446 U.S. 238 (1980) ............................................. 14

Matter of Grand Jury Investigations of Targets,
  918 F.Supp. 1374 (S.D. Cal. 1996) ................................ 18

United States v. Lorenzo,
  995 F.2d 1448 (9th Cir. 1993) ............................... 12, 19

United States v. Mapelli,
  971 F.2d 284 (9th Cir. 1992) .................................... 20

United States v. Nosal,
  2009 WL 482236 (N.D. Cal. Feb. 25, 2009) ....................... 14

United States v. Rosnow,
  977 F.2d 399 (8th Cir. 1992) ................................... 19

**Statutes**

18 U.S.C. § 208(a) ................................................ 13

28 U.S.C. § 455..................................................... 1

28 U.S.C. § 528................................................... 11

**Regulations**

5 C.F.R. § 2635.502(a) ........................................... 12

28 C.F.R. § 45.2(a) ........................................... 11, 13

28 C.F.R. § 45.2(c)(2) ........................................... 11

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.    INTRODUCTION**

Almost nine years ago in a criminal matter unrelated to the case before this Court, <u>United States v. Julio Cesar Ramirez</u>, ED CR 11-051-VAP, then-defendant Ramirez was awaiting sentencing after having pled guilty under a plea agreement and after both the United States and defendant Ramirez had filed sentencing positions.  (ED CR 11-051-VAP, Dkts. 42, 43, 48, 54.)  At that time, he filed a motion for discovery based on an anonymous phone call to defense counsel[1] where a person identified only as "Mike" provided a wide range of allegations of misconduct of law enforcement officers and informants related to his case.  (ED CR 11-051-VAP, Dkt. 60.)  The <u>Ramirez</u> Court denied defendant Ramirez's motion explaining that the "government has investigated the allegations regarding any misconduct by federal agents thoroughly (to the extent possible, given their vague nature)" and "the Court is persuaded no further investigation is warranted." (ED CR 11-051-VAP, Dkt. 71.)

As will be explained in this opposition, and as seen in the accompanying exhibits, defendant Ramirez's motion was based on vague and unsubstantiated allegations.  Defendant Olivas, who was a federal

---

[1] At the time defendant Ramirez filed the motion (December 17, 2012), he was represented by then-Deputy Federal Public Defender Jeffrey Aaron.  This Court, however, when serving as a Deputy Federal Public Defender in Riverside, was Ramirez's counsel of record for approximately six days from Ramirez's initial appearance on June 3, 2011 (ED CR 11-051-VAP, dkt. 11) until replaced by DFPD Aaron on June 9, 2011 (ED CR 11-051-VAP, dkt. 14).  While the Court has never served as counsel to a party in this proceeding (<u>United States v. Olivas</u>) and the representation in <u>Ramirez</u> was of very limited duration, the government notes the prior representation in <u>Ramirez</u>, in case the Court believes that its prior representation of defendant Ramirez creates a conflict as to this specific motion such that the motion should be referred to a different judicial officer.  <u>See</u> 28 U.S.C. § 455.

agent at the time and who appears to have had an auxiliary role in the Ramirez case, was swept up into the investigation into the Ramirez allegations, along with several other law enforcement officers and confidential informants.  Then-Special Agent Olivas, though, was included not because he was specifically named, but because he appeared to be the closest fit to one of the vaguer allegations.  Then-AUSA Joseph Widman, who left the USAO in September 2020 to serve as a California Superior Court Judge, was the prosecuting attorney in the Ramirez case and conducted the investigation into the allegations, which appears to include at least one interview of then-Special Agent Olivas.

Now, defendant Olivas tries to cobble together a conflict of interest based on his limited role in an unrelated case following a brief investigation into vague misconduct allegations by then-AUSA Widman who years later became the prosecuting AUSA in this case and who has not been associated with the USAO since September 2020.  The Court should deny defendant Olivas's "motion to dismiss without prejudice and recuse the USAO, or in the alternative, to dismiss without prejudice and recuse AUSA Joseph Widman" ("Motion," dkt. 102) for several reasons.  First, there is no actual conflict of interest justifying recusal of Mr. Widman, let alone the Riverside Branch Office of the Central District USAO or the Central District USAO as a whole.  Second, just as there was no actual conflict of interest, the facts do not support the appearance of a conflict of interest. Finally, defendant's conflict, if based on the appearance of a conflict, cannot succeed because he has not shown "actual prejudice." The Court should deny the Motion.

