1

<u>**DECLARATION OF ELI A. ALCARAZ**</u>

2

I, Eli A. Alcaraz, declare as follows:

3

    1.   I am an Assistant United States Attorney ("AUSA") in the

4

United States Attorney's Office for the Central District of

5

California ("USAO").  I am one of the attorneys representing the

6

United States in this case, <u>United States v. John Jacob Olivas</u>, ED CR

7

18-231-JGB.  If called to do so, I would and could competently

8

testify to the matters contained herein.

9

    2.   On October 6, 2021, AUSA Frances Lewis and I had a phone

10

call with defense counsel Meghan Blanco, concerning the upcoming

11

October 12, 2021 motions deadline in this case.  Defense counsel

12

mentioned that she planned to file a motion to recuse based on an

13

alleged conflict, but we did not discuss the details or bases of the

14

motion.  On Tuesday, October 12, 2021, at docket entry 102, defendant

15

filed a motion to dismiss without prejudice and recuse the USAO, or

16

in the alternative, to dismiss without prejudice and recuse AUSA

17

Joseph Widman ("Motion").

18

    3.   The Motion mentions at least one exhibit and two

19

declarations, although none were attached to the Motion when it was

20

filed.  I sent emails to defense counsel on October 13 (Wednesday),

21

14 (Thursday), and 15 (Friday), 2021 asking for any attachments that

22

were intended to support defendant's Motion.  On Saturday, October

23

16, 2021, defense counsel emailed me an October 15, 2021 declaration

24

signed by herself, an October 15, 2021 declaration signed by

25

defendant, and five documents where the titles say Exhibit A through

26

Exhibit E, although there are no slip sheets on the separate files.

27

Attached to this declaration as Exhibit 1 are true and correct copies

28

of what I received from defense counsel on Saturday, October 16,

2021.  The only difference from what I received from defense counsel and what is attached to this declaration is that I added page numbers for easy reference and added some redactions for privacy of various individuals.  As of 7:00 p.m. on October 26, 2021, the documents I received on October 16, 2021 have not been filed by defendant on the docket to support the Motion.

4.   When defendant filed the Motion on October 12, 2021, that was when I first learned about United States v. Julio Cesar Ramirez, ED CR 11-051-VAP.  When former-AUSA Joseph Widman and I overlapped as AUSAs between November 2018 and September 2020, I believe that I never had any previous conversations with Mr. Widman about the Ramirez case, including about defendant Olivas' involvement and Mr. Widman's opposition to defendant Ramirez's motion for discovery based on alleged misconduct of various law enforcement officers and confidential informants.  I have spoken with AUSA Frances Lewis and she informed me that she has no memory of discussing the Ramirez case with former-AUSA Widman.

5.   On October 13, 2021, I filed a notice of appearance in the Ramirez case (ED CR 11-051-VAP, dkt. 77) to replace Mr. Widman.  Mr. Widman's opposition (ED CR 11-051-VAP, dkt. 69) to defendant Ramirez's motion for discovery based on alleged misconduct (ED CR 11-051-VAP, dkt. 60) was filed under seal.  As new counsel of record for the United States in the Ramirez case, on October 15, 2021, I received from the clerk's office in the Riverside Courthouse for the District Court for the Central District of California the United States' opposition at docket entry 69.

2

6.    I plan to file a request in the Ramirez case, asking for permission to disclose the opposition at docket entry 69 in the Ramirez case to this Court and to defendant.  If the Ramirez Court authorizes distribution of the opposition at docket entry 69 in the Ramirez case, I then plan to submit docket entry 69 under seal to this Court for its consideration with the Motion, and to defendant as a courtesy copy.

7.    Attached as Exhibit 2 to this declaration is a true and correct copy of a Department of Homeland Security Administrative Inquiry Affidavit that I received from Special Agent Julio Barajas on October 18, 2021.

8.    Attached as Exhibit 3 to this declaration are true and correct copies of FBI reports and emails that are part of the discovery in this case.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed at Riverside, California, on October 26, 2021.

ELI A. ALCARAZ

EXHIBIT 1

MEGHAN A. BLANCO (Cal. Bar No. 238171)
Law Offices of Meghan Blanco
     28202 Cabot Road
     Suite 300
     Laguna Niguel, CA 92677
     Telephone:    (949) 296-9869
     Facsimile:    (949) 606-8988
     Email:        mblanco@meghanblanco.com

Attorney for Defendant
JOHN JACOB OLIVAS

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 18-CR-231-JGB |
|---|---|
| Plaintiff, | DECLARATION OF MEGHAN BLANCO |
| v. | Location:    Courtroom of the Hon. Jesus G. Bernal |
| JOHN JACOB OLIVAS, | |
| Defendant. | |

    Defendant John Olivas, by and through his counsel of record,

Meghan Blanco, files the attached declaration in support of his

previously filed motion to dismiss.

 Dated: October 15, 2021          Respectfully submitted,


                              _____/s/_____
                              MEGHAN BLANCO
                              Attorney for Defendant
                              JOHN JACOB OLIVAS

001

## DECLARATION OF COUNSEL

I, Meghan Blanco, declare as follows:

1. I make this declaration in support of John Olivas's motion to dismiss for conflict of interest. If called to do so, I would and could competently testify to the matters contained herein.

2. I am licensed to practice law before all courts in the State of California and before this Court. I represent Mr. Olivas in the above-entitled case.

3. I have reviewed the Docket in *United States v. Ramirez*, 11-CR-60-VAP. Many documents are under seal. I have not reviewed any of the under-seal documents. Attached hereto as exhibit A is a true and correct copy of Defendant's Motion for Discovery (CR 60), which alleges Mr. Olivas and other case agents engaged in disclosable misconduct in the *Ramirez* matter.

4. Attached here as exhibit E is a true and correct copy of a Stipulation for Order Continuing Sentencing Hearing (cR 51), which was filed in the *Ramirez* matter.

5. AUSA Joseph Widman was the AUSA in charge of the investigation and indictment of Mr. Olivas and was present at Mr. Olivas's initial appearance following his arrest in this case. (CR 1-9)

I declare under penalty of perjury, pursuant to the laws of the State of California, that the foregoing is true and correct to the best of my memory.

Executed on this 15 day of October, 2021 in San Clemente, California.

By: _____

MEGHAN A. BLANCO (Cal. Bar No. 238171)
Law Offices of Meghan Blanco
    28202 Cabot Road
    Suite 300
    Laguna Niguel, CA 92677
    Telephone:    (949) 296-9869
    Facsimile:    (949) 606-8988
    Email:      mblanco@meghanblanco.com

Attorney for Defendant
JOHN JACOB OLIVAS

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 18-CR-231-JGB |
|---|---|
| Plaintiff, | DECLARATION OF JOHN OLIVAS |
| v. | Location:    Courtroom of the Hon. Jesus G. Bernal |
| JOHN JACOB OLIVAS, | |
| Defendant. | |

Defendant John Olivas, by and through his counsel of record, Meghan Blanco, files the attached declaration in support of his previously filed motion to dismiss.

Dated: October 15, 2021          Respectfully submitted,

                            /s/
                        _____
                        MEGHAN BLANCO
                        Attorney for Defendant
                        JOHN JACOB OLIVAS

003

<u>DECLARATION OF JOHN OLIVAS</u>

I, John Olivas, declare as follows:

1. I make this declaration in support of my motion to dismiss for conflict of interest. If called to do so, I would and could competently testify to the matters contained herein.

2. I was a co-case agent in *United States v. Julio Ramirez*, 21-CR-51-VAP, a case that AUSA Joseph Widman investigated and prosecuted. My memory of my specific role in the investigation has faded over the years, but I recall that I participated in surveilling Mr. Ramirez at his parents' home and at LA Fitness, monitoring several controlled narcotics deliveries, monitoring CI interactions with Mr. Ramirez, transporting Mr. Ramirez from local to federal custody, and post-indictment proffers.

