TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
ELI A. ALCARAZ (Cal. Bar No. 288594)
Assistant United States Attorney
Riverside Branch Office
    3403 Tenth Street, Suite 200
    Riverside, California 92501
    Telephone: (951) 276-6938
    Facsimile: (951) 276-6202
    Email:   Eli.Alcaraz@usdoj.gov
FRANCES S. LEWIS (Cal. Bar No. 291055)
Assistant United States Attorney
Deputy Chief, General Crimes Section
    312 North Spring Street, 11th Floor
    Los Angeles, California 90012
    Telephone: (213) 894-4850
    Facsimile: (213) 894-0141
    Email:   Frances.Lewis@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>        v.<br><br>JOHN JACOB OLIVAS,<br><br>      Defendant. | ED CR No. 18-231-JGB<br><br>GOVERNMENT'S TRIAL MEMORANDUM<br><br>Trial Date:  November 30, 2021<br>Location:    Courtroom of the<br>              Hon. Jesús G. Bernal |

    Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Eli A. Alcaraz and

///

///

Frances S. Lewis, hereby files its trial memorandum for the trial of defendant John Jacob Olivas.

Dated: November 26, 2021          Respectfully submitted,

                                  TRACY L. WILKISON
                                  United States Attorney

                                  SCOTT M. GARRINGER
                                  Assistant United States Attorney
                                  Chief, Criminal Division

                                  ___/s/_____
                                  ELI A. ALCARAZ
                                  FRANCES S. LEWIS
                                  Assistant United States Attorneys

                                  Attorneys for Plaintiff
                                  UNITED STATES OF AMERICA

# TABLE OF CONTENTS

DESCRIPTION                                                                                 PAGE

TABLE OF AUTHORITIES...................................................iii

MEMORANDUM OF POINTS AND AUTHORITIES....................................1

I.    INTRODUCTION.....................................................1

II.   STATEMENT OF THE CHARGES.........................................2

III.  SCHEDULING MATTERS...............................................4

      A.   The Government's Case-in-Chief..............................4

      B.   Potential Defense Case......................................5

IV.   STATEMENT OF FACTS...............................................5

      A.   Defendant Deprived Victim K.L. of Her Right to Bodily
           Integrity When Acting under Color of Law He Attempted
           to Rape Her in January 2012.................................5

      B.   Defendant Deprived Victim N.B. of Her Right to Bodily
           Integrity When Acting under Color of Law He Raped Her
           in September and November 2012..............................9

      C.   Defendant Acted Willfully..................................14

      D.   Defendant Acted under Color of Law.........................15

V.    ELEMENTS OF THE CHARGES -- 18 U.S.C. § 242......................16

      A.   The Right to Bodily Integrity..............................16

      B.   Willfully..................................................18

      C.   Color of Law...............................................19

      D.   Aggravated Sexual Abuse....................................21

VI.   LEGAL AND EVIDENTIARY ISSUES....................................22

      A.   Defendant's Prior Statements...............................22

      B.   Statements to Defendant....................................24

      C.   Medical Evidence and Testimony.............................25

      D.   Victim's Prior Consistent Statements.......................26

      E.   Scope of Cross-Examination into Witnesses R.A., C.N.,
           and M.O. (the Uncharged Victims)...........................29

i

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                                 PAGE

    F.   Business Records........................................31

    G.   Video and Photographic Evidence.........................31

    H.   Conditionally Admitting Evidence........................32

    I.   Facebook and Instagram Records..........................33

    J.   Expert Testimony........................................35

        1.   Dr. Janine Shelby, Ph.D............................35

        2.   FBI Forensic Examiners.............................35

    K.   Cross-Examination of Defendant..........................36

    L.   Claims that the Government Should Call a Specific
        Witness.................................................37

    M.   Affirmative Defenses, Reciprocal Discovery, and Jury
        Nullification...........................................38

VII. CONCLUSION.................................................39

ii

**TABLE OF AUTHORITIES**

**CASES**                                                              PAGE

Anderson v. Warner,
    451 F.3d 1063 (9th Cir. 2006) ............................. 19, 20, 21

Berry v. Beauvais,
    No. 12-cv-26470-WJM-CBS, 2015 WL 5244892 (D. Colo. Sept. 9, 2015) 28

Cates v. United States,
    882 F.3d 731 (7th Cir. 2018) ..................................... 22

Darden v. Wainwright,
    477 U.S. 168 (1986) .............................................. 31

Hoffman v. Lee,
    474 F. App'x 503 (9th Cir. 2012) ................................. 26

Kremerman v. Open Source Steel, LLC,
    No. C17-953-BAT, 2018 WL 5785441 (W.D. Wash. Nov. 5, 2018) ....... 34

Lucero v. Stewart,
    892 F.2d 52 (9th Cir. 1989) ...................................... 32

Orsini v. O/S Seabrooke O.N.,
    247 F.3d 953 (9th Cir. 2001) ..................................... 24

Reese v. County of Sacramento,
    888 F.3d 1030 (9th Cir. 2018) .................................... 18

Screws v. United States,
    325 U.S. 91 (1945) ........................................... 18, 20

Taylor v. Illinois,
    484 U.S. 400 (1988) .............................................. 39

Tome v. United States,
    513 U.S. 150 (1995) .............................................. 27

United States. v Ledbetter,
    184 F. Supp. 3d 594 (S.D. Ohio 2106) ............................. 28

United States v. Bao,
    189 F.3d 860 (9th Cir. 1999) ..................................... 27

United States v. Black,
    767 F.2d 1334 (9th Cir. 1985) .................................... 36

iii

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                          PAGE

United States v. Brooks,
    473 F.2d 817 (9th Cir. 1973) ..................................... 24

United States v. Burreson,
    643 F.2d 1344 (9th Cir. 1981) .................................... 23

United States v. Castro,
    887 F.2d 998 (9th Cir. 1987) ..................................... 24

United States v. Catabran,
    836 F.2d 453 (9th Cir. 1988) ..................................... 35

United States v. Ceballos,
    789 F.3d 607 (5th Cir. 2015) ..................................... 34

United States v. Classic,
    313 U.S. 299 (1941) .............................................. 19

United States v. Collicott,
    92 F.3d 973 (9th Cir. 1996) ......................... 23, 24, 27, 28

United States v. Fernandez,
    839 F.2d 639 (9th Cir. 1988) ..................................... 23

United States v. Frederick,
    78 F.3d 1370 (9th Cir. 1996) ..................................... 27

United States v. Gere,
    662 F.2d 1291 (9th Cir. 1981) .................................... 32

United States v. Giordano,
    442 F.3d 30 (2d Cir. 2006) ................................... 19, 21

United States v. Gonzalez,
    533 F.3d 1057 (9th Cir. 2008) .................................... 17

United States v. Johnstone,
    107 F.3d 200 (3d Cir. 1997) ...................................... 18

United States v. Lanier,
    520 U.S. 259 (1997) .............................................. 17

United States v. Lopez-Figueroa,
    316 F. App'x 548 (9th Cir. 2008) ................................. 23

iv

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                    PAGE

United States v. Martin,
  822 F. App'x 521 (9th Cir. 2020) ............................... 34

United States v. May,
  622 F.2d 1000 (9th Cir. 1980) ................................. 32

United States v. Miranda-Uriarte,
  649 F.2d 1345 (9th Cir. 1981) ................................. 36

United States v. Mitchell,
  502 F.3d 931 (9th Cir. 2007) .................................. 23

United States v. Necoechea,
  986 F.2d 1273 (9th Cir. 1993) ................................. 38

United States v. Oaxaca,
  569 F.2d 518 (9th Cir. 1978) .................................. 32

United States v. Ortega,
  203 F.3d 675 (9th Cir. 2000) .................................. 23

United States v. Powell,
  955 F.2d 1206 (9th Cir. 1992) ................................. 39

United States v. Recio,
  884 F.3d 230 (4th Cir. 2018) .................................. 34

United States v. Reese,
  2 F.3d 870 (9th Cir. 1993) .................................... 18

United States v. Segall,
  833 F.2d 144 (9th Cir. 1987) .................................. 30

United States v. Shaw,
  891 F.3d 441 (3d Cir. 2018) ...............................17, 22

United States v. Stearns,
  550 F.2d 1167 (9th Cir. 1977) ................................. 31

United States v. Steele, No. 2:10-CR-148-BLW, 2011 WL 841386 (D.
  Idaho) ........................................................ 26

United States v. Stuart,
  718 F.2d 931 (9th Cir. 1983) .................................. 27

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                        PAGE

United States v. Tank,
    200 F.3d 627 (9th Cir. 2000) ..................................... 35

