TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
ELI A. ALCARAZ (Cal. Bar No. 288594)
Assistant United States Attorney
Riverside Branch Office
     3403 Tenth Street, Suite 200
     Riverside, California 92501
     Telephone: (951) 276-6938
     Facsimile: (951) 276-6202
     Email:    Eli.Alcaraz@usdoj.gov
FRANCES S. LEWIS (Cal. Bar No. 291055)
Assistant United States Attorney
Deputy Chief, General Crimes Section
     312 North Spring Street, 15th Floor
     Los Angeles, California 90012
     Telephone: (213) 894-4850
     Facsimile: (213) 894-0141
     Email:    Frances.Lewis@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ED CR No. 18-231-JGB |
|---|---|
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT'S *EX PARTE* MOTION TO CONTINUE TRIAL (DKT. 138); DECLARATION OF FRANCES S. LEWIS; EXHIBITS 1-7 |
| v. | |
| JOHN JACOB OLIVAS, | |
| Defendant. | **CURRENT TRIAL DATE:** **November 30, 2021 at 9:00 a.m.** |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Frances S. Lewis and Eli A. Alcaraz, hereby files its opposition to defendant's Ex Parte Motion to Continue Trial, filed on Saturday, November 27, 2021 at approximately 9:58 p.m.  (Dkt. 138.)

This opposition is based upon the attached memorandum of points and authorities, the declaration of Frances S. Lewis with accompanying Exhibits 1-7, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: November 28, 2021                 Respectfully submitted,

                                         TRACY L. WILKISON
                                         United States Attorney

                                         SCOTT M. GARRINGER
                                         Assistant United States Attorney
                                         Chief, Criminal Division

                                          /s/
                                         ELI A. ALCARAZ
                                         FRANCES S. LEWIS
                                         Assistant United States Attorneys

                                         Attorneys for Plaintiff
                                         UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES...................................1
I.   INTRODUCTION.......................................................1
II.  RELEVANT BACKGROUND................................................3
     A.   The Original Records Showing N.B.'s Medical Treatment
          for Rib Inflammation by Riverside Medical Center Were
          Produced in 2018..............................................3
     B.   Meet-and-Confer Efforts about the Medical Records and
          Receipt of Additional Medical Records in Response to
          Trial Subpoenas...............................................6
     C.   Defendant's Repeated Efforts to Continue This Trial..........10
III. ARGUMENT..........................................................11
     A.   There Are No "Unproduced Expert Reports" or Even the
          Anticipation of Additional Expert Reports....................11
     B.   No Continuance is Necessary Because No Defense Medical
          Expert Opinions Would Be Relevant or Admissible..............13
IV.  CONCLUSION........................................................16

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

This case was charged in August 2018, yet three days before trial is scheduled to start over three years later, defendant asserts that he needs a continuance to (1) review unproduced expert reports (when there are none) and (2) retain a medical expert (when none is necessary) and defendant has had over three years to do so.  (Dkt. 138.)  Defendant's ex parte motion significantly distorts the factual record, and should be denied.

First, there are no outstanding expert reports to produce.  As set forth in the government's Trial Memorandum (dkt. 137), filed on November 26, 2021, the government intends to call one or more of N.B.'s treating physicians, not as experts, but to testify as to their treatment of N.B. in 2012.  (Id. at 5, 25-26.)  On Saturday, November 27, 2021, when defense counsel contacted the government to discuss for the medical records for the first time in this case, the government explained that it had not yet conducted trial preparation sessions with these physicians, but that it would do so as soon as possible and produce, as the government has done with all of its trial preparation sessions, any resulting new information via a report by the FBI.  The government has not retained these physicians as experts, does not intend to ask them to prepare any expert reports in this case, and has produced all of the information in its possession about these physicians.

Second, there is no need for defendant to retain a medical expert because any such opinion testimony would be inadmissible as irrelevant.  Defendant's focus appears to be on the fact that the new records show N.B.'s treating physicians did not find definitive

evidence of a fracture on a chest x-ray. But it ultimately does not matter whether N.B. had a fractured rib, whether she had one that was undetected, or whether she did not have one at all but simply believed she did and told defendant she did. She was in significant pain, she went to the doctor and was given a rib binder as if she had a fracture, and defendant forcibly raped her a few days later while she was screaming in pain. Although the government has previously characterized this injury as a fracture, the government is willing at trial to not call it a fracture and to only mirror N.B.'s consistent language, which is that she believed defendant broke her ribs.