## II.   FACTUAL BACKGROUND

### A.   *United States v. Ramirez*

Defendant Julio Cesar Ramirez was indicted by the USAO on June 1, 2012, and was prosecuted by then-AUSA Widman.  (United States v. Ramirez, ED CR 11-051-VAP, Dkt. 1; Widman Decl. ¶ 2.)  A signed plea agreement was filed in the Ramirez case on September 10, 2012. (United States v. Ramirez, ED CR 11-051-VAP, Dkt. 42.)  According to the plea agreement factual basis, the criminal conduct in the Ramirez case generally took place between July 2010 and January 2011.  (Id. at 20-23.)  Defendant pled guilty on October 1, 2012.  (Id., Dkt. 43.)  The United States filed its sentencing position on November 19, 2012 (id., dkt. 48) and defendant Ramirez filed his sentencing position the same day (id., dkt. 54).

On December 17, 2012, defendant Ramirez filed a motion for discovery.  (Alcaraz Decl., Ex. 1 at 11-21.)  Specifically, he requested "that the Court order the government to contact the Riverside Police Department, the Fontana Police Department, the FBI, the DEA, and ICE, and request full discovery of any reports, statements, personnel files, memoranda, videos, or any other evidence of (1) Misconduct by Detective Ron Kipp; (2) Misconduct by past or present informants in the Ramirez case; (3) Misconduct by the ICE agent known as 'Robbie'; (4) Evidence of past or present gang membership by informants in the Ramirez case; (5) Evidence of any past or present personal relationship with persons in Eastside Riva or Casa Blanca [gangs] by past or present agents in the Ramirez case; (6) The informant files maintained by the various agencies for the informants known as 'Monkey,' 'Daniel' or 'Big D,' and 'Drew'; (7) The personnel file for Detective Ron Kipp and the ICE agent known

as 'Robbie'; [and] (8) Any other relief the Court believes would be reasonable and proper." (Id. at 17.)  Then-Special Agent Olivas was not identified by name in this discovery motion.

The request was made after defense counsel received a phone call by someone identified only as "Mike" who made a series of allegations against law enforcement and informants. (Id. at 12.)  "Mike" named an ICE agent that allegedly was named "Robbie" and was allegedly the lead ICE agent, and made specific allegations against him and informants "Monkey" and "Daniel" or "Big D." (Id. at 12.)  There were specific additional allegations against an informant "Drew" and a Riverside Detective whose last name was Kipp. (Id. at 12.)  One general allegation was "One of the current ICE agents in Mr. Ramirez's case has a girlfriend who belongs to Casa Blanc Fern Street, a local street gang.  He assists her in illegal activities, and helps her out of 'jams.'  This is taking place right now.  After Mr. Ramirez's federal case is over, according to Mike, he will be charged with attempted murder for hire.  There is an informant on this case, and the case agent will be Detective Kipp." (Id. at 13 (internal citations omitted).)

Ramirez's defense counsel asked "Mike" to call back and speak to a defense investigator, which "Mike" never did. (Id. at 13.)  Then-AUSA Widman investigated the anonymous allegations, including speaking with then-Special Agent Olivas in his capacity as a law enforcement officer. (Widman Decl. ¶ 3.)  Mr. Widman's memory is that he interviewed then-Special Agent Olivas "regarding the allegations made about him" and he would "find it implausible that [he] would have asked Olivas about this relationship history beyond what was alleged about him in the Ramirez case, although [he has]

4

1  very little independent recollection of this/these conversation(s)."

2  (Id.)  Mr. Widman filed an opposition to defendant Ramirez's motion.

3  (ED CR 11-051-VAP, Dkt. 69; Ex. 4.)

4      The opposition explained that some allegations, including

5  allegations against a local police detective who was not present

6  during any of the charged criminal conduct in the Ramirez case, are

7  "completely irrelevant."  (Ex. 4 at 7.)  It asserted that many of

8  "Mike's" "claims are perplexingly vague; no agent is identified by

9  name" and "[t]o the extent these claims can be deciphered, as

10  detailed in the attached declaration of government counsel, they are

11  either terribly misleading or false."  (Id.)  According to the

12  opposition, then-AUSA Widman spoke with, among others, two then- and

13  current-group supervisors for the ICE gangs squad, which investigated

14  the Ramirez case; the first primary case agent Corbin Maxwell; the

15  second primary case agent Julio Barajas; and then-federal agent, now-

16  defendant Olivas.  (Id. at 13.)  Further, ICE's Office of

17  Professional Responsibility conducted "a routine administrative

18  inquiry into the allegations" in Ramirez's motion.  (Id.)