3. It is my understanding that sometime in 2012, Mr. Ramirez accused me and several other agents of various types of misconduct. Specifically, he accused me of "having a girlfriend who belongs to the Casa Blanca Fern Street, a local gang," and "assist[ing] her in illegal activities and help[ing] her get out of jams." These accusations were made after Mr. Ramirez entered a guilty plea, but before he was sentenced.

4. The allegations lodged against me were eventually discredited. However, between late 2012 and mid-2013, I participated in a number of interviews with AUSA Widman and OPR regarding these allegations. The inquiry expanded into my relationship with other women, including a former spouse

who the government has interviewed in connection with my
current case.  Some of these communications are documented
in Exhibits A through C, which are true and correct copies
of communications I had with my employer during this
period.

5. During the period I assisted in the *Ramirez* matter, I dated
all of the women listed as victims in this case.

I declare under penalty of perjury, pursuant to the laws of the
State of California, that the foregoing is true and correct to the
best of my memory.


Executed on this 15 day of October, 2021 in Riverside,
California.

By: _____

3

**Olivas, John J**

| | |
|---|---|
| **From:** | Olivas, John J |
| **Sent:** | Friday, December 28, 2012 4:48 PM |
| **To:** | ██████████@dhs.gov' |

Today, December 28, 2012 at approximately 10:04am Assistant United States Attorney (AUSA) Joe Widman contacted me regarding allegations provided by an UNK source to defense counsel regarding the subject of a past investigation that officers, agents, etc may have mishandled a particular case (██████████ and allegedly these allegations cover the span of multiple agents as well as multiple agencies.

AUSA Widman stated that one of the particular allegations did not directly identify my name and/or agency but rather described me as the "ICE agent who is the boyfriend of a girl from the same 'neighborhood' as the defendant" Case number detailed above.

The questions directed towards me were as follows:

1. Did you date a woman who associates with the particular gang with where she resides?
2. Did you ever assist this woman in getting out of any "jams"?

I stated that I did, in fact date this woman for approximately 10 to 12 weeks (July 2012 – September 2010) and that we ended our relationship 2 years and 2 months ago (October 2010). I also stated that during the time I was dating this woman, she currently had a brother, nephew and grandparents that resided in the adjacent neighborhood opposite of where the defendant used to reside. Furthermore, I did not assist this woman in getting out of 'jams'.

I would like to discuss this further with the agent(s) who are assigned.

ALSO, I'd like a copy of the report number for my records.

Regards,

John Olivas | Special Agent
Department of Homeland Security | HSI
Gangs | Public Safety
655 W. Rialto Ave.
San Bernardino, CA 92410
██████████ | office
909.386.3303 | fax
██████████ | cell
██████████████████

1

## DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

### ADMINISTRATIVE INQUIRY AFFIDAVIT

STATE OF: California

COUNTY OF: Riverside

I, John Jacob Olivas Jr.

being duly sworn, state the following:

I met R████ R██ B████ on Friday, July 9, 2010 in the city of Redlands, California during a gathering my roomate, Joffrey Andre Gurule was hosting at his residence located at █████████████., Highland, California 92346.

My romantic relationship with R████ lasted approximately ten (10) weeks. During the time we were together, we each shared the opportunity to meet each others' parents and siblings and my two (2) sons, ████ and L███. Approximately eight (8) weeks into the relationship, we decided to enter into a lease together and move into an apartment in the city of Riverside, California. At the time, R████, as well as my parents were residing in Riverside, and my son, ████ was attending school there as well. The move benefitted all parties.

Unfortunately, the relationship between R████e and I ceased eleven(11) days after we moved in together. R████ had called me on Saturday, September 18, 2010 advising me that "things were not working out." She proceeded to tell me that she had visited and spent the night with her ex-boyfriend, O██ M█████, whom was employed as a Detective for the Los Angeles Sheriff's Office (LASO). She stated she was confused and didn't know what she wanted. She stated she would reach out to me as to when she would be gathering her belongings. Approximately a few days later, R████'s Mother, S███ assisted me in returning all of R████'s belongings back to her Mother's house. In October 2010, I had notified the Manager of the situation and had the locks changed. In addition, I had R████'s name removed off the lease and a new lease was drafted to reflect only myself and my son, ████.

Approximately, a week later, the week beginning on September 20, 2010, R█████ reached out to spend time with me on my birthday, which was a day later on ████████████. We enjoyed each others company over dinner and drinks. At the time, I felt we were going to get back together. However, the following week on Monday, October 11, 2010 our relationship ceased once again. That Monday, October 11, 2010, R████ and I had plans to meet for lunch. Unfortunately, her ex-boyfriend had contacted her prior and upset her. As I was en route to her work to meet for lunch, R████e responded advising me that she had left work, was headed home and wanted her ex-boyfriend and I to leave her alone. At that point I knew she still maintained contact with him. At that point I terminated the relationship with R████. Due to the fact that I was already near her place of employment, and had knowledge that she was not there, I used that opportunity to return her bracelet to her manager without having to contact R████. In doing so, I had noticed a picture of R████ and my son, ████ on a corkboard wall. I removed the picture and tore my son's picture off. (Re: Management Inquiry dated January 2011. Result of findings stated no alleged abuse on my accord. I was interviewed and counseled as to handle any future occurrences with R████).

The last time I had contact with R████ R██ B████ since the break-up on October

---

Interviewing Official (Name & Title)                                   Affiant's Initials

Page _____ of _____

ICE Form 70-038 (11/09)

"targets" in that she is a beautiful woman and doesn't look like a member of the criminal enterprise. When the folder made its way to me, I was shocked to say the least. That is, until I could hear Sgt. Touissant and various other RPD personnel laughing out loud. I began stood up and acknowledged their prank, and laughed along. Apparently, the week prior when Sgt. Touissant was talking to R████ he learned that R████ had grown up in an adjacent neighborhood in Riverside and thus was making her out to be a gang member. My Group Supervisor, Robert Goetsch along with other members of my group were present and laughing as well. Unbeknownst to me, I was the only one not aware of the prank.

It wasn't until the actual day of the take down that I was made aware that, in fact, there was a loose correlation between R████ and the wife of the target of the investigation. On June 1, 2011, Special Agent Julio Barajas and I arrived at the RPD Magnolia Station to pick up the target, Julio Cesar Ramirez and transport him to the San Bernardino Sheriff Department jail facility located in San Bernardino, California. Once inside the vehicle Julio Cesar Ramirez made reference that I looked familiar and that I resembled a man that was dating the "third, distant cousin" of his wife Vanessa. He described R████, by her name, her car (black BMW) and her profession as a executive secretary (Best, Best & Krieger). He stated that he had seen her at a restaurant some time ago with this man and that I resembled this man. I stated that I resemble a lot of people. There was no further conversation regarding my resemblance to this man. I neither confirmed, nor denied I was that man. Instead, I opted to say I resemble a lot of people.


In regards to any Restraining Orders (RO) involving my second wife, R████ E██ e██ O████:

There has never been any approved restraining orders against me. My second wife and I have been involved in various child custody disputes, historically since 2005. Each time I petitioned the court to gain more custody of my younger son, L██ A████████ O████, my son's mother R██ a██ O████ attempts to garner a Restraining Order against me. She feels that, in doing so, this will limit the time I spend with my son. To date, each Restraining Order R████ O████ has attempted to file against me has been found lacking merit. She has attempted to file these erroneously fueled Restraining Orders in 2005, 2007 and I believe more recently in December 2011 or April 2012. Upon hearing both sides during the Ex Parte Hearings, both Judges have concluded that each Ex Parte Restraining Order has lacked merit and thus never made permanent. I am not entirely sure, but I believe that in either our last or next to last custody hearing, R████ attempted to erroneously file another Restraining Order was either December 2011 or April 2012 of which either nothing was filed or lacked merit. I can say with ease that there has never been a permanent Restraining Order against me.