United States v. Tarpley,
    945 F.2d 806 (5th Cir. 1991) ..................................... 19

United States v. Valerio,
    441 F.3d 837 (9th Cir. 2006) ..................................... 24

United States v. Watkins,
    600 F.2d 201 (9th Cir. 1979) ..................................... 33

United States v. Webb,
    214 F.3d 962 (8th Cir. 2000) ..................................... 18

United States v. Yazzie,
    59 F.3d 807 (9th Cir. 1995) ...................................... 25

West v. Atkins,
    487 U.S. 42 (2000) ............................................... 19

Zal v. Steppe,
    968 F.2d 924 (9th Cir. 1992) ..................................... 39

**Statutes**

18 U.S.C. § 242.............................................passim

**Rules**

Fed. R. Crim. P. 16(b)(1)(A)..................................... 38
Fed. R. Crim. P. 16(d)(2)(C)..................................... 38
Fed. R. Evid. 104(b)............................................ 32
Fed. R. Evid. 106............................................... 23
Fed. R. Evid. 611(b)............................................ 37
Fed. R. Evid. 701(a)............................................ 26
Fed. R. Evid. 801(c)............................................ 24
Fed. R. Evid. 801(d)............................................ 23
Fed. R. Evid. 801(d)(2)......................................... 23
Fed. R. Evid. 801(d)(2)(A)...................................... 23
Fed. R. Evid. 803(1)............................................ 25
Fed. R. Evid. 803(2)............................................ 25
Fed. R. Evid. 803(3)............................................ 25
Fed. R. Evid. 803(6)........................................... 6, 31
Fed. R. Evid. 901(a)............................................ 32

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2
## I.    INTRODUCTION

3       In 2011 and 2012, defendant John Jacob Olivas ("defendant") was

4  a Special Agent with United States Immigration and Customs

5  Enforcement ("ICE"), Homeland Security Investigations ("HSI"),

6  formerly known as "ICE, Office of Investigations."  Instead of using

7  his badge, service firearm, and federal law enforcement power to

8  better his community, however, defendant used his position and power

9  for his own personal gratification: sexually abusing and attempting

10 to sexually abuse two of his intimate partners and preventing them

11 from reporting his sexual assaults, as well as other acts of

12 violence, to law enforcement.  Defendant's abuse of his federal law

13 enforcement authority violated the victims' constitutional rights:

14 namely, their rights to liberty and bodily integrity.  For three

15 specific sexual assaults and attempted sexual assaults of K.L. and

16 N.B., defendant is charged with three counts of deprivation of rights

17 under color of law, in violation of 18 U.S.C. § 242.

18      Defendant's charged sexual assaults were not, for example,

19 spontaneous acts of sexual aggression against strangers after

20 flashing his badge or against victims who simply had some passing

21 knowledge of defendant's status as a federal agent.  Rather,

22 defendant's consistent and methodical reliance on his federal law

23 enforcement authority in his personal relationships were part of a

24 long trajectory of growing power over -- and expanding abuse of --

25 his intimate partners under color of law.  K.L. had a romantic

26 relationship with defendant from approximately August 2011 to January

27 2012, during which defendant repeatedly exhibited escalating violent

28 and controlling behavior, including grabbing her by the head and

squeezing so hard she got black eyes.  When she threatened to call the police, he claimed he was the above local law enforcement and was therefore "invisible"[1] and "untouchable."  During another violent episode, defendant threw his badge at her and refused to let her leave because he was "Homeland Security."  Defendant's violent behavior toward K.L. culminated with his attempt to rape her in January 2012 (Count 1) after K.L. no longer wanted to date defendant, but was still too scared to report his conduct because of his claims about his federal position and authority.

Within two months, defendant started a romantic relationship with N.B. and the two lived together from approximately March 2012 to November 2012, with communication and contact extending until early 2013.  N.B. experienced defendant's same violent, escalating, controlling, and intimidating behavior, which included his repeated brandishing of HSI credentials to her and asserting that he was above the law.  Defendant raped N.B. in September 2012 (Count 2) after earlier in the evening pulling his HSI-issued service weapon on her and threatening to pull the trigger.  In November 2012, defendant raped N.B. again (Count 3).  And just a few days after that, he videotaped himself sodomizing her while she was sedated from a sleeping pill and unable to consent to that sexual act.

## II.   STATEMENT OF THE CHARGES

Defendant is charged in the indictment with three counts of deprivation of rights under color of law, in violation of 18 U.S.C. § 242.

---

[1] The government anticipates that K.L. will testify that defendant used the word "invisible," but that K.L.'s testimony will show the idea to which defendant referred was "invincibility."

In Count One, the United States alleges that between August 2011 to January 2012, in Riverside County, defendant, while acting under color of law, willfully deprived victim K.L. of the right secured and protected by the Constitution and laws of the United States to be free from deprivations of liberty without due process of law, which includes the right to bodily integrity.  Specifically, in or about January 2012, the United States alleges that defendant attempted to engage in vaginal intercourse with K.L. without her consent and by using force against her, after communicating to K.L. that the police would not be responsive to any report she may make about defendant because of his position as a federal law enforcement officer.  This offense included attempted aggravated sexual abuse.

In Count Two, the United States alleges that, between March 2012 and September 29, 2012, in Riverside County, defendant, while acting under color of law, willfully deprived victim N.B. of the right secured and protected by the Constitution and laws of the United States to be free from deprivations of liberty without due process of law, which includes the right of bodily integrity.  Specifically, in or about September 2012, the United States alleges that defendant engaged in vaginal intercourse with N.B. without her consent and by using force against N.B., after communicating to N.B. that the police would not be responsive to any report she may make about defendant because of his position as a federal law enforcement officer.  This offense included aggravated sexual abuse.

In Count Three, the United States further alleges that, between September 30, 2012, and November 2012, in Riverside County, defendant, while acting under color of law, willfully deprived N.B. of the right secured and protected by the Constitution and the laws

3

of the United States to be free from deprivations of liberty without due process of law, which includes the right to bodily integrity. Specifically, on or about November 9, 2012, the United States alleges that defendant engaged in vaginal intercourse with N.B. without her consent and by using force against N.B., after communicating to N.B. that the police would not be responsive to any report she may make about defendant because of her position as a federal law enforcement officer.  This offense included aggravated sexual abuse.

**III.  SCHEDULING MATTERS**

    **A.    The Government's Case-in-Chief**

    Jury trial for defendant is set for Tuesday, November 30, 2021, at 8:30 a.m.  The government estimates five to eight days for its case-in-chief, not including jury selection or cross-examination.

    The government presently anticipates calling the following non-custodial witnesses at trial, which are organized by type and listed in alphabetical order:

    1.   Victims

            a.    R.A. (uncharged victim)

            b.    N.B. (charged victim)

            c.    K.L. (charged victim)

            d.    C.N. (formerly described as C.R.) (uncharged victim)

            e.    M.O. (formerly described as M.H.) (uncharged victim)

    2.   Civilian witnesses

            a.    D.B. (victim N.B.'s mother)

            b.    B.M. (victim N.B.'s friend)

            c.    I.T. (former Killarney's bar manager)

            d.    L.T. (victim N.B.'s friend)

    3.   Law enforcement

     a.   HSI Supervisor Special Agent David Guppenberger

     b.   Murrieta PD Detective Paul Johnson (forensics)

     c.   Former ICE OPR Lead Instructor Karen Martin

     d.   Former Riverside PD Detective Kevin Tutwiler

     e.   FBI Special Agent David Staab

     f.   FBI CART Forensic Analyst Jim Watkins (forensics)

4.   Professionals and Experts

     a.   Dr. Prateek Jindal (treating physician)

     b.   Dr. Janine Shelby, Ph.D (noticed expert)

     c.   Dr. Jessie Rollins (treating physician)

     d.   Dr. Geisele Wudka (treating physician)

     If the parties cannot reach an agreement, the government plans to file a motion in limine to admit certain business records from AT&T, Verizon, Sprint, Facebook, and Southern California Edison under Federal Rules of Evidence 803(6) and 902(11) in lieu of calling those custodians of record at trial.

**B.   Potential Defense Case**

     Defendant has not provided the government with notice that he intends to rely on any affirmative defenses or present an affirmative case.  The government's unopposed motions to exclude Rule 412 evidence (dkt. 101) and good character evidence (dkt. 81) were granted at the pretrial conference on November 22, 2021.