Even if defendant nonetheless wishes to retain his own doctor, he has had -- and still has -- ample time to do so. The government estimates that it will not rest until late the second week of trial, i.e., around December 9 or 10, 2021, giving defendant essentially two weeks to find a doctor to review 26 pages of records, approximately half of which were produced three years ago and some of which are non-substantive consent forms. Defendant is likely to have greater difficulty retaining an expert for a trial set to begin December 28, 2021, between two federal holidays, than for the current one. The government will also not object to any brief delays within trial to accommodate defendant's expert, including, for example, agreeing that defendant's case would not start until December 14, 2021.

This case is long overdue for trial. Out-of-state witnesses, including non-law enforcement witnesses, will be on planes by the time the Court reviews this motion. Defendant's request should be denied, and the trial should proceed as set on November 30, 2021.

## II. RELEVANT BACKGROUND

### A. The Original Records Showing N.B.'s Medical Treatment for Rib Inflammation by Riverside Medical Center Were Produced in 2018

When N.B. first reported defendant's conduct to the Riverside Police Department ("Riverside PD") in October 2013, she told them about many incidents of violence and abuse by defendant. One example she gave was a time when "he wrapped his arms around me and he squeezed . . . and I felt a pop, pop and then I couldn't breathe." (Declaration of Frances S. Lewis, "Lewis Decl.," Ex. 5, at 17:1-16.) N.B. cried from the pain, but defendant would not let her go to the hospital until a few days later when he relented and allowed her to go to urgent care. (Id. at 17:24-40.) In this interview, N.B. was asked what the doctors found out, and she said, "rib pain, primary rib injuries and then they said, um I don't know how to pronounce that. Pretty much the cartilage gave me a lung contusion. . . . So I was in a binder for 5 weeks." (Id. at 18:8-13.) N.B. then described defendant raping her a few days later -- the rape charged as Count 3 in this case -- while she was in pain from the binder, despite pleading with him to stop because, as she told him, "like my ribs are fractured or something is wrong." (Id. at 18:36-44.)

The Riverside PD obtained nine pages of medical records from the Riverside Medical Center, which were produced in discovery in this case in the first production in August 2018. (Lewis Decl., Ex. 1.) Those records appear to reflect only N.B.'s November 8, 2012, visit, but clearly state that it was a "recheck" (her initial visit was on November 6, 2012) and her "[p]rior diagnostic workup includes chest x-ray." (Id. at 1.) The records make no reference to a fracture at all, either the presence or absence of one, and describe N.B. as

appearing "well-developed and well-nourished," with normal breathing and "no respiratory distress," although she did exhibit "tenderness." (Id.) The treating physician, Dr. Rollins, determined that N.B. had "costochondritis," (id.) which the records explain was an inflammation of the cartilage that connects the rib to the breastbone. (Id. at 2, 4.)[1]

In Riverside PD's summary report to the district attorney, Detective Isaac described the incident in the same terms as N.B.:

> [N.B.] then began talking about a later time when she told the suspect that she wanted to leave and he said no you're not and grabbed her by the arm. He then turned her sideways. The suspect put his arms around the victim and started squeezing. The victim heard "pop pop" and immediately she couldn't breathe. [N.B.] said she started crying because she couldn't talk and the suspect asked her what was wrong. [N.B.] was able to tell him that she needed to go to the hospital and he said "You're not going to the hospital."
>
> . . .
>
> [N.B.] said after three days, she still wasn't improving, so the suspect took her to the Riverside Medical Clinic Urgent Care. <u>Basically the victim said when the suspect squeezed her, he separated her cartilage from her ribs. [N.B.] said she was in a "Binder" for five weeks after that.</u>

(Lewis Decl., Ex. 3 (emphasis added).) This report was also produced in August 2018.

The government also produced an interview transcript from Riverside PD Detective Tutwiler's interview with defendant in November 2013, in which defendant admitted hugging N.B. and that N.B. "started to feel a little bit of pain" afterward. (Lewis Decl., Ex. 7.) Defendant himself has been aware since 2012 that an x-ray was

---

[1] The government also obtained and produced in 2018 some dates-of-service records from N.B., which also showed the two visits on November 6, 2012, and November 8, 2012. (Lewis Decl., Ex. 4.)

4

done because he told Detective Tutwiler that he took N.B. "to the urgent care and I was there with her when they did the x-rays and they put her in some brace or some shit."  (Id.)