19      Concerning the allegations that defendant Olivas asserts led to

20  the basis of the conflict of interest in this case, the opposition

21  states: "Allegations against '[o]ne of the current ICE agents' re:

22  current girlfriend who is allegedly a gang member.  This allegation--

23  against an unidentified agent--appears to be completely false.

24  Although no one with whom government counsel spoke had any

25  information to support this allegation, the consensus of the agents

26  was that this allegation conceivably could reference [John Olivas],

27  because he once had a romantic relationship with a woman who had

28  family members who lived in the Casa Blanca area of Riverside.  The

1  ex-girlfriend was never a gang member or involved in any gang
2  activity; to the contrary she was a regular person with a legitimate,
3  full-time job who dated [Olivas] for approximately 12 weeks in 2012."
4  (Ex. 4 at 15 (internal citations omitted).)  According to then-AUSA
5  Widman's declaration supporting the United States' opposition, Olivas
6  was one of the agents who transported defendant Ramirez to his
7  initial appearance on or about June 3, 2011, when Ramirez "said
8  something to [Olivas] along the lines of, 'You look like a guy who's
9  dating my wife's third cousin.'"  (Id. at 31-32.)

10       According to an email provided by defendant Olivas's counsel
11  on October 16, 2021, defendant Olivas wrote an email on December 28,
12  2012 memorializing his interview with then-AUSA Widman.  The email
13  says he met with AUSA Widman "regarding allegations provided by an
14  [unknown] source to defense counsel regarding the subject of a past
15  investigation that officers, agents, etc[.] may have mishandled . . .
16  and allegedly these allegations cover the span of multiple agents as
17  well as multiple agencies."  (Ex. 1 at 6.)  The email continues "AUSA
18  Widman stated that one of the particular allegations did not directly
19  identify my name and/or agency but rather described me as the 'ICE
20  agent who is the boyfriend of a girl from the same 'neighborhood' as
21  the defendant.'"  (Id.)  Olivas said there were only two questions
22  "directed towards" him: "(1) Did you date a woman who associates with
23  the particular gang with where she resides? (2) Did you ever assist
24  this woman in getting out of any 'jams'?"  (Id.)  Olivas wrote, "I
25  stated that I did, in fact date this woman for approximately 10 to 12
26  weeks (July 2012 [sic] – September 2010) and that we ended our
27  relationship 2 years and 2 months ago (October 2010).  I also stated
28  that during the time I was dating this woman, she currently had a

brother, nephew and grandparents that resided in the adjacent
neighborhood opposite of where defendant used to reside.
Furthermore, I did not assist this woman in getting out of 'jams.'"
(Id.).

According to a Department of Homeland Security Administrative
Inquiry Affidavit provided by defendant Olivas's counsel on October
16, 2021, defendant made a statement about a former romantic partner
R.B., starting in July 2010 and ending in October 2010.  (Ex. 1 at
7.)  He describes a "prank" by other law enforcement officers based
on the woman growing up "in an adjacent neighborhood in Riverside and
thus [the pranksters were] making her out to be a gang member." (Id.
at 8.)  "My Group Supervisor, . . . along with other members of my
group were present and laughing as well.  Unbeknownst to me, I was
the only one not aware of the prank."  (Id.)  It continues, "It
wasn't until the actual day of the take down that I was made aware
that, in fact, there was a loose correlation between [R.B.] and the
wife of the target of the investigation.  On June 1, 2011, Special
Agent Julio Barajas and I arrived at the RPD Magnolia Station to pick
up the target, Julio Cesar Ramirez and transport him to the San
Bernardino Sheriff Department jail facility located in San
Bernardino, California.  Once inside the vehicle, Julio Cesar Ramirez
made reference that I looked familiar and that I resembled a man that
was dating the 'third, distance cousin' of his wife [V.].  He
described [R.B.], by her name, her car (black BMW) and her profession
as an executive secretary  (Best, Best & Kreiger).  He stated that he
had seen her at a restaurant some time ago with this man and that I
resembled this man.  I stated that I resemble a lot of people.  There
was no further conversation regarding my resemblance to this man.  I

1  neither confirmed, nor denied I was that man.  Instead, I opted to

2  say I resemble a lot of people."  (Id.)  The statement also discusses

3  restraining orders concerning a former wife, R.A.  (Id.)