---

Interviewing Official (Name & Title)

Page _____ of _____

Affiant's Initials

ICE Form 70-038 (11/09)

## ADMINISTRATIVE INQUIRY AFFIDAVIT (continuation)

7. 1. 0

I have read the foregoing statement consisting of __2__ pages, each of which I have initialed. I fully understand this statement and it is true, accurate and complete to the best of my knowledge and belief. I made the corrections shown and placed my initials opposite each. Should I become aware of any additional information regarding the matter for which I provided in this statement, I will promptly contact the fact finder and provide such information. I made this statement freely and voluntarily without any threats or reward, or promise of reward having been made to me in return for it.

Subscribed and sworn to me

on _____ , in the month

of _____ ,

in the year of _____ .

_____
Affiant

_____
Interviewing Official (Name & Title)

_____
Witness

_____
Signature

Page __2__ of __2__

ICE Form 70-038 (11/09)



*Office of Professional Responsibility*
**U.S. Department of Homeland Security**
950 L'Enfant Plaza, 2nd Floor, SW
Washington, DC   20536

**U.S. Immigration
and Customs
Enforcement**

July 26, 2013

**MEMORANDUM FOR**     John Olivas
Criminal Investigator
Homeland Security Investigations

**From:**     Timothy M. Moynihan
Assistant Director
Office of Professional Responsibility

**Subject:**     Letter of Closure

**Reference:**     OPR Case 201302256

On November 21, 2012, the Office of Professional Responsibility received the following allegation against you:

- Knowingly and inappropriately associating with persons connected to criminal activity.

An investigation into the allegation has been completed. The investigative results do not support the reported allegation; therefore, this report will not be referred to management for action and is now considered closed.

If you have any questions regarding the outcome of this investigation please contact Ronald Grimes, Division Director of Investigations via email at ▮▮▮▮▮▮▮▮▮.

1    SEAN K. KENNEDY (SBN 145632)
     Federal Public Defender
2    (Email: Sean_Kennedy@fd.org)
     JEFFREY A. AARON (SBN 135625)
3    Deputy Federal Public Defender
     (Email: Jeffrey_Aaron@fd.org)
4    3801 University Avenue, Suite 700
     Riverside, CA 92501
5    Telephone (951) 276-6346
     Facsimile (951) 276-6368
6
     Attorneys for defendant:
7    JULIO CESAR RAMIREZ

8              UNITED STATES DISTRICT COURT

9            CENTRAL DISTRICT OF CALIFORNIA

10                 EASTERN DIVISION

11    UNITED STATES OF AMERICA,      )    NO. ED CR 11-51-VAP

12            Plaintiff,          )    DEFENDANT'S MOTION FOR
                            )    DISCOVERY; MEMORANDUM
13                             )    OF POINTS AND AUTHORITIES
          v.                      )    IN SUPPORT THEREOF;
14                             )    DECLARATION OF COUNSEL;
                            )    EXHIBIT
15                             )
16    JULIO CESAR RAMIREZ,        )    Hearing Date: January 14, 2012
                            )    Hearing Time: 9:00 a.m.
17          Defendant.         )
   _____ )

18

19        PLEASE TAKE NOTICE THAT defendant, JULIO CESAR RAMIREZ, by

20    and through counsel, will move at the above date, time, and place, or as soon

21    thereafter as counsel may be heard, for a order granting discovery as set forth

22    hereinafter. This motion is based on the papers, files, records, and exhibits in this

23    action, and on such exhibits and evidence as may be produced at the hearing of this

24    motion.

25                          Respectfully submitted,

26                          SEAN K. KENNEDY
                          Federal Public Defender

27

28    DATED: December 17, 2012       By___*/S/Jeffrey A. Aaron*_____
                               JEFFREY A. AARON
                               Deputy Federal Public Defender

## MEMORANDUM OF POINTS AND AUTHORITIES

1.  Statement of Facts.

Julio Cesar Ramirez has pled guilty, has been interviewed and received his Pre-Sentence Investigation Report (PSR), and has filed his sentencing position paper. The defense is asking for a twenty year sentence; the government is seeking thirty years.  See Defense Position re: Sentencing at 7-8; Government Sentencing Position at 21.

While awaiting sentencing, defense counsel received a very disturbing, and anonymous, telephone call.  See Declaration of Counsel (attached hereto).  The caller identified himself as "Mike" and provided a number of details of alleged police and informant misconduct.  Id.  The allegations are shocking and difficult to believe.

According to Mike, Robbie, first name unknown, was the lead agent for the United States Immigration and Customs Enforcement (ICE) in Mr. Ramirez's case. Id.  Robbie tried to get one of the confidential informants in the case, a person known as "Monkey," who apparently did a controlled buy from Mr. Ramirez, to murder another informant.  Id.  This other informant was named "Daniel" or "Big D" and he was from Ontario, and he worked for Riverside Police Department (RPD) Officer Ron Kipp and/or persons working with Detective Kipp.  Id.

Robbie, the ICE agent, was later removed from the Ramirez case.  Id.  The ICE agent gave Monkey the addresses for informant Daniel and met with Monkey in private.  Id.  There was an internal investigation at RPD and a FBI investigation concerning this incident.  Id.  Monkey was allowed to run the drug trade and tax collection for the Mexican Mafia (Eme) in Riverside with Detective Kipp's guidance. Id.  This was from about 2008 to early 2010, and there are documented reports by other detectives asking why Ron Kipp would allow that.  Id.

A confidential informant named "Drew" did a gun transaction and a controlled buy with Mr. Ramirez.  Id.  Drew is a documented member of "Eastside

-2-

Riva," a local street gang, and a major "shot caller" (an individual who can order killings on behalf of a gang) for them.  Id.  He committed two homicides in the last six to seven months before the Drug Enforcement Agency (DEA) took him into protective custody after the last major bust of Eastside Riva.  Id.  Nobody was ever charged in the killings.  Id.  Mike did not know the victims, but he said that the lead agent for the DEA in Mr. Ramirez's case would know.  Id.

About three years ago, when Detective Kipp was on a drug task force, there was an incident between him, an unnamed informant in Mr. Ramirez's case who did either a gun transaction or a drug buy from Mr. Ramirez, and members of the Fontana Police Department.  Id.  This incident took place, Mike believed, at the park near Jurupa Road and the Granite Golf Course.  Id.

Essentially, the incident resulted from Detective Kipp hiding an illegal relationship with the informant and meeting with the informant in private.  Id.  Guns were supposedly drawn by Detective Kipp and the Fontana Police Department.  Id.  Following the incident, Detective Kipp was put on desk duty and later transferred to a different group.  Id.

One of the current ICE agents in Mr. Ramirez's case has a girlfriend who belongs to Casa Blanca Fern Street, a local street gang.  Id.  He assists her in illegal activities, and helps her get out of "jams."  Id.  This is taking place right now.  Id.  After Mr. Ramirez's federal case is over, according to Mike, he will be charged with attempted murder for hire.  Id.  There is an informant on this case, and the case agent will be Detective Kipp.  Id.

Defense counsel asked Mike to call back the next day to speak to a Public Defender Investigator and assured him of confidentiality.  Id.  After waiting two days for Mike to call back, defense counsel contacted the government.  Id.; see also Jeffrey A. Aaron-Joseph Widman Email chain (dated 11/16/12 to 11/20/12) (attached hereto as Exhibit A).

On November 16, 2012, defense counsel emailed the government, asked AUSA

-3-

1    Widman about this information, and specifically mentioned his <u>Henthorn</u> and <u>Brady</u>

2    requests.  <u>Id.</u>; <u>see also</u> Exhibit A.  The government did not respond, and on November

3    20, 2012, defense counsel again contacted the government about these allegations.

4    <u>Id.</u>; <u>see also</u> Exhibit A.  On November 20, 2012, the government responded:  "The

5    government takes its discovery obligation very seriously in this and every case.  We

6    have and will continue to produce any discoverable material in our possession."  <u>Id.</u>;

7    <u>see also</u> Exhibit A.