**IV.   STATEMENT OF FACTS**

     The evidence at trial will demonstrate the following:

**A.   Defendant Deprived Victim K.L. of Her Right to Bodily Integrity When Acting under Color of Law He Attempted to Rape Her in January 2012**

     Defendant and K.L. met and began dating in August 2011.  From the beginning, K.L. knew and understood -- because defendant made it

5

1    a point of emphasis -- not just that defendant was a federal agent,

2    but that his position gave him power over her and others.  K.L. also

3    recalls defendant's temper and quick resort to violence.  For

4    example, the government anticipates K.L. will testify about a time

5    the two attended a water park together where he referred to other

6    individuals in line as his confidential informants, and then used

7    them to cut the long line to gain entry to the park.  Defendant then

8    proceeded to drink excessively, and, while drunk, drove K.L. home,

9    screaming at her the whole ride home.  When the two entered K.L.'s

10   house, she locked herself in her bedroom because she was scared of

11   defendant.

12        After some time had passed that same day, when she thought

13   defendant had calmed down or left, she went out into her living room.

14   Defendant was waiting for her.  He grabbed her by her head with both

15   hands and squeezed her face, giving her two black eyes.  After K.L.

16   threatened to call the police, defendant told her that he was above

17   local law enforcement, that nothing could ever happen to him, and

18   that he was "invisible" to local law enforcement, i.e., invincible,

19   because of his status as a federal agent.  Although K.L. had

20   originally intended to call the police, K.L. did not then call the

21   police because of defendant's comments that her efforts to report him

22   would be ignored.  Despite defendant's abusive behavior, K.L.

23   remained in a relationship with defendant after this incident.  The

24   government's noticed expert, Dr. Janine Shelby, Ph.D, is anticipated

25   to testify that women in abusive relationships frequently struggle to

26   leave or report violent conduct for a host of reasons, including fear

27   of their abuser and the hope that the person will change.

28

6

During the remainder of their relationship, defendant continued to abuse K.L. physically and, for example, threaten her with arrest. Defendant would choke K.L. to the point that she would have lasting red marks, grab her arms to the point where she would bruise, and throw her against walls.  K.L. has photographs of bruises to her arms, face, and neck from defendant's violent acts.  Although she does not recall the exact date they were taken, K.L. is anticipated to testify that she started documenting these physical abuses after defendant said he could make her "disappear" and she believed him. When she would threaten to call the police, defendant would return to his time-tested routine of telling her that he was above the local police, it would be his word against hers, and the local police would believe him over her because he was a federal agent.  He also told her that that he could get her arrested and that the arrest would result in K.L. losing custody of her children.

At other times, as noted, when trying to control her behavior, defendant told K.L. that he could make her "disappear."  Relatedly, when out in public, at the Riverside bar Killarney's, for example, he would tell her that some particular person was in fact his informant and that defendant looked out for the informant and the informant helped defendant.  K.L. believed that informants were criminals who would assist law enforcement in return for not being sent to jail. Defendant would also routinely tell K.L. that he could access a person's Facebook account through his work, and that defendant also monitored his ex-wife R.A.'s electronic communications through work, and that he could track K.L.'s phone using his phone.  K.L. believed defendant could and was accessing her social media because of his position as a federal agent.

On K.L.'s birthday in December 2011, she and some friends went
dancing with defendant at Killarney's bar in Riverside.  Defendant
accused K.L. of dancing with other men and then dragged her out by
her arm as K.L. screamed.  Despite K.L.'s protect, the security at
the bar did not help her, adding to her belief that because of
defendant's law enforcement status, he could abuse her with impunity.
Defendant threw her into his car.  Defendant drove her back to his
house in Riverside.  Once back at defendant's house, K.L. tried to
get into her car and leave.  Defendant threw his HSI-badge at her,
told her that he was "Homeland Security," and refused to move his
car, which was parked behind hers.  Eventually defendant relented and
allowed her to leave.

In or about January 2012, defendant attempted to rape K.L. while
the two of them were at defendant's residence and after she had made
it clear to defendant that they were just friends and no longer had a
romantic relationship.  While watching a movie, defendant repeatedly
tried to kiss K.L., and she told him he was not abiding by her
request that they not have any physical contact.  Defendant tried to
put his hand up K.L.'s shirt and tried to take off her pants.
Eventually, defendant held her down by the shoulders, using his body
weight and strength, and tried to have sex with her.  K.L.
emphatically told defendant that she did not want to have sex with
him, but defendant kept holding her down.  K.L. began screaming, but
defendant persisted.  It was not until K.L. began kicking defendant
in his stomach area and screaming for help that he relented.  After
this incident, K.L. did not want any more contact with defendant.
She, however, did not report the attempted rape or defendant's
abusive conduct toward her to the police.  Based on defendant's past

statements about his position as a federal agent, K.L. felt the

police would not help her.

**B.    Defendant Deprived Victim N.B. of Her Right to Bodily Integrity When Acting under Color of Law He Raped Her in September and November 2012**

Just a few months after attempting to rape K.L., defendant began

a relationship with N.B. in March 2012.  On their first date,

defendant identified himself as a federal agent and showed his

official credentials to her, his firearm, and his department-issued

tactical vest and other agency-issued equipment in the back seat of

his car.  Throughout their relationship, N.B. would see defendant use

his credentials to get special treatment.  Any time they went out,

defendant was armed with his HSI-issued service weapon on his waist.

He would often use his credentials and the fact that he had a weapon

to get special parking at venues or cut the line at local bars and

clubs.[2]

N.B. moved into defendant's home in Riverside very quickly and

it took only a few weeks for defendant to become physically abusive.

Defendant would throw objects at N.B., physically restrain her by

pinning her against walls, pull her hair, and choke her to the point

where she would nearly pass out.  As with K.L., defendant used his

position as a federal agent to intimidate N.B. into not reporting any

of his physical and sexual attacks to law enforcement officials.

After physical attacks, defendant would tell N.B. that the

police would not believe her word over his.  He would also tell her

---

[2] I.T., the bar manager at Killarney's during this time period, is expected to corroborate N.B.'s testimony by describing multiple incidents where defendant would use his badge to gain entry to the bar, including asking if he (defendant) could place his gun in the Killarney's safe.  Defendant would also ask I.T. to tell other patrons at Killarney's about defendant's status as a federal agent.

that he was "well-connected" to Riverside Police Department ("RPD")
management and, as a Special Agent, he had more authority than local
police officers.  For example, after one particularly violent episode
on October 5, 2012, N.B. called a longtime mentor of hers, L.T.,
crying hysterically that defendant had just choked her and would not
let her leave.  L.T. asked to speak to defendant, and not wanting to
make the situation worse, simply urged him to let N.B. leave the
house.  Defendant continued to refuse -- telling L.T. that he was a
federal agent and that he had the situation under control.  L.T. is
expected to testify that defendant's statements to her appeared to
try and influence L.T. to ignore N.B.'s plea for help.

As early as May 2012, N.B. had seen enough violence that she
would want to call the police.  Defendant, however, told N.B. that if
she did, he would also call and tell them ignore any complaints from
his residence.  Defendant would sometimes take it a step farther and
even pretend to call "Sector" (HSI's version of a watch commander) in
front of N.B. and ask to be connected to the RPD watch commander.  He
would then get a call back from someone N.B. believed to be an RPD
sergeant.  Defendant once even threatened to send a confidential
informant ("CI") to N.B.'s house to "put [her] in a hospital."  In
August 2012, N.B. managed to record one such incident of defendant
threatening to send a "CI snitch" to beat her up if she ever cheated
him.  Defendant's threatened use of a CI was intended to influence
N.B. during a purely personal, and non-HSI related, incident.  N.B.
believed defendant's flaunting of his authority as a federal agent
and connection to local law enforcement was to discourage her from
reporting instances of physical and sexual abuse to the police.

The first rape, which is charged as Count 2, occurred in late September 2012, shortly after defendant held his HSI-issued gun to N.B.'s head.  Specifically, after a night of drinking at a local bar, defendant became enraged when he perceived men outside the bar to be catcalling N.B.  Sitting in the passenger's seat while N.B. was driving, he pulled his HSI-issued service pistol and put its muzzle to N.B.'s head.  He asked her, "What would you do if I pulled the trigger?"  After they arrived home, defendant shoved N.B. to the ground of the living room.  When N.B. tried to get up off the floor and away from defendant, he began dragging her around the carpet, rubbing raw the skin on her arm and causing it to bleed.  He then flipped her over, ripped her pants off, and forcefully raped her despite N.B. emphatically telling defendant that she did not want to have sex with him.  Defendant yelled at N.B. for bleeding on his carpet and continued to rape her.  Defendant's service pistol was on a table directly above N.B.'s head within defendant's reach and N.B.'s view.  N.B. did not report this rape to law enforcement because defendant had led N.B. to believe that law enforcement would protect defendant and defendant would retaliate against her for reporting him.