The FBI interviewed N.B. in 2014, and she again described the "bear hug" incident where defendant grabbed her so that her shoulder was pressed into his chest in a T-shape.  Defendant squeezed her so hard that she heard a "pop" and had the wind knocked out of her, that she started crying and could not talk, and defendant ripped her shirt.  (Lewis Decl., Ex. 6 at 134:24-35.)  She explained that during her visit to urgent care, the doctors "said they could to a cat scan, . . . and he goes but I can already tell you look I think that they're fractured and he's like but if you want to go through the radiation you can," but she did not want to so "I just said screw it just put me in a binder you can't do anything further, if they're broken anyways you're not gonna put me in a cast so . . . I'm good to go."  (Id. at 148:13-20.)[2]

N.B. again described defendant's rape of her a few days after sustaining this injury, while she was still in the binder.  She explained that "he wanted to have sex the first time, so I tried and it hurt too bad because the movement . . . of my rib, so I told him no. . . . I was dying of pain."  (Id. at 149-50.)  When asked if defendant stopped, she said "no.  He finished what he needed to do and that was the end of that."  (Id. at 150.)  She described her anger at defendant and that she wanted to shoot him, saying "I

---

[2] This is consistent with the medical literature that chest x-rays miss 25% of rib fractures, which are better detected by CT scan. See, e.g., Pallin, Daniel J., MD, MPH, Chest X-Ray Misses Most Rib Fractures, New England Journal of Medicine (June 13, 2017), available online at https://www.jwatch.org/na44294/2017/06/13/chest-x-ray-misses-most-rib-fractures

5

couldn't believe [it], it's like you broke my ribs and you did this to me and then you're gonna rape me? How much torture you need to put me through?" (Id. at 153.) This was the second time that defendant raped N.B. and is the aggravated sexual assault charged in Count 3 of the indictment.

**B. Meet-and-Confer Efforts about the Medical Records and Receipt of Additional Medical Records in Response to Trial Subpoenas**

Defense counsel's chronology of the production of medical information in this case leaves out crucial details and significantly exaggerates others.

The investigative records by Riverside PD, including nine pages of information from the Riverside Medical Center reflecting N.B.'s visit on November 8, 2012, and the dates of service provided by N.B. were produced in the first batch of discovery on August 28, 2018. (Lewis Decl. Exs. 1, 4.) As discussed above, those records refer to the existence of a prior visit, the existence (but not the results) of a chest x-ray, the diagnosis of costochondritis, and make no mention of the presence or absence of a fracture. That same production also included transcripts of N.B.'s interviews with Riverside PD and the FBI, in which she describes being in extreme pain and her belief that defendant fractured her ribs and had told the defendant as much when he raped her.[3] (Lewis Decl., Exs. 5-7.)

At no point in the past three years, including during the last three months when the current defense counsel was counsel of record, did any defense attorney inquire as to the existence of additional

---

[3] Defendant asserts that "N.B. repeatedly told assigned agents and prosecutors that Mr. Olivas fractured her ribs," (Blanco Decl. ¶ 3), but does not cite any specific statements by N.B. from the record.

6

medical records, or specifically, the records from N.B.'s November 6, 2012, visit, or the results of the chest x-ray, even though the existence of those additional treatment records has been knowable to all parties since they were produced in 2018.[4] Defense counsel did not request these records from the government, and the government is unaware of any request by defense counsel through a Rule 17 subpoena to obtain them directly from the Riverside Medical Center.

As the government began preparing in earnest for trial in this case -- a difficult feat given the unending delay tactics by defendant described below -- the government determined that it may want to call the treating physician from the Riverside Medical Center to corroborate N.B.'s testimony about her injury. (Lewis Decl. ¶ 3.) Upon reviewing the file in this case, the government realized that the only medical records were those acquired by Riverside PD and that, absent an agreement by defense counsel or a custodian of records declaration, there may be evidentiary hurdles to having those records admitted at trial. (Id.) On November 5, 2012, the government therefore issued trial subpoenas to Dr. Rollins, the treating physician reflected in the November 8, 2012, records, as well as to the Riverside Medical Center for the entirety of N.B.'s patient records.[5] (Id.) The government also approached defense

---

[4] Defense counsel's declaration implies that she requested these records after becoming suspicious following a meet and confer session with the government (Blanco Decl. ¶ 5), which is incorrect. At no point has defense counsel requested any medical records at all in this case nor has she communicated, until November 27, 2021, that he would reserve stipulating to foundation subject to receipt of additional medical records.