4      According to a different Department of Homeland Security

5  Administrative Inquiry Affidavit, this one for Special Agent Julio

6  Barajas, in "approximately September 2010, I was assigned as the case

7  agent" for the Ramirez case to "replace[] . . . Corbin Maxwell as the

8  case agent."  (Ex. 2 at 1.)  Agent Barajas said that in

9  "approximately October 2010, SA John Olivas told me that he (Olivas)

10  was dating a woman (UW), and that he (Olivas) was becoming serious

11  with her (UW). . . . SA Olivas showed me one or two photos of her

12  (UW).  The photos shown to me did not depict her (UW) as a gang

13  member or the gang member type."  (Id.)  Agent Barajas described his

14  limited understanding about a November 2010 prank against defendant

15  concerning UW (id.), which appears to be the same prank just

16  described.  Months later, Agent Barajas was in a vehicle with

17  defendant in February or March 2011, when defendant received a call

18  from UW and from what Barajas could hear, UW was reinitiating a

19  relationship with an ex-boyfriend.  (Id.)  Agent Barajas said that

20  defendant gave the impression in April 2011 that he hand ended the

21  relationship with UW.  (Id.)

22      Agent Barajas continued that on "June 1, 2011, when I finished

23  with grand jury testimony [for the Ramirez case], I was called by SA

24  Heizer and told that RPD or DEA made an allegation against SA Olivas.

25  The allegation was that SA Olivas told a woman, during a baseball

26  game at a local Riverside park, that HSI was investigating Julio

27  Cesar Ramirez.  This woman told a law enforcement officer, who then

28  reported it."  (Id.)  According to Agent Barajas, he and "SA Olivas

8

1  [were] to transport Ramirez from RPD to the San Bernardino County
2  jail.  During the transport, Ramirez told Olivas that he (Ramirez)
3  recognized him (Olivas) from the L.A. Fitness health club.  Ramirez
4  also told him (Olivas) that he (Ramirez) knew that he (Olivas) dated
5  UW who had some relation to Ramirez or Ramirez's girlfriend.  I
6  recall that Olivas downplayed Ramirez's statements." (Id. at 2.)
7  Agent Barajas also described the separate investigation conducted by
8  then-AUSA Widman into the Ramirez case allegations.  (Id.)

9      **B.   _United States v. Olivas_**

10      On or about June 9, 2014, the FBI received an initial complaint
11  call concerning Olivas following the Riverside District Attorney's
12  decision not to prosecute Olivas generally for rape, domestic
13  violence, and unlawful use of a service weapon (the decision not to
14  prosecute Olivas at the state was later reversed).  (Ex. 3 at 1-2.)
15  On or about June 12, 2014, the FBI received a notification from ICE
16  OPR about possible civil rights violations by defendant.  (Id. at 5.)
17  On July 1, 2014, FBI Special Agent David Staab met with an ICE OPR
18  Special Agent and then-AUSA Jay Robinson, where AUSA Robinson agreed
19  to review the case for any potential federal violations.  (Id. at 3.)
20  The FBI's report of the July 1, 2014 meeting does not mention AUSA
21  Widman participating, and Mr. Widman does not recall joining the case
22  as a prosecuting AUSA until 2016.  (Widman Decl. ¶ 6.)  The FBI
23  initiated an investigation on August 4, 2014.  (Id. at 5.)  Then-AUSA
24  Widman was the chief of the Riverside Branch Office of the USAO
25  starting January 1, 2014.  (Widman Decl. ¶ 1.)

26      In August 2016, then-AUSA Widman received some information about
27  the Olivas investigation from Agent Staab.  (Ex. 3 at 10.)  Then-AUSA
28  Widman became responsible for the investigation in 2016.  (Widman

Decl. ¶ 6.)  On October 4, 2017, then-AUSA Widman participated in an interview of a potential victim with Agent Staab.  (Ex. 3 at 12.)