8          Defense counsel has received no information relating to the above allegations,

9    nor has he received any response that the government has inquired about these

10   allegations with the respective agencies.

11         These anonymous allegations put the defense into a difficult position.  If the

12   defense disregards them, it fails in its duty to investigate Mr. Ramirez's case

13   diligently and to defend him vigorously.  The defense has no proof that these

14   allegations are true, but it has no proof that they were investigated and shown to be

15   false.  Such incredible allegations would appear to require a significant amount of

16   proof, but for defense counsel to decide not to investigate them would require defense

17   counsel to assume that the law enforcement agencies have thoroughly investigated

18   these allegations, found them to be unsubstantiated, and communicated that

19   information to the government.  The defense has no evidence that this has in fact

20   happened, and it would be remiss of defense counsel to waive his client's rights to

21   such an investigation.  This is particularly the case when the allegations come from

22   someone previously unknown to defense  counsel, but who seems to have such

23   detailed knowledge of the various players in the task-force investigation in the

24   Ramirez case.

25                              **LEGAL ARGUMENT**

26   <u>2.  The defendant is entitled to evidence of police/informant misconduct or bias.</u>

27         Evidence of police or informant misconduct should have been provided to the

28   defense.  In general, evidence of a witness's hostility to the defendant should be

                                    -4-

provided.  See, e.g., United States v. Sperling, 726 F.2d 69 (2nd Cir. 1984).  In
addition, evidence of rewards or promises, whether formal or informal, to a witness
should be disclosed.  Singh v. Prunty, 142 F.3d 1157, 1161-63 (9th Cir. 1998)
(nondisclosure of state's agreement to provide benefits to a witness violated due
process); see also United States v. Bagley, 473 U.S. 667 (1985); Giglio v. United
States, 405 U.S. 150, 155 (1972).  The Ninth Circuit also requires that evidence of
prior bad acts of a witness that go to the witness's credibility should be disclosed.
United States v. Steinberg, 99 F.3d 1486, 1490 (9th Cir. 1996) (ordering a new trial
when the confidential informant was shown to be engaged in illegal activity while
cooperating); United States v. Strifler, 851 F.2d 1197, 1202 (9th Cir. 1988)
(information in a witness's probation file that disclosed motives for informing and his
tendency to overcompensate for problems and lie should have been disclosed).
Finally, the FBI informant file, and personnel files for a government witness, should
be disclosed under certain circumstances.  United States v. Henthorn, 931 F.2d 29,
30-31 (9th Cir. 1991); United States v. Phillips, 854 F.2d 273, 277-78 (7th Cir. 1988);
see also United States v. Garrett, 542 F.2d 23, 27 (6th Cir. 1976) (defendant was
entitled to personnel file of officer who was later suspended for drug use).

Following the conviction of Senator Ted Stevens in 2008, the court appointed a
Special Counsel, Henry F. Schuelke, III, to investigate "a series of allegations" of
prosecutorial misconduct.  In re Special Proceedings, 842 F.Supp. 2d 232, 235-36
(D.D.C. 2012).  After a thorough investigation, the Special Counsel filed a 525 page
report detailing a number of instances of grave prosecutorial misconduct.  See Report
to Hon. Emmet G. Sullivan of Investigation Conducted Pursuant to the Court's Order,
dated April 7, 2009 at http://www.scribd.com/doc/85469006/Schuelke-Report (as
visited on December 13, 2012).

The violations were so serious and so widespread that the United States District
Court ordered that the Special Counsel's report should remain public in order to
educate the community that, among other things, the government's repeated

-5-

violations of its discovery violations were not, as claimed by the government attorneys, "unintentional," or "inadvertent," or "immaterial." Id. at 242. The government ultimately filed a motion to dismiss the case with prejudice in 2009. Following the Sevens case, the Deputy Attorney General wrote a memorandum in which he suggested that prosecutors provide "broad and early discovery" and "err on the side of inclusiveness" when making determinations as to what is discoverable. See Memorandum by Deputy Attorney General David W. Ogen (January 4, 2010).

The lessons of the Stevens case are clear. Unfortunately, when allegations of misconduct are made, defense counsel must exercise due diligence and cannot take the government's representations at face value. This is true even if defense counsel does not know that discovery violations have in fact occurred; or, if such violations have occurred, that the government is even aware of them. The allegations here are shocking and, defense counsel admits, difficult to believe. But a failure to investigate these claims would violate defense counsel's duty to vigorously investigate Mr. Ramirez's case.

Here the government's response to counsel's email was ambiguous. It is impossible to tell if (1) the government checked with the agencies discussed above and found no information, or (2) checked with the agencies and found information but did not deem it discoverable, or (3) did not check with the agencies at all. In any case, the defense has requested a number of items that would be discoverable. Given the above authorities, it seems self-evident that the kind of misconduct described would be discoverable under several different theories, whether as prior bad acts, general impeachment evidence, evidence of a motive to fabricate, and so forth. Whether the information involves law enforcement or informants, the misconduct is severe and certainly material. If any of the allegations were proven to be true, Mr. Ramirez would seek a number of different remedies. At the very least, if Mr. Ramirez had known of such misconduct, he would certainly have reconsidered his decision to plead guilty, and would have conducted even more investigation and widened the

-6-

defense investigation into a number of other areas.

## **CONCLUSION**

The defense respectfully requests that the Court order the government to contact the Riverside Police Department, the Fontana Police Department, the FBI, the DEA, and ICE, and request full discovery of any reports, statements, personnel files, memoranda, videos, or any other evidence of

1. Misconduct by Detective Ron Kipp;

2. Misconduct by past or present informants in the Ramirez case;

3. Misconduct by the ICE agent known as "Robbie";

4. Evidence of past or present gang membership by informants in the Ramirez case;

5. Evidence of any past or present personal relationships with persons in Eastside Riva or Casa Blanca by past or present agents in the Ramirez case;

6. The informant files maintained by the various agencies for the informants known as "Monkey," "Daniel" or "Big D," and "Drew";

7. The personnel file for Detective Ron Kipp and the ICE agent known as "Robbie";

8. Any other relief that the Court believes would be reasonable and proper.

Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender

DATED: December 17, 2012     By___/S/Jeffrey A. Aaron_____
JEFFREY A. AARON
Deputy Federal Public Defender

-7-

017

# DECLARATION OF COUNSEL

I, Jeffrey A. Aaron, declare as follows:

1.  I am a Deputy Federal Public Defender and in that capacity I represent Mr. Julio Ramirez in the above action.

2.  On November 14, 2012, I received a telephone call from a man who identified himself as "Mike." He told me that he feared retaliation and, consequently, he would not give me his last name. To the best of my knowledge, I had never spoken to "Mike" before, and he did not appear to be connected to any of the people who had been supporting Mr. Ramirez throughout this case.

3.  Mike told me the following:

    A.  Robbie, first name unknown, was the lead agent for the United States Immigration and Customs Enforcement Agency (ICE) in Mr. Ramirez's case. He attempted to arrange for one of the confidential informants in the case, a person known as "Monkey," who apparently did a controlled buy from Mr. Ramirez, to murder another informant.

    B.  This other informant was named "Daniel" or "Big D" and he was from Ontario. He worked for Riverside Police Department (RPD) Officer Ron Kipp and/or persons working with Detective Kipp.

    C.  The ICE agent was later removed from the Ramirez case. The ICE agent gave Monkey the addresses for informant Daniel and met with Monkey in private.

    D.  There was an internal investigation at RPD and a FBI investigation concerning this incident.

    E.  Monkey was allowed to run the drug trade and tax collection for the Mexican Mafia (Eme) in Riverside under the guidance of Detective

-8-

Kipp. This was from about 2008 to early 2010. There are documented reports by other detectives asking why Ron Kipp would allow that.

F. A confidential informant named "Drew" did a gun transaction and a controlled buy with Mr. Ramirez. Drew was a documented member of "Eastside Riva," a local street gang, and a major "shot caller" (an individual who can order killings on behalf of a gang) for them. He committed two homicides in the last six to seven months before the Drug Enforcement Agency (DEA) took him into protective custody after the last major bust of Eastside Riva.