On or about November 3, 2012, after N.B. told defendant that she wanted to end their relationship, defendant became enraged and began destroying N.B.'s personal property, pointed his loaded HSI-issued gun at N.B.'s head with his finger on the trigger, pointed the gun also at his mother, and dropped the gun only after his father

intervened.[3]  On November 4, 2012, defendant physically restrained N.B. to prevent her from leaving his house.  Defendant wrapped his arms around her body with enough force that her ribs fractured, then he denied her request to receive medical care.[4]  A few days later, N.B. finally persuaded defendant to allow her to seek medical attention so long as she promised not to report any of his conduct and describe it as an accident.  On November 6, 2012, N.B. was treated by Dr. Jindal of Riverside Urgent Care, and then again on November 8, 2012, by Dr. Rollins.  N.B. was placed in a restrictive medical binder that wrapped around her rib cage.

Defendant raped N.B. again on or about November 9, 2012, just a few days after defendant fractured N.B.'s ribs by grabbing and squeezing her.  Defendant wanted to have sex, but N.B.'s ribs hurt too much so she told him no.  She eventually relented and agreed to try having sex, so long as defendant promised that if it hurt at all they would stop.  But once they began having vaginal intercourse and N.B. asked him to stop because of the pain, he refused, and persisted with having sex with her.  His body was too heavy for her to get out

[3] In connection with this conduct, defendant was charged with and pleaded guilty to (1) assault with a gun against his father in violation of California Penal Code ("CPC") § 245(a)(2); (2) infliction of corporal injury resulting in a traumatic condition upon a cohabitant, N.B., in violation of CPC § 273.5(a); and (3) witness tampering in violation of CPC § 136.1(b)(1) in Riverside County Superior Court, Case No. 327926.  As part of defendant's agreement with the State of California, the witness tampering charge was dismissed at sentencing, and defendant was convicted of the first two offenses.

[4] The government's motion in limine no. 1 incorrectly suggested that defendant's domestic violence conviction related to both the November 3, 2012, gun incident and the November 4, 2012, bear hug incident.  The government's best understanding of the state court records is that defendant's conviction was for his conduct on November 3, 2012, against N.B. and his father, and not the bear hug believed to take place a day or so later.

12

from under him, and defendant's service firearm was on the dresser next to the bed where he raped her.  It was within defendant's easy reach and N.B.'s clear view.  N.B. did not report this rape to law enforcement because defendant had led N.B. to believe that law enforcement would protect defendant and that defendant would retaliate against her for reporting him.

Shortly after this rape, on an unknown date but believed to be around November 12, 2012, defendant videotaped himself having anal sex with a lethargic N.B. who was unable to consent.  What N.B. recalls is that she took Ambien as a sleeping aid, as she had routinely done during her relationship with defendant and which, as he knew, caused her to be largely incapacitated.  N.B. does not remember the actual attack due to her sedation, but does recall waking up the next morning with no panties on (after having gone to bed wearing them) and bleeding from her anus.  She also does remember what defendant did afterwards: when she threatened to report him to the police after their relationship ended in March 2013, defendant sent the video to her cell phone, which she kept, that shows him sodomizing her while she is only semi-conscious.  In the video, N.B. appears only partially awake, with her eyes open but droopy and making very slurred and largely unintelligible sounds as well as providing some limited responses to defendant.

N.B. ended her relationship with defendant over Thanksgiving of November 2012, although they maintained some contact for months. N.B. told defendant that she was going to stay at her parents' house for the holiday, and then finally moved out, returning only a handful of times to get her stuff.  Defendant's threats and comments regarding his power and position contributed to N.B.'s increasing

13

fear of him.  She believed that defendant was above the law,
"invincible" to the criminal justice system, and well-positioned to
physically retaliate against her if she reported his abuse to law
enforcement.  To this day, N.B. remains extremely afraid of
retaliation from defendant.  Defendant sexually assaulted N.B. at
least three times, two of which are charged in the indictment.

### C.   Defendant Acted Willfully

As will be clear from K.L. and N.B.'s testimony, defendant's
acts of sexual aggression were not accidents or misunderstandings,
nor were they consensual acts to one party but not the other.  Even
before defendant had the enormous power bestowed upon him by virtue
of his status as a federal agent, defendant had a long history of
taking what he wanted from women sexually.  Defendant's first wife,
C.N. (formerly C.R.) married defendant in 2000.  During the course of
their romantic relationship, defendant raped C.N. twice.  Once, in
1999, defendant sexually assaulted C.R. at her mother's house.
Defendant held C.N. down, treated her very roughly, and raped her.
After moving to Fort Bragg, North Carolina, defendant sexually
assaulted C.N. again.  C.N. was sleeping when defendant entered the
bedroom and woke C.N. wanting to have sex.  C.N. refused, but he
forced himself on her anyway and raped her.

R.A. first met defendant when they both were college students in
1996, but they did not start dating until approximately 2003.
Defendant and R.A. got married in February 2004, but by August 2004,
the relationship deteriorated and defendant moved out of their shared
residence that August.  When defendant moved out, R.A. was pregnant
with their son to whom she gave birth in October 2004.

In mid-November 2004, defendant raped R.A., just a few weeks after she gave birth to their son via cesarean section.  After spending the first few post-partum weeks at her mother's house, R.A. had moved back into the apartment she previously shared with defendant.  One day, defendant broke into the apartment while R.A. was finishing taking a shower.  He told her he wanted to get back together and to be with her, and when she refused, he forcibly raped her on the floor, while she still had stitches from her cesarean section, and just feet away from the crib holding their infant child. R.A. never reported the rape out of fear of reprisal from defendant and the stigma associated with being a sexual assault victim.  R.A. also waited over three years, until December 2007, to file for divorce because she was terrified of how defendant might react.

### D.   Defendant Acted under Color of Law

The evidence at trial will also establish that defendant fully understood that was abusing power possessed by virtue of law and made possible only because he was clothed with the authority of law when committing these offenses and was not merely pursuing a personal pursuit.  In addition to K.L.'s and N.B.'s testimony about how defendant used his badge and firearm in front of them to get what he wanted, the government also plans to present testimony from HSI employees about the nature and scope of defendant's responsibilities with HSI.  This testimony will include information about specific trainings defendant received on when and how it was appropriate to use a badge or firearm, including that it would not be appropriate to use these items for personal reasons, including while drinking, or to obtain special privileges.

Defendant also used his position as a federal law enforcement officer to discourage and dissuade his most recent wife, M.O. (previously described as M.H.), from reporting his abuse against her to the police.  M.O. is expected to testify as to a specific instance in 2013 when M.O. wanted to leave defendant's house, and defendant refused to let her go.  Defendant then pretended to call the RPD in front of M.O. and requested that the police disregard any calls for assistance from their residence that might be made that day. Although M.O. understands now that defendant did not in fact call the RPD that day, at the time she genuinely believed he did, that he was not joking, and that he had the power and authority to influence local law enforcement.

**V.    ELEMENTS OF THE CHARGES -- 18 U.S.C. § 242**

All three counts charge defendant with deprivation of rights under color of law.  In order for defendant to be found guilty of this charge, the government must prove beyond a reasonable doubt:

1.    The defendant deprived the person named in the indictment of a right secured and protected by the Constitution or laws of the United States;

2.    The defendant acted willfully, specifically intending to deprive the individual of that right;

3.    The defendant acted under color of law; and

4.    The victims were present in the State of California. 18 U.S.C. § 242; 5th Cir. Pattern Crim. Inst. No. 2.12 (2019) [Deprivation of Civil Rights] (modified); 7th Cir. Pattern Crim. Inst. No. 18 U.S.C. § 242 (2012) [Elements].

**A.    The Right to Bodily Integrity**

The first element requires the government to prove that

16

defendant deprived the person named in that count of a right secured or protected by the Constitution or laws of the United States. Specifically, the indictment alleges the right at issue is K.L.'s and N.B.'s right to bodily integrity, which is a right protected by the Fourth and Fifth Amendments of the United States Constitution. See, e.g., United States v. Gonzalez, 533 F.3d 1057, 1064 (9th Cir. 2008) ("Included in the liberty protected by the Fourteenth Amendment is the concept of personal bodily integrity and specifically the right to be free from certain sexually motivated physical assaults and coerced sexual battery.") (emphasis added) (citing United States v. Lanier, 520 U.S. 259, 262 (1997)).

The right to bodily integrity includes the right to be free from nonconsensual sexual acts with someone acting under color of law. A sexual act is nonconsensual if it is done without the free and voluntary consent of the victim. A nonconsensual sexual act occurs when the defendant used physical force or the threat of physical force, or if the defendant used official intimidation to coerce a sexual act. United States v. Shaw, 891 F.3d 441, 448-50 (3d Cir. 2018) (streamlined) ("[S]exual abuse," as compared to aggravated sexual abuse, "encompasses the use of . . . fear-inducing coercion to overcome the victim's will.").