[5] As noted in the Trial Memorandum (dkt. 137 at 5), the government may also call treating physician Dr. Geisele Wudka. The government has also issued a trial subpoena for medical files from visits in or about November 2012, but has not received any records
*(footnote cont'd on next page)*

7

counsel about admitting the medical records, among other business records, but never received a definitive answer. (Id. ¶ 4.)

After speaking with counsel for the Riverside Medical Center about whether the care provider could release the records or be willing to voluntarily supply them in advance of trial, the government received on November 23, 2021, 26 total pages of records, including 18 pages of substantive medical records in response to the subpoena. (Id. ¶ 5, 10.) The government immediately produced the records it received to defense counsel the same day, noting that while largely duplicative of what was already produced, the November 6, 2012, records did in fact appear new. (Id. ¶ 10.) Upon reviewing the records, the government determined that Dr. Jindal was the treating physician from November 6, 2012, and Dr. Jindal was served with a trial subpoena on November 26, 2021. (Id. ¶¶ 11-12.)

The government tried contacting defense counsel repeatedly following the pretrial conference on November 22, 2021, to confer about multiple outstanding issues, including the need to call any treating physicians, but was unable to reach her despite sending multiple emails and calling her on both her cell phone and leaving a message for her at the office. (Id. ¶¶ 7-9.) Instead, while many pending requests were with defense counsel, on Saturday, November 27, 2021, at 5:54 p.m., defense counsel sent a single sentence email asking, "Nicole's rib wasn't broken after all?" (Id. ¶ 13.) Defense counsel then called government counsel at approximately 6:43 p.m., and asked the same question, and the government repeated what was in

---

yet. Medical records concerning N.B. and Dr. Wudka that are in the government's possession and that it currently is consider using during trial were produced over three years ago at bates 00012326.

8

1  the medical records -- there was "no definite evidence of acute
2  displaced fracture of the ribs" in the records.  (Id. ¶ 14.)
3     The government also highlighted to defense counsel during this
4  November 27, 2021 evening call, that the two treating physicians, Dr.
5  Jindal and Dr. Rollins, were both under subpoena to testify at trial
6  in this case, and that the government had not yet done its witness
7  preparation session with either witness.  (Id. ¶ 15.)  The government
8  represented that it would endeavor to have those sessions done
9  immediately given defense counsel's questions about the chest x-ray
10 results and committed to producing any resulting 302s (FBI reports)
11 immediately thereafter.  (Id.)  The government did not identify these
12 witnesses as experts -- indeed, the government's trial memorandum
13 filed on November 26, 2021, explained why treating physicians are not
14 medical experts -- and did not identify any existing or forthcoming
15 "expert reports" on this topic.  (Id.)
16    The government further explained that it did not share
17 defendant's concern about the lack of a definitive fracture on the
18 chest x-rays because (1) the government's awareness of medical
19 journals stating that fractures are not always visible, (2) N.B.'s
20 consistent testimony that she believed she had a fracture but
21 ultimately declined the CT scan, and (3) the ultimate immateriality
22 of whether there was or was not a fracture to N.B.'s claims that she
23 was in severe pain from a violent "hug," that she asked defendant to
24 stop having sex with her, and that defendant refused and forcibly
25 restrained her until he could finish.  (Id. ¶ 14.)  Defense counsel
26 argued that the lack of a definitive fracture somehow called into
27 question the validity of his underlying state conviction and the rape
28 charges in this case (id.), even though Riverside PD's report to the

district attorney made no mention of or reliance upon a fracture, because none was reflected in the medical records in the Riverside PD's files (Lewis Decl., Exs. 1, 3).

Importantly, during the approximately 18-minute call the evening of November 27, 2021, defense counsel made no mention of the need for a trial continuance. (Lewis Decl. ¶ 16.) Defense counsel provided ambiguous information that she intended to file "motions" objecting to the probable cause in the indictment and the need to retain a medical expert in this case. (Id.) The first the government learned of defendant's request for a continuance was when the ex parte motion triggered an email notification at approximately 9:57 p.m. later that same night.