Then-AUSA Widman indicted defendant on the pending charges on August 1, 2018.  (Dkt. 1.)  Riverside AUSA Eli Alcaraz filed a notice of appearance in the matter on February 28, 2019.  (Dkt. 21.) Riverside AUSA Julius Nam replaced then-AUSA Widman on March 12, 2019 as counsel of record in this case.  (Dkt. 22.)  Los Angeles AUSA Frances Lewis filed a notice of appearance in this case on April 27, 2020.  (Dkt. 47.)  AUSA Alcaraz first learned of the Ramirez case when defendant filed the instant motion on October 12, 2021. (Alcaraz Decl. ¶ 4.)  Mr. Widman does not recall talking about the Ramirez case with AUSA Alcaraz and/or AUSA Nam and/or AUSA Lewis. (Widman Decl. ¶ 4.)  When former-AUSA Widman and AUSA Alcaraz overlapped as AUSAs between November 2018 and September 2020, AUSA Alcaraz believes that he never had any previous conversations with Mr. Widman about the Ramirez case, including about defendant Olivas' involvement and Mr. Widman's opposition to defendant Ramirez's motion for discovery based on alleged misconduct of various law enforcement officers and confidential informants.  (Alcaraz Decl. ¶ 4.)  AUSA Alcaraz spoke with AUSA Lewis and she informed him that she has no memory of discussing the Ramirez case with former-AUSA Widman.  (Id.) Mr. Widman left the USAO in September 2020 to serve the State of California as a Superior Court Judge for the County of San Bernardino.  (Widman Decl. ¶ 1.)

**III. LEGAL STANDARD**

The Department of Justice is required by law to create rules requiring the disqualification of AUSAs "from participation in a particular investigation or prosecution if such participation may

result in a personal, financial, or political conflict of interest, or the appearance thereof."  28 U.S.C. § 528.

Under 28 C.F.R. § 45.2(a), concerning "Disqualification arising from personal or political relationship," it is prohibited for an AUSA to "participate in a criminal investigation or prosecution if he has a personal or political relationship with: (1) Any person . . . substantially involved in the conduct that is the subject to the investigation or prosecution; or (2) Any person . . . which he knows has a specific substantial interest that would be directly affected by the outcome of the investigation or prosecution."  A "personal relationship" is defined as "a close and substantial connection of the type normally viewed as likely to induce partiality."  28 C.F.R. § 45.2(c)(2).  "An employee is presumed to have a personal relationship with his father, mother, brother, sister, child and spouse" and whether "relationships (including friendships) of an employee to other persons . . . are 'personal' must be judged on an individual basis with due regard given to the subjective opinion of the employee."  Id. (emphasis added.)  Importantly, this "section pertains to agency management and is not intended to create rights enforceable by private individuals."  Id.

"Where an employee knows that a particular matter involving specific parties is likely to have a direct and predictable effect on the financial interest of a member of his household, or knows that a person with whom he has a covered relationship is or represents a party to such matter, and where the employee determines that the circumstances would cause a reasonable person with knowledge of the relevant facts to question his impartiality in the matter, the employee should not participate in the matter unless he has informed

the agency designee of the appearance problem and received

authorization from the agency designee in accordance with paragraph

(d) of this section."  5 C.F.R. § 2635.502(a).

There are also certain procedures set forth in the Justice

Manual, providing for recusal under certain limited circumstances.

See Justice Manual § 3-1.140 ("The requirement of recusal does not

arise in every instance, but only where a conflict of interest exists

or there is an appearance of loss of impartiality.").  Of course, the

Justice Manual (formerly referred to as the U.S. Attorney's Manual)

"'is not intended to, does not, and may not be relied upon to create

any rights, substantive or procedural, enforceable at law by any

party in any matter civil or criminal.'"  United States v. Lorenzo,

995 F.2d 1448, 1453 (9th Cir. 1993) (considering recusal guidelines

promulgated in the U.S. Attorneys' Manual, § 1-3.170).

**IV.  ARGUMENT**

    **A.  THERE IS NO ACTUAL CONFLICT OF INTEREST JUSTIFYING RECUSAL OF MR. WIDMAN, LET ALONE THE ENTIRE CENTRAL DISTRICT USAO**