G. Nobody was ever charged in the killings. Mike does not know the victims, but the lead agent for the DEA in Mr. Ramirez's case would know.

H. About three years ago, when Detective Kipp was on a drug task force, there was an incident between him, an unnamed informant in Mr. Ramirez's case who did either a gun transaction or a drug buy from Mr. Ramirez, and members of the Fontana Police Department. This incident took place, Mike believed, at the park near Jurupa Road and the Granite Golf Course.

I. Essentially, the incident resulted from Detective Kipp hiding an illegal relationship with the informant and meeting with the informant in private. Guns were supposedly drawn by Detective Kipp and the Fontana Police Department. Following the incident, Detective Kipp was put on desk duty and later transferred to a different group.

J. One of the current ICE agents in Mr. Ramirez's case has a girlfriend who belongs to Casa Blanca Fern Street, a local street gang. He assists her in illegal activities, and helps her get out of "jams." This relationship, said Mike, is currently on-going.

-9-

K.  After Mr. Ramirez's federal case is over, according to Mike, he will be charged with attempted murder for hire.  There is an informant on this case, and the case agent will be Detective Kipp.

4.  I did not have an investigator present with me when Mike called.  I wrote down the information Mike gave me the best that I could.

5.  I asked Mike to call back the next day to speak to a Public Defender Investigator and assured him that we would not divulge any personal information he might give us.

6.  I waited two days for Mike to call back.  After two days passed and Mike did not call, I contacted the government.  Jeffrey A. Aaron-Joseph Widman Email chain (dated 11/16/12 to 11/20/12) (attached hereto as Exhibit A).

7.  On November 16, 2012, I emailed the government, asking AUSA Joseph Widman about this information, and specifically mentioned my Henthorn and Brady requests.  Exhibit A.

8.  The government did not respond.

9.  On November 20, 2012, I again contacted the government above this information.  Exhibit A.

10.  On November 20, 2012, the government responded:  "The government takes its discovery obligation very seriously in this and every case.  We have and will continue to produce any discoverable material in our possession."  Exhibit A.

11.  The government's response is ambiguous in my opinion.  It is impossible to tell if the government checked with the agencies discussed above and found no information, or checked with the agencies and found information but did not deem it discoverable, or failed altogether to check with the agencies.  It is clear, however, that the government does not believe that it has any discoverable information relating to

///

-10-

the above allegations.

12. At no time has my office received any information about the above allegations from the government.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed this ___17___ day of December, 2012, in Riverside, California.

Jeffrey A. Aaron
Declarant

-11-

**EXHIBIT A**



"Widman, Joseph (USACAC)"
<Joseph.Widman@usdoj.gov
>

11/20/2012 02:08 PM

To    Jeffrey Aaron <Jeffrey_Aaron@fd.org>

cc

bcc

Subject    RE: Ramirez: Brady/Hethorn information

History:         📧 This message has been replied to.

Jeff,

The government takes its discovery obligation very seriously in this and every
case. We have and will continue to produce any discoverable material in our
possession.

Joe

-----Original Message-----
From: Jeffrey Aaron [mailto:Jeffrey_Aaron@fd.org]
Sent: Tuesday, November 20, 2012 1:13 PM
To: Widman, Joseph (USACAC)
Subject: Re: Ramirez: Brady/Hethorn information

Hi Joe:  I have not heard back from you on this and was wondering what your
thoughts were, and I'd appreciate it if you could get back to me on it.
Thanks.
Jeffrey A. Aaron
Deputy Federal Public Defender
Office of the Federal Public Defender
3801 University Avenue, Ste. 700
Riverside, CA 92501
Telephone  951.276.6346
Facsimile  951.276.6368


          Jeffrey
          Aaron/CACF/09/FDO

          11/16/2012 07:23
          PM

                                                                            To
                              "Widman, Joseph (USACAC)"
                              <Joseph.Widman@usdoj.gov>

                                                                            cc

                                                                       Subject
                              Ramirez:  Brady/Hethorn information
                              (Document link: Jeffrey Aaron)


Hi Joe:  I received some very unusual information the other day about this.
I was told:
(1)  One of the original ICE agents on Julio's case tried to get a CI to
murder another CI who was from Ontario.  The ICE agent was removed from the

case. The second CI was run by Ronald Kipp, a RPD officer. This was
documented through internal affairs at RPD and in a FBI investigation and was
about 2008-2010.
(2) One of the CIs, also known as "Drew," committed two murders in the nine
months before the DEA took him into protective custody but while he was
working for authorities. The DEA agent handling him knew who the victims
were, but nobody was ever charged. Drew is a major shot-caller for Eastside
Riva and he was taken into custody following the last major bust of that gang.
(3) Officer Kipp, a CI in Julio's case, and a Fontana Police Officer had an
incident after which Officer Kipp was put on desk duty and then reassigned to
a different group. Apparently it was some sort of confrontation in which guns
were draw. This was about three years ago.
(4) One of the ICE agents currently has a romantic relationship with a girl
from Casa Blanca Fern Street. Supposedly he has helped her get out of
trouble.
(5) In addition, apparently law enforcement has plans to file additional
charges against Julio. Riverside PD plans to file charges against Julio for
attempted murder as soon as he is sentenced.
Did you ask the TFO officers and the federal agents about Brady and Henthorn?
As you know, we make Brady and Henthorn requests in all cases.
Please let me know. Thanks.
Jeffrey A. Aaron
Deputy Federal Public Defender
Office of the Federal Public Defender
3801 University Avenue, Ste. 700
Riverside, CA 92501
Telephone  951.276.6346
Facsimile  951.276.6368

1   SEAN K. KENNEDY (SBN 145632)
    Federal Public Defender
2   (E-mail: Sean_Kennedy@fd.org)
    JEFFREY A. AARON (SBN 135625)
3   Deputy Federal Public Defender
    (E-mail: Jeffrey_Aaron@fd.org)
4   3801 University Avenue, Suite 700
    Riverside, California 92501
5   Telephone (951) 276-6355
    Facsimile (951) 276-6368
6
    Attorneys for Defendant
7   JULIO CESAR RAMIREZ

8                    UNITED STATES DISTRICT COURT

9                  CENTRAL DISTRICT OF CALIFORNIA

10                        EASTERN DIVISION

11  UNITED STATES OF AMERICA,        )   NO. ED CR 11-51-VAP
                                     )
12                   Plaintiff,      )   STIPULATION AND [PROPOSED]
                                     )   ORDER TO CONTINUE
13          v.                       )   SENTENCING HEARING
                                     )
14  JULIO CESAR RAMIREZ,             )   Current Date and Time:
                                     )      December 10, 2012, at 9:00 a.m.
15                                   )
                     Defendant.      )   Proposed Date and Time:
16                                   )      February 4, 2013, at 9:00 a.m.
                                     )
17  _____ )

18

19          IT IS HEREBY STIPULATED AND AGREED by and between Plaintiff,

20  United States of America, by and through its attorney of record, Assistant United

21  States Attorney Joseph Widman, and defendant JULIO CESAR RAMIREZ, by and

22  through his attorney of record, Deputy Federal Public Defender Jeffrey A. Aaron:

23          1.      The current sentencing date is December 10, 2012, at 9:00 a.m., but

24  the defense needs more time to prepare for sentencing, to serve subpoenas and review

25  the materials provided, and to possibly draft motions.

26          2.      The defense has received information about possible misconduct by

27  various officers and informants involved in the Ramirez case and investigation. The

28  misconduct allegedly involves federal and state officers. Based on the allegations,

1  the defense believes it is essential to conduct further investigation into the matter.  In

2  order to do this, the defense will need more time to  draft and serve motions, draft

3  and serve subpoenas, provide sufficient time for the subpoenaed materials to be

4  prepared and provided, and, finally, to review the materials provided in response to

5  the subpoenas.