In evaluating whether a nonconsensual sexual act occurred, the jury should consider all of the circumstances, including the context in which the alleged incident occurred, the relationship between the defendant and the victim, the relative positions of power and authority between the defendant and the victim, any disparity in size between the defendant and the victim, and any use of physical or mental coercion. In determining whether a deprivation occurred, the

17

jury is free to consider "the coercive power, physical and

psychological, that [the defendant] may have possessed by virtue of

that disparity in size and by virtue of the office he held." United

States v. Webb, 214 F.3d 962, 963-64 (8th Cir. 2000) (affirming

conviction of sheriff's deputy for § 242 violation).

### B. Willfully

The second element addresses the defendant's intent and requires

the government to prove that defendant acted willfully.  To act

willfully means to act voluntarily and deliberately, with the

specific intent to deprive the person named in Counts One, Two, or

Three of a Constitutional right, namely, the right to bodily

integrity.  The defendant does not have to know or recognize that his

acts are illegal or unconstitutional.  United States v. Reese, 2 F.3d

870, 836 (9th Cir. 1993) ("There is no requirement under section 241

[or 242] that a defendant recognize the unlawfulness of his acts.")

(alteration in original).

Reckless disregard of a person's established constitutional

rights is evidence of a specific intent to deprive that person of

those rights.  Reese, 2 F.3d at 881 ("To 'act willfully in the sense

in which we use the word is to act in open defiance or reckless

disregard of a constitutional requirement that has been made specific

and definite.") (quoting Screws v. United States, 325 U.S. 91, 105

(1945) (emphasis in original)); Reese v. County of Sacramento, 888

F.3d 1030, 1045 (9th Cir. 2018) ("[I]t is not necessary for the

defendants to have been 'thinking in constitutional or legal terms at

the time of the incidents, because a reckless disregard for a

person's constitutional rights is evidence of a specific intent to

deprive that person of those rights.'" (emphasis omitted)); United

18

States v. Johnstone, 107 F.3d 200, 208 (3d Cir. 1997) ("[W]illfulness includes reckless disregard.").

### C. Color of Law

The third element requires the government to prove defendant acted under color of law. A person acts under "color of law" when he acts in his official capacity or purports or claims to act in his official capacity. Action under color of law includes the abuse or misuse of the power possessed by the defendant by virtue of his office or official position. United States v. Classic, 313 U.S. 299, 325 (1941) ("Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with authority of state law, is action taken 'under color of state law.'").

Officers pursuing their personal pursuits do not act under color of law merely because they are officers. However, whether an officer is acting under color of law does not depend on duty status at the time of the offense. Anderson v. Warner, 451 F.3d 1063, 1068 (9th Cir. 2006) ("[W]hether an officer is acting under color of state law turns on the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties." (streamlined)); United States v. Giordano, 442 F.3d 30, 47 (2d Cir. 2006) (holding mayor acted under color of law during protracted private relationship with prostitute); United States v. Tarpley, 945 F.2d 806, 809 (5th Cir. 1991) (holding duty status irrelevant).

To find that the defendant acted under color of law, the jury must find that he committed the offense by using or abusing power possessed by virtue of law and made possible only because he was clothed with the authority of law. West v. Atkins, 487 U.S. 42, 48

1    (2000) ("The traditional definition of acting under color of state

2    law requires that the defendant . . . have exercised power 'possessed

3    by virtue of state law and made possible only because the wrongdoer

4    is clothed with the authority of state law.'"); Screws v. United

5    States, 325 U.S. 91, 111 (1945) (stating that "under 'color' of law

6    means under 'pretense' of law" and distinguishing between "acts of

7    officers in the ambit of their personal pursuits"--which are

8    excluded--and "[a]cts of officers who undertake to perform their

9    official duties whether they hew to the line of their authority or

10   overstep it"--which are included).

11       "There is no 'rigid formula' for determining whether a state or

12   local law official is acting under color of law." Anderson, 451 F.3d

13   at 1068.  The Ninth Circuit has identified three requirements that

14   guided its analysis in those circumstances.  First, the defendant

15   "pretended to act in the performance of his official duties." Id. at

16   1069.  Second, the defendant's "pretense of acting in the performance

17   of his duties . . . had the purpose and effect of influencing the

18   behavior of others." Id.  Third, the defendant's conduct was

19   "sufficiently related either to the officer's governmental status or

20   to the performance of his official duties." Id. (quotation omitted).

21       The Ninth Circuit has explained that the third requirement

22   "cannot mean that an officer must have been acting within the scope

23   of his authority in order for him to have been acting under color of

24   state law." Id.  "If that were true," no civil rights claim or

25   prosecution "could ever succeed" because the underlying premise "is

26   that the officer acted illegally--that is, outside the scope of his

27   authority." Id.  Accordingly, in Anderson, as here, the "third

28   requirement means that [the defendant] must have used the badge of

1  his authority to deprive an individual of his rights by invoking his

2  governmental status to influence the behavior of those around him."

3  Id. (streamlined).

4      In Giordano, the Second Circuit affirmed a § 242 conviction

5  against a mayor who was sexually abusing minors where he "threatened

6  his victims by invoking a 'special authority' to undertake

7  retaliatory action," and "he used his authority to cause the victims

8  to submit to repeated abuse, in this case by causing the victims to

9  fear that he would use his power to harm them if they reported the

10 abuse."  442 F.3d at 45.  There, as here, the victims believed --

11 because defendant wanted them to believe -- that "he had a lot to do

12 with the police" and had "control" over the police, repeatedly

13 invoking "the real or apparent power of his office to make the

14 continuing sexual abuse possible."  Id. (streamlined).  There, as

15 here, defendant acted under color of law because his "misuse of

16 official power made the commission of a constitutional wrong

17 possible, even though the official committed abusive acts for

18 personal reasons far removed from the scope of official duties."  Id.

19 (emphasis added).

20     **D.  Aggravated Sexual Abuse**

21     Should the jury find the elements for a § 242 violation have

22 been met, it will then be required to determine for each count

23 whether defendant's conduct constituted aggravated sexual abuse, as

24 charged for victim N.B. (counts two and three), or attempted

25 aggravated sexual abuse, as charged for victim K.L.  If the jury

26 finds that defendant committed aggravated sexual abuse, or attempted

27 to do so, the defendant's crime is a felony.  Should the jury find

28

only that defendant committed sexual abuse, not aggravated sexual abuse, the defendant's crime is a misdemeanor.

A person commits "aggravated sexual abuse" if he knowingly used force to cause another person to engage in a sexual act.  The term "sexual act" means contact between the penis and the vulva, including vaginal intercourse.

A person commits attempted aggravated sexual abuse if he intended to use force to cause a person to engage in a sexual act; and (2) does something that was a substantial step toward committing the crime and that strongly corroborated the defendant's intent to commit the crime unanimously as to which particular act or actions constituted a substantial step toward the commission of a crime.  18 U.S.C. §§ 242, 2241, 2246; 9th Cir. Mod. Crim. Inst. No. 8.164 [Aggravated Sexual Abuse], 8.165 [Attempted Aggravated Sexual Abuse] (2010).  United States v. Shaw, 891 F.3d 441, 450 (3d Cir. 2018) (distinguishing unwanted sexual conduct from aggravated sexual abuse); Cates v. United States, 882 F.3d 731, 733 (7th Cir. 2018) ("[A]ggravated sexual abuse is knowingly causing another person to engage in a sex act by 'using force against that other person.'").

## VI.   LEGAL AND EVIDENTIARY ISSUES

The government has attempted to meet and confer with defendant about the following possible legal and evidentiary issues at trial, but has been unable to get a hold of defense counsel following the pretrial counsel on Monday, November 22, 2021, despite repeated overtures by email and phone.

### A.   Defendant's Prior Statements

The government intends to admit several statements by defendant from various sources in this case, including, for example, statements

he made to victims K.L. and N.B. during their relationships, text messages he sent to N.B., and statements he made to Riverside PD Detective Tutwiler during a recorded telephone interview.

Statements by a party opponent when offered against that party are excluded from the hearsay definition. Fed. R. Evid. 801(d)(2)(A). Thus, each of defendant's own statements may be admitted against him. When the government offers some of a defendant's prior statements, the door is not thereby opened to the defendant to put in all of his out-of-court statements because, when offered by the defendant, the statements are hearsay. See Fed. R. Evid. 801(d)(2); United States v. Burreson, 643 F.2d 1344, 1349 (9th Cir. 1981); United States v. Fernandez, 839 F.2d 639, 640 (9th Cir. 1988). Accordingly, any exculpatory statements made by a defendant are hearsay and are not admissible at trial, when offered by that defendant. See Fed. R. Evid. 801(d), 802; United States v. Ortega, 203 F.3d 675, 682 (9th Cir. 2000).