**C.   Defendant's Repeated Efforts to Continue This Trial**

Defendant's ex parte cannot be viewed in isolation from the continuances he already received at the expense of a timely resolution of this matter for victims. Before the pandemic, defendant received three continuances over the government's objection. (Dkts. 33, 34, 45, 46, 50, 51.) As trials returned to the Central District, and when the trial in this matter was set for September 28, 2021 (dkt. 66), prior defense counsel emailed government counsel on June 29, 2021 that they intended to seek a continuance of approximately two months, which would be to around November 2021. Government counsel told prior defense counsel it would oppose any continuance and prior defense counsel did not ultimately seek one. Instead, after nearly three years, defendant filed on July 19, 2021, a motion to dismiss based on the statute of limitations (dkt. 76) and filed a request on July 23, 2021, that

current counsel, Meghan Blanco, be substituted as counsel of record (dkt. 85).

In permitting Ms. Blanco to serve as counsel of record, the Court granted another continuance, to the current trial date, the length of which was over the government's objection. (Dkts. 99, 100.) On October 12, 2021, defendant, through his current counsel, filed a motion to dismiss the indictment <u>without prejudice</u> based on an asserted conflict, essentially seeking another delay so that a different U.S. Attorney's Office could review and prosecute this case. (Dkt. 102.) That motion was denied orally at a status conference on November 22, 2021. The next morning defense counsel emailed government counsel and the Court that she intended to file a new motion to dismiss, this time concerning the information presented to the Grand Jury and that she would seek to file such motion by Friday, November 26, 2021. (Lewis Decl. ¶ 9.) Defendant did not file such motion, and instead, on Saturday, November 27, 2021, three days before trial, filed the instant <u>ex parte</u> for a continuance.

**III. ARGUMENT**

Defendant has identified no legitimate basis to continue the trial. His <u>ex parte</u> motion purports to name only two: (1) the existence of "expert reports that have not yet been produced," which is false, and (2) the supposed need to retain his own medical expert, which is unsupported by the record.

    **A.    There Are No "Unproduced Expert Reports" or Even the Anticipation of Additional Expert Reports**

As described above, there are no medical records that the government currently possesses that it has not produced. The government anticipates calling at trial some combination of Drs.

Jindal, Rollins, and Wudka to explain, as set forth in the government's trial memorandum, their treatment of N.B. in November 2012 -- their medical observations of tenderness, their assessment of costochondritis, the diagnostic tests they performed (and their limitations), and any statements made by N.B. for the purpose of medical diagnosis or treatment. During the parties' phone call on the night of November 27, 2021, the government explained that it had not yet done any trial preparation sessions with any doctor, but that it would schedule those immediately and produce any resulting reports immediately. (Lewis Decl. ¶ 15.) It explained that because it was the weekend, it would be unlikely that the either doctor would be available before November 29, 2021.[6] (Id.)

These treating physicians have not been retained by the government as experts and are not being called to offer any medical expert opinion. They are expected to testify only to what they personally observed when they treated N.B., what they expected their diagnostic tests would or would not reveal, their assessments, and any statements made by N.B. for the purpose of medical diagnosis or treatment. (Dkt. 137, Trial Memorandum, at 25-26.) In a case where defendant is expected to deny ever causing any physical harm to N.B., the medical providers can corroborate that N.B. came in for treatment reporting significant pain in early November 2012 and provide necessary context for why she was in a binder when the second rape occurred. The government has no intention of establishing whether N.B. did or did not actually have a fractured rib, because, as set forth below it is ultimately irrelevant to the charges in this case.

---

[6] The government has now made contact with Dr. Jindal and is scheduled to speak with him Monday, November 29, 2021, at 11:00 a.m.

12

### B. No Continuance is Necessary Because No Defense Medical Expert Opinions Would Be Relevant or Admissible

The government has no reason to doubt that N.B. likely did experience a fractured rib, which is why in previous filings it referred to N.B. experiencing one,[7] but ultimately, the existence of a fracture, a suspected fracture, or no fracture at all is irrelevant to the charges in this case. N.B. is expected to testify that she experienced severe pain when defendant refused to let her leave and squeezed her so hard she heard a "pop" and felt the wind knocked out of her. The medical records state that there was "no definite evidence of acute displaced fracture of the ribs." It is entirely unclear what a defense expert would even opine on that is not already reflected in these medical records.

As the Court is well aware, "[i]rrelevant evidence is not admissible." Fed. R. Evid. 402. Only relevant evidence is admissible, and to be relevant the evidence must have "any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. It is unclear what relevance a non-treating medical expert could testify to that could not be addressed by direct testimony of the treating physician, especially where any such expert has also not met with or examined N.B.