Defendant's ambiguous asserted conflict provides no basis for

recusal.  Under rules propagated concerning prosecutor recusal, there

is no and was no justification at any point to recuse (1) the Central

District USAO, (2) the Riverside Branch Office of the USAO, or

(3) former-AUSA, now-California-State-Court-Judge Widman.  Defendant

does not assert, nor can he, a personal, financial, or political

conflict of interest with Mr. Widman.  There is no political or

financial consideration whatsoever, and there is no personal interest

due to Mr. Widman's very limited work with now-defendant Olivas on

another matter.  To be considered a "personal relationship" under the

conflicts of interest regulations, defendant would need to show that

12

1  Mr. Widman and Olivas had "a close and substantial connection of the
2  type normally viewed as likely to induce partiality."   28 C.F.R.
3  § 45.2(a) (defining a "personal relationship" and providing examples
4  like "father, mother, brother, sister, child and spouse").  Mr.
5  Widman's sworn statement is that "I never had any personal
6  relationship with Olivas; my relationship with him was strictly
7  professional."  (Widman Decl. ¶ 3.)  Defendant has alleged no such
8  close personal relationship nor could he based on the facts.  There
9  is no actual conflict of interest and the Motion should be denied.

10      None of defendant's limited case citations stand to the
11  contrary.  In Young, in affirming a district court's power to appoint
12  a private attorney to prosecute contempt, the Supreme Court mentioned
13  that federal prosecutors are prohibited from representing the United
14  States in any matter where they, their family, or their business
15  associates have any interest, citing 18 U.S.C. § 208(a), which
16  relates to financial conflicts.  Young v. United States ex rel.
17  Vuitton et Fils S.A., 481 U.S. 787, 803-804 (1987) (holding that
18  counsel for a party that is the beneficiary of a court order may not
19  be appointed as prosecutor in a contempt action alleging a violation
20  of that order).  Thus, a private attorney who previously represented
21  a manufacturing company could not serve as a special prosecutor
22  because he had a financial interest in the outcome.  Id.  Defendant
23  has not alleged -- indeed because he cannot -- that former-AUSA
24  Widman or anyone from the USAO had or has a financial interest in the
25  outcome of the case.[2]

26

27      [2] Indeed, the only person who has a financial interest in the
   case is defense counsel, who was herself an employee of the USAO in
28  the Central District of California during much of the relevant time
   period.

13

1    The Supreme Court's decision in <u>Marshall v. Jerrico</u>, 446 U.S.

2    238, 243-244 (1980), is equally unavailing.  There, in an appeal from

3    summary judgment in civil litigation of a Fair Labor Standards Act

4    violation, the Supreme Court held that the influence on the regional

5    administrator who would seek out evidence supporting penalties was

6    "too remote and insubstantial to violate the constitutional

7    constraints applicable to the decisions of an administrator

8    performing prosecutorial functions."  <u>Id.</u>  As the Court explained,

9    "[p]rosecutors need not be entirely 'neutral and detached' . . . . In

10   an adversary system, they are necessarily permitted to be zealous in

11   their enforcement of the law."  <u>Id.</u> at 248.  What the Supreme Court

12   did not approve, however, was a reimbursement scheme that created a

13   conflict, which again is far afield from the facts of this case.  <u>Id.</u>

14   **B.   JUST AS THERE IS NO ACTUAL CONFLICT OF INTEREST, THE FACTS
        DO NOT SUGGEST THE APPEARANCE OF A CONFLICT**

15

16   There is no appearance of a conflict of interest either.  In the

17   absence of an actual conflict of interest, defendant tries to

18   manufacture the appearance of a conflict by suggesting that then-AUSA

19   Widman had some vendetta against defendant stemming from the <u>Ramirez</u>

20   misconduct investigation and leading to charges here.  Defendant

21   tries to bootstrap unreliable misconduct allegations on assertions in

22   his Motion that are simply not correct.  In any event, "[t]he Ninth

23   Circuit has made clear the appearance of impartiality is insufficient

24   grounds for prosecutorial disqualification."  <u>United States v. Nosal</u>,

25   2009 WL 482236, at *3 (N.D. Cal. Feb. 25, 2009).

26   Starting with the <u>Ramirez</u> allegations, there were specific

27   allegations against confidential informants and certain law

28   enforcement officers, but the allegation that ended up leading to

14

then-AUSA Widman interviewing defendant were vague.  The allegation about an ICE agent assisting a gang member girlfriend was just one of seven specific buckets of information sought by Ramirez.  (Ex. 1 at 17.)  So defendant's assertion that the investigation into him somehow colored then-AUSA Widman's view drastically overstates defendant's importance to the United States' opposition.