6       3.    The government has no objection to the sentencing be continued.

7       4.    The parties agree that the sentencing hearing in this case should be

8  continued from December 10, 2012, 9:00 a.m. to February 4, 2013, at 9:00 a.m.

9

10                   Respectfully submitted,

11                   SEAN K. KENNEDY
                 Federal Public Defender

12

13

14  DATED:  November 26, 2012    By

15                   JEFFREY A. AARON
                 Deputy Federal Public Defender

16

17                   ANDRÉ BIROTTE JR.
                 United States Attorney

18

19

20  DATED:  November 26, 2012    By  Joseph Widman

21                   JOSEPH WIDMAN
                 Special Assistant United States Attorney

22

23

24

25

26

27

28

PROOF OF SERVICE

I, the undersigned, declare that I am a resident or employed in Riverside County, California; that my business address is the Federal Public Defender's Office, 3801 University Avenue, Suite 700; Riverside, California 92501; that I am over the age of eighteen years; that I am not a party to the above-entitled action; that I am employed by the Federal Public Defender for the Central District of California, who is a member of the Bar of the United States District Court for the Central District of California, and at whose direction I served the Stipulation and [Proposed] Order to Continue Sentencing Hearing.

On November 26, 2012, following ordinary business practice, service was:

| [X] Placed in a closed envelope, for collection and hand-delivery by our internal staff, addressed as follows: | [ ] By hand-delivery addressed as follows: | [ ] Placed in a sealed envelope for collection and mailing via United States Mail, addressed as follows: |
|---|---|---|

Kim Cassulo
United States Probation Officer
United States Court House
312 North Spring Street, 6th Fl.
Los Angeles, California 90012

This proof of service is executed at Riverside, California, on November 26, 2012.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

*Kristina Beck*
Kristina Beck

3

EXHIBIT 2

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

**ADMINISTRATIVE INQUIRY AFFIDAVIT**

STATE OF:   California

COUNTY OF:  San Bernardino

I, Julio C. Barajas

being duly sworn, state the following:

In approximately September 2010, I was assigned as the case agent for Operation Casa Blanca Rifa (███████████.  I replaced Special Agent (SA) Corbin Maxwell as the case agent.

In approximately October 2010, SA John Olivas told me that he (Olivas) was dating a woman (UW), and that he (Olivas) was becoming serious with her (UW).  SA Olivas told me that he (Olivas) introduced her (UW) to his (Olivas) family and that their (Olivas and UW) families met each other.  SA Olivas showed me one or two photos of her (UW).  The photos shown to me did not depict her (UW) as a gang member or the gang member type.

In approximately November 2010, HSI agents and Riverside Police Department (RPD) officers had a meeting at RPD.  I believe that the HSI agents present were Group Supervisor (GS) Rob Goetsch, SA Olivas, SA Kenneth Heizer, SA Scott Steward, SA Tad Freesmeier, and I.  I do not recall the names of the RPD officers present.  At the end of the meeting, one of the RPD officers was saying something about a woman that caught SA Olivas' attention.  I believe that the RPD officer had a DMV photo of the woman and some other documents.  Ultimately, all of the RPD officers started to laugh at Olivas, indicating that it was all a prank against Olivas.  At the end, Olivas sighed relief.  I never did catch everything said during the prank and no one (HSI or RPD) came to me with any allegations.  Lastly, I concluded that the prank was about UW.

In approximately February or March 2011, I was in the same vehicle with SA Olivas when he (Olivas) got into a telephonic argument with UW.  From what I was able to hear, I believe that the argument was about the UW re-initiating a relationship with her (UW) ex-boyfriend (possibly LAPD).

In approximately April 2011, SA Olivas gave me the impression that he (Olivas) broke off the relationship with UW and that he (Olivas) was in the process of returning and/or obtaining personal belongings to and from UW.  During this period, SA Olivas and I were driving around a section of Riverside conducting address checks for the investigation.  SA Olivas stated that the UW lived or had lived in the area.

On June 1, 2011, when I finished with grand jury testimony, I was called by SA Heizer and told that RPD or DEA made an allegation against SA Olivas.  The allegation was that SA Olivas told a woman, during a baseball game at a local Riverside park, that HSI was investigating Julio Cesar Ramirez.  This woman told a law enforcement officer, who then reported it.  I advised SA Heizer to tell GS Goetsch about the allegation.  Later, while I was still at the Federal Courthouse, I was told by GS Goetsch to not pick up the search

_____
Interviewing Official (Name & Title)

Page ___1___ of ___3___

_____
                                    JCB
                              Affiant's Initials

ICE Form 70-038 (11/09)

and arrest warrants from the Judge.  By approximately 1 pm, GS Goetsch gave me the go
ahead to get the warrants in preparation of executing them on June 2, 2011.  Later, I was
told by ASAC Debra Parker and GS Goetsch that SA Olivas was not to participate during the
execution of the warrants.

On June 2, 2011, the search and arrest warrants were executed.  I do not believe that the
operation was compromised by the allegation made against Olivas.  GS Goetsch directed me
and SA Olivas to transport Ramirez from RPD to the San Bernardino County jail.  During the
transport, Ramirez told Olivas that he (Ramirez) recognized him (Olivas) from the L.A.
Fitness health club.  Ramirez also told him (Olivas) that he (Ramirez) knew that he
(Olivas) dated UW who had some relation to Ramirez or Ramirez's girlfriend.  I recall that
Olivas downplayed Ramirez's statements.

On approximately two days before Thanksgiving Day 2012, AUSA Joe Widman called me and told
me that Ramirez made some allegations against HSI agents, but did not provide details.
AUSA Widman asked me for the contact information for GS Goetsch and GS Daren Dowell.

In approximately December 2012, Widman provided me with a copy of the allegations.  Upon
seeing the allegation, I conferred with GS Dowell and GS Salacup.  GS Dowell advised me
that he (Dowell) reported it.  Later, I recall that Widman spoke with SA Maxwell about the
allegations.  Later, Olivas told me that he (Olivas) received a copy of the allegations
from AUSA Widman.

On April 1, 2013, I was looking for someone on the first floor that I can ask if there
were appointments made to be interviewed regarding the allegations.  I was on leave for 2
1/2 weeks and I was unsure.  SA Olivas saw me and we began to talk to each other, but we
were unsure if we could say anything.  Finally, SA Olivas revealed to me that he spoke
with the fact finder and that he (Olivas) knew someone was coming to conduct interviews.
SA Olivas stated that he (Olivas) had no specific interview time.  I decided that I would
just wait to be called because I did not hear otherwise.

On April 2, 2013, GS Goetsch called me and told me that the fact finder was ready to
interview me.  I drove to Riverside and I was interviewed by Laura Murphy from
approximately 10:45 am to 11:45 am.



| Interviewing Official (Name & Title) | | Affiant's Initials |

Page ___2___ of ___3___

ICE Form 70-038 (11/09)

## ADMINISTRATIVE INQUIRY AFFIDAVIT (continuation)

I have read the foregoing statement consisting of ___3___ pages, each of which I have initialed.  I fully understand this statement and it is true, accurate and complete to the best of my knowledge and belief.  I made the corrections shown and placed my initials opposite each.  Should I become aware of any additional information regarding the matter for which I provided in this statement, I will promptly contact the fact finder and provide such information.  I made this statement freely and voluntarily without any threats or reward, or promise of reward having been made to me in return for it.

Subscribed and sworn to me

on _3rd day_ , in the month

of _April_ ,

in the year of _2013_ .