The only recognized limitation of this principle is the "doctrine of completeness," which has been applied by some courts to admit additional portions of a defendant's prior statements where necessary to explain an admitted statement, place it in context, or avoid misleading the trier of fact. See Fed. R. Evid. 106; Burreson, 643 F.2d at 1349. However, the completeness doctrine does not require introduction of portions of a statement that are neither explanatory of, nor relevant to, the admitted passages. United States v. Mitchell, 502 F.3d 931, 965 (9th Cir. 2007); United States v. Collicott, 92 F.3d 973, 983 (9th Cir. 1996) (holding that Federal Rule of Evidence 106 does not compel admission of otherwise inadmissible hearsay evidence); see also United States v. Lopez-

1  Figueroa, 316 F. App'x 548, 550 (9th Cir. 2008) (defendant could not

2  introduce own statements redacted from confession by government).  As

3  the Ninth Circuit has recognized, "it is often perfectly proper to

4  admit segments . . . without including everything, and adverse

5  parties are not entitled to offer additional segments just because

6  they are there and the proponent has not offered them." Collicott,

7  92 F.3d at 983.  Defendant has not identified any additional

8  statements that he maintains must be introduced under the doctrine of

9  completeness.

10       **B.   Statements to Defendant**

11       The government intends to introduce statements of people in

12  conversation with the defendant, including statements by N.B. in text

13  message conversations with defendant.  Unless otherwise noted, these

14  statements are not offered for their truth, but to provide context

15  for what the defendant said or did, and thus, are not hearsay.  Fed.

16  R. Evid. 801(c); see also United States v. Valerio, 441 F.3d 837, 844

17  (9th Cir. 2006) (informant's statements on a recording are admissible

18  to give context to defendant's statements).

19       For similar reasons, the victim's statements to defendant (or

20  statements made by others to defendant, such as witnesses L.T. and

21  I.T.) may be offered not for their truth but for the effect they have

22  on the hearer (e.g., to show a party's knowledge).  These statements

23  are also not hearsay in such contexts.  United States v. Castro, 887

24  F.2d 998, 1000 (9th Cir. 1987); Orsini v. O/S Seabrooke O.N., 247

25  F.3d 953, 960 n.4 (9th Cir. 2001).  A witness also may testify to

26  what he or she understood a declarant to mean with respect to a

27  statement made by the declarant to the witness.  United States v.

28  Brooks, 473 F.2d 817, 818 (9th Cir. 1973) (per curiam).

                                    24

1       Additionally, some of the victims' statements may further

2   qualify under other hearsay exceptions, such as their statements to

3   the defendant during his assaults reflecting pain or lack of consent.

4   See, e.g., Fed. R. Evid. 803(1) (defining "present sense impression"

5   as one made "while the declarant was perceiving the event or

6   condition"); Fed. R. Evid. 803(2) (defining an "excited utterance" as

7   a "statement relating to a startling event or condition, made while

8   the declarant was under the stress of excitement that it caused");

9   Fed. R. Evid. 803(3) (hearsay exception for a "then-existing mental,

10  emotional, or physical condition" where the statement reflects the

11  declarant's "then-existing state of mind (such as motive, intent, or

12  plan) or emotional, sensory, or physical condition (such as mental

13  feeling, pain, or bodily health)").

14      **C.   Medical Evidence and Testimony**

15      The government intends to introduce certain medical records of

16  victim N.B. to corroborate her testimony that defendant was abusive

17  to her.  Specifically, the government intends to introduce records

18  from the Riverside Urgent Care center in November 2012 reflecting

19  that N.B. sustained injuries after reporting that her boyfriend

20  "hugged" her.  The government may also include records from a

21  longtime physician of N.B. with UCLA Health that she provided N.B.

22  with counseling on abusive relationships.

23      These medical records are admissible under Federal Rule of

24  Evidence 803(4), which provides that any statement that describes the

25  general cause of a declarant's medical symptoms or conditions

26  constitutes an exception to the hearsay rule.  "Statements as to

27  fault" are generally not admissible as non-hearsay statements under

28  Rule 803(4), except in certain sexual abuse cases.  United States v.

25

1  *Yazzie*, 59 F.3d 807, 812 (9th Cir. 1995).  Here, however, N.B.'s
2  identification of defendant as the source of her injury was "made for
3  -- and [] reasonably pertinent to -- medical diagnoses or treatment,"
4  since it was necessary to explain her reasons for treatment that day.
5  Rule 803(3)(4).  Therefore, it is admissible.

6      In the event the parties are unable to stipulate as to the
7  admissibility of the underlying medical records in this case, the
8  government plans to call the treating physicians to introduce the
9  records.  The Ninth Circuit has held that a treating physician need
10 not be designated as an expert where "he could testify to matters
11 rationally based on upon his perception."  *Hoffman v. Lee*, 474 F.
12 App'x 503, 505 (9th Cir. 2012); *see also* Fed. R. Evid. 701(a) ("If a
13 witness is not testifying as an expert, testimony in the form of an
14 opinion is limited to one that is . . . rationally based on the
15 witness's perception."); *United States v. Steele*, No. 2:10-CR-148-
16 BLW, 2011 WL 841386 (D. Idaho) ("Treating physicians may obviously
17 testify concerning the diagnosis made, the course of
18 treatment provided, the prognosis anticipated, and the consequences
19 of treatment likely to be encountered.  However, they do so, not as
20 expert witnesses, but as fact witnesses who are describing the nature
21 and course of treatment actually provided to the [patient].").

22     **D.  Victim's Prior Consistent Statements**

23     Prior consistent statements of a testifying witness may be
24 admissible either to rebut an express or implied charge of recent
25 fabrication or to rehabilitate a witness whose credibility has been
26 attacked on another ground, such as faulty memory.  Both
27 circumstances are likely to apply here depending on defendant's
28 cross-examinations of the witnesses in this case.

Under Federal Rule of Evidence 801(d)(1)(B)(i), an out-of-court statement is not hearsay if the declarant testifies at the trial and is subject to cross-examination concerning the statement, and the statement is "consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." Rule 801(d)(1)(B)(i); see United States v. Bao, 189 F.3d 860, 864 (9th Cir. 1999); United States v. Frederick, 78 F.3d 1370, 1377 (9th Cir. 1996); United States v. Stuart, 718 F.2d 931, 934 (9th Cir. 1983). However, "[p]rior consistent statements may not be admitted to counter all forms of impeachment or to bolster the witness merely because [the witness] has been discredited . . . . The Rule speaks of a party rebutting an alleged motive, not bolstering the veracity of the story told." Tome v. United States, 513 U.S. 150, 157-58 (1995). For example, in Tome, the Supreme Court held "that prior consistent statements made after the date of the alleged motivation to lie are inadmissible." Frederick, 78 F.3d at 1377; see Tome, 513 U.S. at 167.

To establish the admissibility of a prior consistent statement under Rule 801(d)(1)(B)(i), the following foundational factors must be satisfied: "(1) the declarant must testify at trial and be subject to cross-examination; (2) there must be an express or implied charge of recent fabrication or improper influence or motive of the declarant's testimony; (3) the proponent must offer a prior consistent statement that is consistent with the declarant's challenged in-court testimony; and, (4) the prior consistent statement must be made prior to the time that the supposed motive to falsify arose." Collicott, 92 F.3d at 979. It is unclear what

accusations defendant will levy on cross-examination of the victims regarding the basis of an alleged motive to fabricate, but whatever motive is claimed, the government on redirect should be entitled to introduce the victim's consistent statements that pre-date that alleged motive under Rule 801(d)(1)(B)(i).[5]

If a witness's testimony is attacked on another ground, such as an allegation of faulty memory, that witness's prior consistent statements should also be admitted under Rule 801(d)(1)(B)(ii).  This second clause permits the introduction of "consistent statements that are probative to explain what otherwise appears to be an inconsistency in the witness's testimony" and "consistent statements that would be probative to rebut a charge of faulty memory." Fed. R. Evid. 801, Adv. Comm. Notes to 2014 Amendments.  "The intent of the amendment [wa]s to extend substantive effect to consistent statements that rebut other attacks on a witness -- such as charges of inconsistency or faulty memory." Id.; see also United States. v Ledbetter, 184 F. Supp. 3d 594, 598-601 (S.D. Ohio 2106); Berry v. Beauvais, No. 12-cv-26470-WJM-CBS, 2015 WL 5244892, at *2 (D. Colo. Sept. 9, 2015) ("The committee saw that the Rule, as originally written, left these sorts of prior consistent statements potentially admissible only for the limited purpose of rehabilitating a witness's credibility, not as substantive evidence.  Clause (ii) clarifies that such statements may be treated as substantive evidence [too]." (quotation omitted)).