Even if N.B. entirely made up the pain, defendant gains no advantage -- he is not permitted to force someone to have sex with

---

[7] Defense counsel references the government's assertions that defendant's squeeze fractured N.B.'s ribs. (Blanco Decl. ¶ 3.) The government has no reason to doubt N.B.'s memory of her communications with the doctor that her rib was likely fractured, but acknowledges that no fracture was detected by the chest x-ray or reflected in the medical records.

13

him simply because he believes their cries of pain to be psychosomatic. Even if medically those cries of pain were entirely feigned -- and the government has no reason to think they were -- that does not negate a material fact, which is the standard for any such medical testimony by a defense expert to become admissible. Defendant can at best argue that the existence of a fracture (or lack thereof) bears on N.B.'s credibility, since she claimed she felt she had a fracture, but defendant does not need to delay trial for a month to obtain a medical expert to opine on that issue. This is simply a point to make on cross-examination using the existing medical records.

Defendant also raises <u>Brady</u> concerns about how the fracture relates to defendant's underlying state conviction, but there is no evidence in any of the Riverside PD records that the district attorney charged defendant with causing a fracture of any kind and defendant points to none. There remains a great deal of confusion over whether defendant's conviction for infliction of a corporal injury on a domestic partner in violation of California Penal Code § 273.5(a) arose from the bear hug or from his conduct on November 3, 2012, involving the gun incident with his parents.[8] Ultimately,

---

[8] The government was under the initial impression that the conviction stemmed from the "bear hug" incident believed to take place on November 4, 2012, as set forth in its original briefing in support of motion in limine no. 1. (Dkt. 80 at 9). However, as set forth in the government's trial memorandum (dkt. 137, at 12 n.4), upon closer review of the state court records, defendant's convictions appear to concern actions on November 3, 2012, the day of the gun incident involving his parents. Therefore, the government believes that his conviction was for the gun incident, not the bear hug. The government obtained and produced in 2018 the certified conviction records reflecting the minute entries for defendant's conviction and sentencing in 2015. In preparation for trial, and to resolve this issue, the government is seeking to obtain transcripts
*(footnote cont'd on next page)*

however, it does not matter what gave rise to the conviction since the fact of conviction will only be admissible if defendant testifies, and the underlying conduct (without the fact of conviction) should be admitted as inextricably intertwined evidence.

Another continuance does not serve the interest of justice and causes great prejudice to the victims and the government. Since April 2019, the government has voiced its strong objections on behalf of the victims to any additional delays in the proceedings in this case. For the eighth time since this case was filed, the victims' very strong desire to vindicate their rights is in jeopardy. The victims who remain deeply affected by defendant's criminal conduct have stated to the government that they would like the trial to proceed on November 30, 2021, so that they can find resolution to the trauma that they have been living and reliving over the past seven to eight years. Indeed, many of them remain angry and traumatized over the previous continuances that were granted in this case. The government asks the Court to consider the victims' ardent desire for a speedy resolution of this case and deny defendant's request for a one-month continuance.

The defense has had more than sufficient time to prepare for trial. The defense has had more than sufficient time to identify the need for and retain any experts. While the results of the chest x-ray were recently produced, the existence of the chest x-ray has been known to defense counsel since 2018, and to defendant since 2012, and the absence of the word "fracture" in the medical records has

---

of those proceedings on an expedited basis, which will hopefully provide clarity. The government has also asked defense counsel to provide any records or documentation she has that may shed light on this question.

similarly been known since then. Defendant has been represented by experienced counsel -- first with multiple attorneys from the Federal Public Defenders Office, including for a time the now-Federal Public Defender for the Central District, and now from a former AUSA who served in the public corruption and civil rights section of the United States Attorney's Office. Each of these attorneys has had ample opportunity to review the discovery from the beginning of this case and has overseen the investigation into potential defenses, including whether those defenses might require expert testimony.

Additionally, the government's trial preparations are fully underway. The government has three witnesses flying in from out of state, including two flying on Monday, November 29, 2021, and one flying on Tuesday, November 30, 2021. Hotels have been booked for those witnesses and several other witnesses within the Central District but more than 50 miles from the Courthouse. A further continuance is not necessary to prevent a manifest injustice -- indeed, granting one at this stage would cause one.

## IV. CONCLUSION

The Court should deny defendant's request for a continuance of the November 30, 2021, trial date.