Additionally, no ICE agent was named, so defendant was the person that was the "consensus of the agents" that the allegation could "conceivably" reference because "he once had a romantic relationship with a woman who had family members who lived in the Casa Blanca area of Riverside." (Ex. 1 at 31.)  Accordingly, defendant's October 15, 2021 declaration that "Ramirez accused me" of "having a girlfriend who belongs to the Casa Blanca Fern Street, a local gang" and "assist[ing] her in illegal activities and help[ing] her out of jams" is not accurate.  (Ex. 1 at 4.)  Defendant was never named by "Mike."  Defendant was various agents' best guest to the identity of an agent refenced in an exceedingly vague allegation by "Mike."  Investigating this nebulous allegation creates no conflict of interest nor does it create the appearance of a conflict for the instant case.

Further, defendant overstates the connection between this case and the inquiry in the Ramirez case, which undercuts any appearance of a conflict.  Specifically, defendant's declaration says, "between late 2012 and mid-2013, I participated in a number of interviews with AUSA Widman and OPR regarding these allegations.  The inquiry expanded into my relationship with other women, including a former spouse who the government has interviewed in connection with my current case." (Ex. 1 at 4-5.)  In fact, defendant's memorializing

15

email from his December 28, 2012 interview with then-AUSA Widman was
limited--"The questions directed towards me were as follows: (1) Did
you date a woman who associates with the particular gang with where
he reside? (2) Did you ever assist this woman in getting out of any
'jams'?" (Ex. 1 at 6.) As explained in the United States'
opposition to the Ramirez motion, "ICE's Office of Professional
Responsibility is conducting a routine administrative inquiry into
the allegations." (Ex. 1 at 13.) Further, according to former-AUSA
Widman, "I find it implausible that I would have asked Olivas about
his relationship history beyond what was alleged about him in the
Ramirez case." (Widman Decl. ¶ 3.) The investigation, according to
defendant's sworn affidavit, was not nearly as broad as he asserts in
his declaration.

The contemporaneous records from the Ramirez matter,
specifically defendant Olivas's own affidavit, do not reflect any
discussion of his "entire relationship history" or his relationships
with K.L. and N.B., both of which had ended by November 2012.
Instead, the interviews concerned the woman who appears to be the
basis of the Ramirez allegation, R.B., and an ex-wife, R.A. (Ex. 1
at 7-9.) Neither woman is one of the charged victims in this
indictment. The FBI interviewed R.B. in connection with its
investigation into defendant Olivas, but she has not been named as a
witness and is not expected to testify at trial. While defendant's
ex-wife, R.A., was interviewed as part of this case and has been
identified as a witness under Rule 413, she was not the subject of
the alleged conflict in Ramirez and appears to have only come up
during these interviews because of restraining orders she had sought
against defendant Olivas. Because defendant faces charges in this

1    case concerning violence against former romantic partners, he tries

2    to create a conflict by lumping any and all former romantic partners

3    into a single unit to make them appear more relevant to the vague

4    Ramirez allegations.

5         In any event, even if there was some information about the

6    charged victims in this case that was disclosed during the Ramirez

7    investigation, and there is no contemporaneous evidence to support

8    that, defendant is wrong about other critical facts, including the

9    timing of Mr. Widman's involvement, that demonstrate the lack of any

10   conflict or appearance thereof.  In particular, his Motion asserts

11   that "just months" after the Ramirez investigation, then-AUSA Widman

12   "assumed the role of lead prosecutor against Mr. Olivas in this

13   case."  (Mot. at 3.)  First, as shown in Exhibit 3 (at 1 and 5), the

14   referral on the current charges went to FBI in 2014 by a family

15   member of a charged victim and by ICE OPR.  This investigation was

16   not initiated by then-AUSA Widman.  Further, when the investigation

17   was initiated, then-AUSA Robinson was the AUSA primarily handling the

18   matter until sometime in 2016, at which point then-AUSA Widman became

19   the primary investigator.  (Ex. 3 at 8; Widman Decl. ¶¶ 5-6.)  There

20   was approximately three years between the Ramirez investigation and

21   the time when Mr. Widman became responsible for the instant case.