_____
Affiant

_____
Interviewing Official (Name & Title)

_____
Witness

_____
Signature

Page ___3___ of ___3___

EXHIBIT 3

FD-71 (Rev. 5-8-10)



UNCLASSIFIED

# FEDERAL BUREAU OF INVESTIGATION

### Complaint Form

**Title:** (U) JOHN OLIVAS                                    **Date:** 08/04/2014

**Approved By:** SSA Colin L. Schmitt

**Drafted By:** David Staab

**Case ID #:** ▮▮▮▮▮▮▮▮          (U) JOHN OLIVAS – SUBJECT;
                                N▮▮▮ B▮▮▮▮ – VICTIM;
                                CIVIL RIGHTS – (COLOR OF LAW)

**Full Investigation Initiated:** 08/04/2014

**Enclosure(s):** Enclosed are the following items:
1.  (U) JOHN OLIVAS NCIC & DL PHOTO
2.  (U) JOHN OLIVAS NCIC & DL PHOTO
3.  (U) JOHN OLIVAS NCIC & DL PHOTO
4.  (U) JOHN OLIVAS NCIC & DL PHOTO
5.  (U) JOHN OLIVAS NCIC & DL PHOTO

---

**Complaint Synopsis:**   (U) DA declined to prosecute investigation against
HSI Special Agent JOHN OLIVAS regarding rape, domestic violence, and
unlawful use of service weapon.

**Received On:**   06/09/2014

**Receipt Method:**   Telephone

**Incident Type:**   Criminal Activity

**Drafted By:**   Arielle Nielsen

**Complaint Details:**

     (U) Duty Agent received complaint call from D▮▮▮ B▮▮▮ (B▮▮▮,
telephone number ▮▮▮▮▮▮▮▮, cell phone number ▮▮▮▮▮▮▮,
concerning the District Attorney's declination to prosecute Homeland
Security Investigations (HSI) Special Agent JOHN JACOB OLIVAS (OLIVAS)

UNCLASSIFIED

00014494

UNCLASSIFIED

Title:  (U) JOHN OLIVAS
Re:  ███████████████,  08/04/2014

based on charges of rape, misuse of duty weapon, and felony domestic
violence.

    (U) B█████ stated that her daughter, N████ B█████ (████████ Date
of Birth (DOB) ████████████, filed a complaint on OLIVAS with the
Riverside Police Department (Case # ███████████ regarding the above
mentioned allegations and provided video evidence of the rape, numerous
text messages, and Facebook posts to support this claim. N█████ dated
OLIVAS for approximately a year and a half. During this time, N█████
was raped by OLIVAS on two separate occasions. OLIVAS provided
documentation of numerous medical injuries caused by OLIVAS. OLIVAS
recorded at least one instance of rape and forwarded it to N█████ with
the threat that he would send it to N████'s father if she spoke of the
incident. Additionally, OLIVAS pointed his duty weapon at N█████ on at
least one occasion and at his father in a separate incident, witnessed
by OLIVAS' mother. N█████ provided text message evidence corroborating
the event with his father.

    (U) B█████ stated that the decision to prosecute was postponed on
several occasions by the DA's office and on Friday, 06/06/2014, B█████
received a phone call stating the DA's declination to pursue
prosecution against OLIVAS. B█████ stated this decision came
immediately following the election and believes there may be a
connection to OLIVAS's father who has ties to the city council.

    (U) B█████ stated that OLIVAS' access to HSI space and information
systems had been suspended and he no longer had possession of his duty
weapon.

    (U) HSI Long Beach Field Office, Office of Professional
Responsibility (OPR), opened an internal investigation on OLIVAS, but
the case remained pending inactive to not interfere with the criminal
investigation by the Riverside PD. TROY JACOBS (JACOBS), telephone
number ████████████, of HSI OPR was in charge of the internal
investigation.

    (U) Duty Agent contacted JACOBS for further information. JACOBS

UNCLASSIFIED

2

00014495

Title:   (U) JOHN OLIVAS
Re:   ████████████ , 08/04/2014

stated that HSI was pursuing the administrative investigation of OLIVAS
but believed the evidence of the allegations was substantial and a
criminal investigation should be pursued against OLIVAS. JACOBS
confirmed that video, cell phone, and social media (Facebook) evidence
corroborates the allegations made by N████ in addition to similar
complaints filed by 3-4 ex-girlfriends of OLIVAS. JACOBS stated that
HSI OPR was additionally reviewing allegations of illegal steroid usage
by OLIVAS. JACOBS believed that Assistant DA Silverman was in charge of
the DA investigation.

**Drafted By:** David Staab
**Pre-Assessment Finding 1:**

On July 1, 2014, Writer met with ICE OPR SA Troy Jacobs and AUSA Jay
Robinson.  SA Jacobs provided a briefing on the case against Olivas.
 AUSA Robinson agreed to review the case for any potential federal
violations.

Writer reviewed all of the RPD reports as well as the results of the
consent search of the victim's phone.

Writer has contacted RPD to obtain copies of the audio recordings of
the victim/witness/subject interviews conducted in the state case.
 Writer also requested the complete image of the victim's phone, not
just the results of the RPD search.

Review is on going.

**Final Pre-Assessment Finding:**

Writer received the audio recordings from RPD on July 31, 2014.  Based
on initial review, it appears there may be sufficient evidence to
indicate Olivas deprived the victim of her civil rights through force

UNCLASSIFIED

Title:  (U) JOHN OLIVAS
Re:  ▬▬▬▬▬▬▬, 08/04/2014


and/or violence.  Recommend that a full investigation be opened and
assigned.

**Recommended Action:**  Open New Case


♦♦

UNCLASSIFIED

4

00014497

FD-1057 (Rev. 5-8-10)



UNCLASSIFIED

# FEDERAL BUREAU OF INVESTIGATION
### Electronic Communication

**Title:** (U) EC to document the opening of a full        **Date:** 08/05/2014
field investigation.

**From:** LOS ANGELES
         LA-RV02 (SSA C. Schmitt)
         **Contact:** David Staab, 951-248-6529

**Approved By:** A/SSA Doris H. Webster

**Drafted By:** David Staab

**Case ID #:** ▮▮▮▮▮▮▮▮          (U) JOHN OLIVAS - SUBJECT;
                               N▮▮▮ B▮▮▮▮ - VICTIM;
                               CIVIL RIGHTS - (COLOR OF LAW)

**Synopsis:** (U) To open a full field investigation and notify Civil
Rights Unit (CRU) of the case opening.

**Full Investigation Initiated:** 08/04/2014

**Administrative Notes:** (U) Full field opened 08/04/2014.

**Details:**

   On June 12, 2014, the Riverside Office of the FBI was notified of
possible civil rights violations by a Homeland Security Investigations
(HSI) Special Agent JOHN OLIVAS.  The FBI was made aware of these
allegations from Immigration and Customs Enforcement (ICE), Office of
Professional Responsibility (OPR), Resident Agent in Charge, CHRISTINE
REDMAN.

   Specifically, the allegations are that SA OLIVAS used his position
as a HSI SA to intimidate, and to sexually and physically assault his
then live-in girlfriend N▮▮▮ B▮▮▮▮.  Further, it was alleged he used
his position to keep the alleged victim from reporting the assaults.

   B▮▮▮▮ first reported the alleged abuse and rape to Riverside
Police Department (RPD) on or about October 31, 2013.  RPD conducted an

UNCLASSIFIED

UNCLASSIFIED

Title:  (U) EC to document the opening of a full field investigation.
Re:  ███████████, 08/05/2014


investigation and referred the case to the Riverside County District Attorney's (RCDA) office for prosecution.  On June 5, 2014, the RCDA declined to file domestic violence and rape charges against OLIVAS.

The information for the predication of this investigation has come from the RPD reports and interviews.

I.  Summary of the Predication

B████ and SA OLIVAS began a dating relationship on or about March 22, 2012.  According to B█████, the relationship ended on or about Thanksgiving 2012 (November 20, 2012).

On their first date, OLIVAS told the victim he worked as a police officer, and showed B█████ his badge.  OLIVAS told B█████ he could not tell her what department he worked for, but took her to his car at the end of the date and showed her his "SWAT" gear.  B█████ was living with OLIVAS at his residence in Riverside, California within a week of the initial meeting.