---

[5] For example, defendant has previously claimed that victim N.B. was motivated to lie after his marriage to M.O. in 2013.  If N.B.'s credibility is attacked on this ground, N.B.'s consistent statements pre-dating that marriage should be admitted on redirect.

1       If defendant attacks the victims' credibility on cross-

2   examination by suggesting that the victim's memories may have faded,

3   the government intends to introduce the victim's prior consistent

4   statements under Rule 801(d)(1)(B)(ii).

5       **E.   Scope of Cross-Examination into Witnesses R.A., C.N., and**
    **M.O. (the Uncharged Victims)**

6

7       At the pretrial conference on November 15, 2021, the Court

8   partially granted and partially denied the government's motion to

9   admit certain evidence under Rule 413 and 404(b).  Specifically, the

10  Court held that the government could call defendant's prior wives

11  R.A. and C.N. (previously identified as C.R.) for the limited purpose

12  of describing defendant's sexual assaults of these two women under

13  Rule 413.  The Court also ruled that defendant's most recent wife,

14  M.O. (previously identified as M.H.), could testify only as to one

15  specific act under Rule 404(b):  defendant's feigned call to the

16  Riverside PD in front of her when she threatened to leave.

17      On direct examination of these witnesses, the government

18  therefore intends to inquire only into these specific acts and to

19  provide brief, but sufficient testimony, that the victims knew

20  defendant and were in relationships with him.  The witnesses are

21  expected to say generally that there were problems in the

22  relationship to provide context for the assaults, but the government

23  plans to ask questions that avoid eliciting specific information

24  about the nature of those problems on direct.  For example, as this

25  Court is aware, defendant committed multiple acts of violence against

26  each of these women and all three have had custody disputes with

27  defendant, all of which explains why they never reported his conduct

28  until now.

1        The government anticipates that defendant will attempt to cross-

2    examine these witnesses about their custody disputes with defendant

3    in an effort to establish bias against him.[6]  Defendant will also

4    likely suggest that these women must be lying because they waited

5    several years to come forward.  The government intends to object to

6    such topics of cross-examination as irrelevant, but recognizes the

7    Court has broad discretion to permit questioning related to a

8    witness's bias or memory.  However, if defendant is permitted to

9    cross-examine these witnesses on such grounds -- i.e., the existence

10   of the custody disputes with defendant or their delayed reporting --

11   the jury should not be left with the mistaken impression that these

12   witnesses only had one single negative experience with defendant that

13   they are just now coming forward with years after the fact.

14        Depending on the cross-examination of these witnesses, the

15   government must be allowed to rebut any false impression created by

16   such questions.  R.A., C.N., and M.O. each have long and sad stories

17   about the violence they experience at defendant's hands that directly

18   contributed to their fear of defendant, their behavior in the custody

19   disputes, and their decision not to come forward initially,

20   especially about sexual assault or defendant's abuse of his federal

21   power.  The government would plan to seek a sidebar during trial if

22   the government believes that defendant's cross-examination of these

23   witnesses is about to open the door to the presentation of such

24   additional context on redirect.  See United States v. Segall, 833

25   F.2d 144, 148 (9th Cir. 1987) (cross-examination opened the door to

26

27

28       [6] Defendant, for example, has produced court documents reflecting a restraining order he received against C.N. as part of their custody dispute.

1   additional evidence on redirect to avoid leaving jury with false

2   impression and remove unfair prejudice); cf. Darden v. Wainwright,

3   477 U.S. 168, 186 (1986) (holding, in ineffective assistance of

4   counsel context, that efforts to "portray petitioner as a nonviolent

5   man would have opened the door for the State to rebut with evidence

6   of petitioner's prior convictions"); United States v. Morris, No. 89-

7   50458, 1190 WL 167849 (9th Cir. 1990)(unpublished)(affirming district

8   court decision permitting redirect-examination into cooperator's

9   knowledge of defendant's membership in gang if the cross-examination

10   opened the door to the topic by attacking his motive to testify).

### F.  Business Records

11

12      The government intends to admit telephone records from Verizon,

13   Sprint, and AT&T as well as utility records from Southern California

14   Edison and subscriber information from Facebook that were produced in

15   discovery along with custodian of records declarations.  Absent a

16   stipulation by defendant, the government intends to file a motion in

17   limine to admit these business records under Rule 803(6) and 902(11).

### G.  Video and Photographic Evidence

18

19      The government has identified certain video recordings and

20   photographs that it intends to introduce at trial.  These include

21   videos and photographs taken during defendant's relationships with

22   K.L. and N.B., as well as more recent photographs that depict key

23   locations and items, such as defendant's home and his firearms.

24   These items will be authenticated by witnesses with knowledge and

25   familiarity of the items depicted on the video or photograph.

26      Photographs are generally admissible as evidence.  See United

27   States v. Stearns, 550 F.2d 1167, 1171 (9th Cir. 1977) (photographs

28   of crime scene admissible).  Photographs should be admitted so long

as they fairly and accurately represent the event or object in question.  United States v. Oaxaca, 569 F.2d 518, 525 (9th Cir. 1978).  Also, "[p]hotographs are admissible as substantive as well as illustrative evidence."  United States v. May, 622 F.2d 1000, 1007 (9th Cir. 1980).  Photographs may be authenticated by a witness who "identif[ies] the scene itself [in the photograph] and its coordinates in time and place."  See Lucero v. Stewart, 892 F.2d 52, 55 (9th Cir. 1989) (internal quotation marks omitted).

Videos are akin to photographs, which the Ninth Circuit has held "are admissible as substantive as well as illustrative evidence." United States v. May, 622 F.2d 1000, 1007 (9th Cir. 1980).

The government need not necessarily call a specific witness to admit a particular video or photograph.  Rule 901(a) simply requires that a proponent of evidence make a prima facie showing of authenticity so that a reasonable juror could find "that the item is what the proponent claims it is."  Fed. R. Evid. 901(a).  Thus, as with photographs, any witness with knowledge of the events being depicted in the video (like N.B.) would be able to authenticate, for example, a video created by defendant and sent to her.

**H.   Conditionally Admitting Evidence**

Federal Rule of Evidence 104(b) gives the trial court the discretion to conditionally admit evidence dependent on proof of later facts by the moving party.  Fed. R. Evid. 104(b); see also United States v. Gere, 662 F.2d 1291, 1294 (9th Cir. 1981) ("The trial judge may make a preliminary determination of admissibility or may admit the testimony conditionally, subject to 'connecting up' with the foundation to be eventually laid by the prosecution.").  If the government fails to establish the required foundation for the

32

1 conditionally admitted evidence, the video would be subject to a

2 later motion to strike.  See, e.g., United States v. Watkins, 600

3 F.2d 201, 204 (9th Cir. 1979).

4      Here, however, there is no dispute that the government will be

5 able to lay the necessary foundation as to the admissibility of its

6 evidence.  Therefore, the government may seek to show certain

7 exhibits in opening statement or with early witnesses prior to

8 seeking to admit the exhibits in order to present a streamlined case.

9      **I.   Facebook and Instagram Records**

10      The government intends to introduce screenshots of defendant's

11 social media accounts that were produced in discovery and taken by

12 victim N.B. and her mother, D.B., in 2013 when N.B. was in the

13 process of reporting defendant to law enforcement.  These include

14 screenshots of the "About Us" page of defendant's clothing company,

15 Genetics Gear, in which defendant described his company as creating a

16 "niche in society which flaunted gear, aggressiveness, narcissism and

17 confidence.  The original Inland Empire bad boy image.  We followed

18 the mantra, 'We don't fake it, we just take it.'"  Victim N.B.,

19 eyewitness I.T., and/or K.L. are all expected to testify that they

20 recognize the Genetics Gear logo, which comprised the word "Genetics"

21 above two crossing syringes and the words "Est. 2012" as the clothing

22 company defendant attempted to start in 2012.  Additional posts by

23 defendant include: (1) an image of two hands making a heart symbol

24 and the words, "It's not rape, it's a snuggle with a struggle"; (2)

25 an image of the rapper Chris Brown, who famously assaulted the singer

26 Rihanna in 2009, and the words "I beat women, not animals"; (3) a

27 photograph of himself holding up a t-shirt that says "fighting solves

28 everything."