22        Overall, the facts of the Ramirez case do not support a conflict

23   of interest between Mr. Widman and defendant nor do they support the

24   appearance of a conflict.  The manner with which the FBI was referred

25   the case and the timing and sequencing of then-AUSA Robinson

26   investigating the case and handing it off to then-AUSA Widman erode

27   any assertion by defendant that his limited participation in the

28   Ramirez investigation somehow led to a vendetta prosecution by then-

1    AUSA Widman in this case.  Moreover, AUSAs handling this matter since

2    March 2019 did not discuss the Ramirez case with Mr. Widman and did

3    not even know about it until defendant filed the Motion.  Said

4    another way, between AUSA Robinson initially handling this case, and

5    AUSAs other than Mr. Widman advancing this prosecution over the last

6    two and one half years, there is no indication that the Ramirez

7    investigation impacted the instant charges.

8         Under the rules propagated for identifying actual and apparent

9    conflicts, there is no reason for Mr. Widman to have recused himself

10   during the investigation or following indictment, so, it follows,

11   that there was and is no justification to recuse any member of the

12   Riverside Branch Office of the Central District USAO or the Central

13   District USAO as a whole.  In addition to the fact that vicarious

14   disqualification generally does not apply to government agencies,[3]

15   here, in addition to showing no conflict at all, the defense cannot

16   show that any purported conflict affected any decisions in the case

17   or any actions taken by the initially assigned or subsequently

18   assigned prosecutors.

19        **C.   IN ANY CASE, DEFENDANT MUST ESTABLISH "ACTUAL PREJUDICE"
              AND HE HAS NOT DONE SO, NOR CAN HE**

20

21        While there was no conflict at all, even if defendant could

22   establish the appearance of impartiality -- based on (1) a vague

23   Ramirez allegation that was part of many other allegations,

24   (2) inaccurate information about how the current investigation opened

25

26        [3] Matter of Grand Jury Investigations of Targets, 918 F.Supp.
     1374, 1378 n.11 (S.D. Cal. 1996) (noting that the imputed
27   disqualification rule assumes that the client can hire another law
     firm, whereas in the case of government agencies, "the only choices
28   for federal prosecution are the local AUSAs, DOJ attorneys, or
     special prosecutors")

1   and who handled the investigation and prosecution at what times, and

2   (3) some ill-defined vendetta that purportedly influenced the Olivas

3   case -- his Motion still fails as he has shown no actual prejudice.

4       A defendant pointing to the appearance of a conflict must show

5   "actual prejudice." Lorenzo, 995 F.2d at 1453 (9th Cir. 1993).

6   Here, as in Lorenzo, "there is no suggestion that the U.S. Attorney's

7   Office did not exercise its discretionary function in an even-handed

8   manner." Id.  He cannot carry such a burden.  Defendant's citation

9   to an Eighth Circuit case for the proposition that he need not show

10  any prejudice contradicts clear Ninth Circuit law.  (Mot at. 6

11  (citing United States v. Rosnow, 977 F.2d 399, 411 (8th Cir. 1992).)

12  Setting aside the fact that Rosnow also alleged a financial conflict,

13  not present here, the Eight Circuit did not so hold -- ruling instead

14  that there was no conflict precisely because defendant had not

15  "identified any prejudice resulting from the trial court's refusal to

16  disqualify the prosecutor." Rosnow, 977 F.2d at 411.

17      For many reasons, there is no actual prejudice.  AUSAs Alcaraz,

18  Nam, and Lewis never spoke with Mr. Widman about the Ramirez case.

19  AUSA Robinson handled the initial intake and first years of

20  investigation.  There is no indication that the investigation and

21  charges were handled any differently due to the Ramirez case or Mr.

22  Widman's connection to it.  The grand jury, not the USAO, charged

23  defendant Olivas with a crime after finding probable cause to indict.

24  Mr. Widman never represented defendant during the investigation into

25  the current charges, only to become the prosecutor and defendant has

26  made no such allegation.  There is also no allegation that Mr. Widman

27  was exposed to immunized, privileged, or otherwise confidential

28  information regarding Olivas in connection with the Ramirez case.

See <u>United States v. Mapelli</u>, 971 F.2d 284, 287-88 (9th Cir. 1992) (disqualifying two Assistant U.S. Attorneys who had been exposed to the defendant's immunized testimony, but declining to disqualify the entire U.S. Attorney's Office).

Because defendant does not show any actual prejudice, there is no reason to disqualify the Central District USAO or any member of the Riverside Branch Office of the Central District USAO.

**V.   CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court deny defendant's "motion to dismiss without prejudice and recuse the USAO, or in the alternative, to dismiss without prejudice and recuse AUSA Joseph Widman" (dkt. 102).