Almost immediately, OLIVAS began to get violent and abusive towards B█████.  OLIVAS and B█████ would argue often.  When B█████ wanted to leave the house, OLIVAS would part his Government HSI vehicle directly behind B███'s vehicle so that she could not leave.

Over the course of the relationship, OLIVAS allegedly committed various types of assaults against B█████.  OLIVAS squeezed B█████ to prevent her from leaving after an argument. The "squeeze" caused an injury to B███'s rib area. (OLIVAS was described to be 6'4" and 270 lbs.  Victim B█████ was 5'4" and 100 lbs.)  OLIVAS would throw the batteries from the TV remote control at her; OLIVAS choked B█████ to the point of almost passing out, and other types of abuse that caused injuries to B███'s legs, arms and face.

RPD asked B█████ why she did not report any of the abuse.  B█████ stated she was afraid of OLIVAS and that he had several videos and pictures on his cell phone of them having sex.  OLIVAS threatened to

UNCLASSIFIED

2

006

00014508

UNCLASSIFIED

Title:  (U) EC to document the opening of a full field investigation.
Re:  ▮▮▮▮▮▮▮▮▮▮, 08/05/2014


send the pictures to her father if ▮▮▮▮ ever told anyone what had
happened.  ▮▮▮▮ did not want her father to see the videos of her
having sex with OLIVAS.

    Anytime ▮▮▮▮ threatened to call the police, OLIVAS would take her
cell phone from her.  From his Government issued cell phone, OLIVAS
would call "Sector" and identify himself as "Alpha 1294."  He would
ask whoever he was speaking with to have the RPD Watch Commander
contact him and he would hang up.  Within a few minutes, his Government
issued phone would ring and OLIVAS would have a conversation with
someone.  After he got off the phone, OLIVAS would tell ▮▮▮▮ to go
ahead and call the police because they are my friends and they are not
going to do shit.

    ▮▮▮▮ described an incident when she and OLIVAS were out at a bar
in Riverside.  When they were leaving the bar and while sitting in
OLIVAS' truck, OLIVAS pulled out his gun and waved it around, pointed
it at her head and eventually put the gun in his mouth.  When he put
the weapon in his mouth, OLIVAS asked ▮▮▮▮ what would she do if he
pulled the trigger.  OLIVAS was described to be "belligerent and
completely drunk" when this occurred.  OLIVAS eventually put the weapon
away and drove them home to his house.

    Later that night, once they returned to OLIVAS' home, OLIVAS
forcibly raped ▮▮▮▮ on the floor.  ▮▮▮▮ begged OLIVAS to stop and
OLIVAS told her to "shut the fuck up and do what I say."

    Approximately two months after the first rape, OLIVAS raped ▮▮▮▮
again.  This occurred after she returned from a doctor's appointment
for her rib injury caused by OLIVAS.  ▮▮▮▮ was in bed when OLIVAS
returned home.  OLIVAS started to grab ▮▮▮▮ and wanted to have sex.
▮▮▮▮ told OLIVAS that she did not want to have sex because she was
in too much pain from her rib injury.  OLIVAS did not care, and held
▮▮▮▮'s wrist together above her head with one of his hands and forced
her down.  When ▮▮▮▮ told OLIVAS to stop and that she was in pain,
OLIVAS told ▮▮▮▮ "I don't care, shut the fuck up."  ▮▮▮R stated she
just laid there and told OLIVAS to let her know when he was done.

UNCLASSIFIED

3

00014509

**UNCLASSIFIED**

Title:  (U) EC to document the opening of a full field investigation.
Re:  ████████████, 08/05/2014


B████ stated there were times during the relationship when OLIVAS
wanted to have sex and she did not.  OLIVAS would talk B████ into
having sex, and those times it was different than the two alleged
rapes.  She stated that during the rapes, OLIVAS held her down and
would not allow her to move.

B████ did not report the conduct earlier for fear of retaliation
or injury from OLIVAS.  She advised that he was a cop and was friends
with the RPD cops, so she felt that she had no one to report the
conduct to.

B████ had an audio recording on her cellular telephone of OLIVAS
and her.  On the recording, a male voice, believed to be OLIVAS, was
heard telling B████ that if she ever cheated on him, he would
have/send a CI (Confidential Informant) to assault her.

On July 1, 2014, Writer, SA Troy Jacobs from ICE OPR, and AUSA Jay
Robinson met to discuss the case.  Jacobs provided copies of the RPD
reports and the results of the digital search of B████'s phone to
Writer and AUSA Robinson.

Should the investigation uncover evidence of violations of federal
law by OLIVAS, AUSA Robinson agreed to pursue prosecution of OLIVAS.

II.    Victim Descriptive Data:

    a. Victim's Race - White

    b. Victim's Gender - Female

    c. Injury - Yes

    d. Death - no

III.    Subject Descriptive Data:

    a. Subject's Race - White


**UNCLASSIFIED**

4

00014510

**UNCLASSIFIED**

Title:  (U) EC to document the opening of a full field investigation.
Re:  ███████████, 08/05/2014


    b. Subject's Gender - Male

IV.   <u>General Descriptive Data:</u>

    a. Date of Incident - various, second rape on or about
      10/31/2012

    b. Incident Location - Subject's residence, 8925 Digger
  Pine, Riverside

    c. Type of Offense - Sexual assault/physical assault

    d. Weapons - HSI issued pistol


◆◆

**UNCLASSIFIED**

5

**Armendariz, Ezequiel N**

| | |
|---|---|
| **From:** | Staab, David S. (LA) (FBI) <████████████████████> |
| **Sent:** | Tuesday, November 01, 2016 9:21 AM |
| **To:** | Armendariz, Ezequiel N |
| **Subject:** | RE: Olivas stuff |
| **Attachments:** | complaint_Riverside.pdf |

SA David Staab • Los Angeles Field Office • Riverside Resident Agency
Desk: ███████  •  Cell: ████████  •  Fax: (951) 248-6560

**From:** Armendariz, Ezequiel N ████████████████████
**Sent:** Monday, October 31, 2016 9:04 AM
**To:** Staab, David S. (LA) (FBI)
**Subject:** RE: Olivas stuff

Dave,

Hope you had a good weekend.  Do you have the state charging documents for our file?

Thanks,
Zeke

**From:** Staab, David S. (LA) (FBI) ████████████████████]
**Sent:** Thursday, September 08, 2016 4:59 PM
**To:** Armendariz, Ezequiel N
**Subject:** Fwd: Olivas stuff

SA David Staab
FBI Riverside
Desk: ████████
Cell: ████████

-------- Original message --------
From: "Staab, David S. (LA) (FBI)" ████████████████>
Date: 08/30/2016 11:00 AM (GMT-08:00)
To: "Widman, Joseph (USACAC)" <████████████████████>
Subject: Olivas stuff

Joe,

Here are drafts of the stuff we talked about last night.  The memo is still a work in progress.

1

010

00023653

Thanks again

Dave

_____

SA David Staab • Los Angeles Field Office • Riverside Resident Agency
Desk: ▮▮▮▮▮▮▮▮ • Cell: ▮▮▮▮▮▮▮▮ • Fax: (951) 248-6560

FD-302 (Rev. 5-8-10)

- 1 of 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    10/05/2017

M███████ H███████, date of birth, ███████ ████, was interviewed at the
United States District Court in Riverside, California. Also present for
the interview was AUSA Joseph Widman. After being advised of the
identities of the interviewing agents, and the nature of the interview,
H███████ provided the following information:

**The below is an interview summary. It is not intended to be a verbatim
account and does not memorialize all statements made during the interview.
Communications by the parties in the interview were electronically
recorded. The recording captures the actual words spoken.**

H███████ provided background information on her relationship with JOHN
OLIVAS. H███████ detailed the major incidents she endured during their
relationship.

| | | |
|---|---|---|
| Investigation on | 10/04/2017 | at Riverside, California, United States (In Person) |
| File # | ███████████ | Date drafted   10/04/2017 |
| by | David Staab | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

00022752

EXHIBIT 4
UNDER SEAL