Defendant's posts were made to a variety of social media accounts, many of which have since been deleted or are no longer active.  Facebook records confirm that posts from accounts still in existence did, in fact, belong to the defendant, and that when a user deletes an account, they purge all records related to that account, including the act of deletion, after a short period of time.  However, for these deleted accounts, N.B. and other witnesses will be able to authenticate that the posts came from accounts that the witness either personally saw and knew belong to defendant, or that the witness reviewed and saw multiple profile pictures with defendant's image plainly visible.  This is sufficient under the law, because "[t]he burden to authenticate under Rule 901 is not high." United States v. Recio, 884 F.3d 230, 236 (4th Cir. 2018); see also United States v. Ceballos, 789 F.3d 607, 618 (5th Cir. 2015) (characterizing the proponent's burden as "low").  In the trial context, the court "must merely conclude that the jury could reasonably find that the evidence is authentic, not that the jury necessarily would so find." Recio, 884 F.3d at 236-37.

In the context of social media accounts, a combination of sources can establish the authenticity of a post, such as "testimony about the origins of the pictures and accounts, the testimony of a Facebook custodian, the testimony of a co-conspirator, and the contents of the photographs themselves." United States v. Martin, 822 F. App'x 521, 527 (9th Cir. 2020), cert. denied sub nom. Landry v. United States, 141 S. Ct. 1726, 209 L. Ed. 2d 486 (2021). Although a custodian of records declaration is one way to authenticate social media records, it is not the only means of doing so.  See, e.g., Kremerman v. Open Source Steel, LLC, No. C17-953-BAT,

1    2018 WL 5785441, at *5 (W.D. Wash. Nov. 5, 2018) (holding certificate
2    of authenticity from Facebook not required to authenticate social
3    media records).
4         Any question as to the accuracy of the records goes to weight,
5    not admissibility.  See United States v. Tank, 200 F.3d 627, 630 (9th
6    Cir. 2000) (holding government sufficiently authenticated chat room
7    records involving defendant) (citing United States v. Catabran, 836
8    F.2d 453, 458 (9th Cir. 1988)).
9         **J.   Expert Testimony**
10             1.   Dr. Janine Shelby, Ph.D
11        The government provided defendant notice that it intends to
12   introduce expert testimony from Dr. Janine S. Shelby, Ph.D, to
13   explain primarily to the jury why victims of sexual abuse may behave
14   differently from common sense expectations.  Defendant moved to
15   exclude her testimony, and the Court orally denied defendant's motion
16   at the pretrial conference on November 15, 2021.
17             2.   FBI Forensic Examiners
18        The FBI consensually extracted data from three digital devices
19   in this case: (1) an iPhone 4s belonging to victim N.B; (2) an iPhone
20   4 belonging to victim N.B.'s mother, D.B.; and (3) a Motorola Droid
21   cell phone and accompanying SD card belonging to victim N.B.  The
22   results of these extractions were produced in discovery to defendant,
23   including Cellebrite reports reflecting the complete metadata for all
24   of the items found on these devices.
25        The government intends to introduce at trial evidence seized
26   from these devices, including photographs, video recordings,
27   geolocation data, and text messages.  Although N.B. and D.B. will be
28   able to recognize and authenticate the photographs, the precise date

1   and time of some of the items is also a key part of the government's

2   case.  The government is willing to enter into stipulations about the

3   extracted data that would obviate the need for purely forensic

4   testimony as to when a specific text was sent or photograph taken,

5   but has not yet received an answer from defendant after multiple

6   efforts to confer about this topic.

7        Absent a stipulation, the government is prepared to call either

8   or both James M. Watkins, Jr., retired FBI Computer Analysis Response

9   Team ("CART"), and Murrieta Police Department Detective Paul C.

10  Johnson, Computer Forensic Examiner with the Orange County Regional

11  Computer Forensic Laboratory for the FBI.  Out of an abundance of

12  caution, the government has provided defense counsel with notice of

13  these individual's qualifications and experience and the subject of

14  their anticipated testimony, namely, their extraction reports.

15       **K.   Cross-Examination of Defendant**

16       A defendant who testifies at trial may be cross-examined as to

17  all matters reasonably related to the issues he puts in dispute

18  during direct examination, such as his intent and knowledge.  "A

19  defendant has no right to avoid cross-examination on matters which

20  call into question his claim of innocence."  United States v.

21  Miranda-Uriarte, 649 F.2d 1345, 1353-54 (9th Cir. 1981).  See, e.g.,

22  United States v. Black, 767 F.2d 1334, 1341 (9th Cir. 1985) ("What

23  the defendant actually discusses on direct does not determine the

24  extent of permissible cross-examination or his waiver.  Rather, the

25  inquiry is whether 'the government's questions are reasonably

26  related' to the subjects covered by the defendant's testimony.")

27  (internal quotations and citation omitted).  The scope of cross-

28

36

examination is within the discretion of the trial court.  Fed. R.
Evid. 611(b).

If defendant testifies, as set forth in the government's motion
in limine no. 1 and the government's opposition to defendant's motion
in limine to exclude evidence of prior convictions, the government
intends to introduce his guilty pleas in September 2015 to three
charges (assault with a deadly weapon, inflicting corporal injury on
N.B., and witness tampering, all felonies), and his conviction for
the first two of these offenses at sentencing a month later.

**L.   Claims that the Government Should Call a Specific Witness**

Defendant may try to challenge the government's case by arguing
to the jury that the government should have called a specific
witness, for example, certain of defendant's family members, such as
Rita Olivas,[7] John Olivas, Sr., or Jaykb Olivas, who may have
witnessed certain events or had direct interactions with charged and
uncharged victims and witnesses.  If defendant raises during opening
statement, on cross examination, during an affirmative case, or
during closing argument that a certain witness is necessary, the
government may decide to respond to such argument.  So long as it is
clear that the United States is not burden shifting or commenting on
defendant's right not to testify, it is permissible for the

---

[7] There are text messages between defendant's mother, Rita
Olivas, and victim N.B., including concerning the November 3, 2012,
incident where defendant pulled his service weapon on N.B. and his
parents, in which Ms. Olivas acknowledges that her son pulled a gun
on N.B., although she later denied making such statements in her
testimony before the grand jury.  The government does not intend to
present in its case-in-chief the text messages between Rita Olivas
and N.B., but if defendant challenges N.B.'s memory on these events
or that they took place, the text messages may become relevant.
Further, and importantly, Rita Olivas has passed away, so if
defendant creates the misleading impression that the government could
present her testimony, then it should be able to correct the record.

government to explain to the jury the defendant can subpoena witnesses himself to present evidence.  See United States v. Necoechea, 986 F.2d 1273, 1282 (9th Cir. 1993) ("A prosecutor is entitled to comment on a defendant's failure to present witnesses so long as it is not phrased to call attention to defendant's own failure to testify.").

### M.   Affirmative Defenses, Reciprocal Discovery, and Jury Nullification

The government requested notice of affirmative defenses (including an entrapment, mental condition or duress, and/or alibi defense) and reciprocal discovery by letter on August 28, 2018, and in subsequent discovery letters.  As of this filing, defendant has not provided the government with notice of any affirmative defenses. The only discovery defendant has produced were court records from the custody dispute between defendant and his first wife, C.N. (formerly C.R.), discussed above.

Rule 16 of the Federal Rules of Criminal Procedure creates certain reciprocal discovery obligations on the part of defendants to produce three categories of materials that they intend to introduce as evidence at trial: (1) documents and tangible objects; (2) reports of any examinations or tests; and (3) expert witness disclosure. Rule 16 imposes on defendants a continuing duty to disclose these categories of materials.  Fed. R. Crim. P. 16(b)(1)(A), (b)(1)(C), and (c).  In those circumstances where a party fails to produce discovery as required by Rule 16, the rule empowers the district court to "prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances."  Fed. R. Crim. P. 16(d)(2)(C) and (D).  To the extent

defendant may attempt to introduce or use any evidence at trial that she has not produced to the government, such documents should be excluded.  See Taylor v. Illinois, 484 U.S. 400, 415 (1988) (defendant's failure to comply with, or object to, government's discovery request before trial justified exclusion of unproduced evidence)

The government also reserves the right to object to any evidence and/or argument relating to any possible jury nullification defense, including concerning punishment or that this is a case that should be tried in state court.  A defendant has no right to present evidence relevant only to such a defense.  United States v. Powell, 955 F.2d 1206, 1213 (9th Cir. 1992); Zal v. Steppe, 968 F.2d 924, 930 (9th Cir. 1992) (Trott, J., concurring) ("[N]either a defendant nor his attorney has a right to present to a jury evidence that is irrelevant to a legal defense to, or an element of, the crime charged.").

**VII. CONCLUSION**

The government respectfully requests leave to supplement this Trial Memorandum, as necessary.