UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CRIMINAL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **EDCR 18-231 JGB** | Date | November 2, 2022 |
| Title | *United States of America v. John Jacob Olivas* | | |

Present: The Honorable   JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

Attorney(s) Present for Government:   Attorney(s) Present for Defendant(s):

None Present   None Present

**Proceedings:** Order (1) RESERVING RULING IN PART and DENYING IN PART Government's Motion in Limine to Exclude Improper Impeachment Evidence (Dkt. No. 192); (2) GRANTING IN PART and DENYING IN PART Government's Motion in Limine to Admit Additional Evidence Concerning Witnesses M.O and C.N. (Dkt. No. 196); and (3) GRANTING Government's Motion in Limine to Admit Prior Statements of Defendant (Dkt. No. 204) (IN CHAMBERS)

Before the Court are three motions in limine filed by the Government: (1) a motion in limine to exclude improper impeachment evidence ("Impeachment MIL," Dkt. No. 192); (2) a motion in limine to admit additional evidence concerning witnesses M.O. and C.N. ("Additional Evidence MIL," Dkt. No. 196); and (3) a motion in limine to admit prior statements of Defendant John Jacob Olivas ("Prior Statements MIL," Dkt. No. 205) (collectively, "the MILs"). The Court held hearings on the MILs on October 17, 2022 and October 24, 2022. After considering all papers submitted in support of and in opposition to the MILs, as well as oral argument, the Court RESERVES RULING ON IN PART and GRANTS IN PART the Impeachment MIL, GRANTS IN PART AND DENIES IN PART the Additional Evidence MIL, and GRANTS the Prior Statements MIL.

## I. BACKGROUND

John Jacob Olivas ("Defendant" or "Mr. Olivas") is charged with three counts of deprivation of rights under color of law in violation of 18 U.S.C. § 242. ("Indictment," Dkt. No. 1.)

A trial began on November 30, 2021.  (Dkt. No. 151.)  On December 15, 2021, the jury deadlocked on all three counts and the Court declared a mistrial.  (Dkt. No. 184.)  A retrial was set for February 8, 2022.  (Id.)  On February 3, 2022, the parties stipulated to continue the trial from February 8, 2022 to September 20, 2022.  (Dkt. Nos. 187, 189.)

On August 15, 2022, the Government filed the Impeachment MIL.  (Impeachment MIL.)  On August 26, 2022, the Government filed under seal the Additional Evidence MIL.  (Additional Evidence MIL.)  On September 6, 2022, the Court granted Defendant's ex parte application to continue the trial from September 20, 2022 to October 25, 2022.  (Dkt. No. 201.)  On October 3, 2022, the Government filed the Prior Statements MIL.  (Prior Statements MIL.)  On October 14, 2022, Defendant opposed the Prior Statements MIL.  ("Opposition to Prior Statements MIL," Dkt. No. 205.)  The same day, Defendant filed a position regarding the Impeachment MIL.  ("Impeachment MIL Position," Dkt. No. 206.)

On October 17, 2022, the Court held a hearing on the MILs.  (Dkt. No. 209.)  On October 19, 2022, the Government filed a supplemental brief in support of the Prior Statements MIL.  ("Government Prior Statements Supplemental," Dkt. No. 221.)  On October 21, 2022, Defendant filed a supplemental declaration of Daniel Greenberg in opposition to the Prior Statements MIL.  ("Greenberg Declaration," Dkt. No. 222.)

On October 24, 2022, Defendant filed a notice seeking a continuance if the Court were to grant the Prior Statements MIL.  (Dkt. No. 223.)  On October 24, 2022, the Government also filed a notice of lodging of Exhibit 14 relevant to the Greenberg Declaration.  ("Exhibit 14," Dkt. No. 224.)  The same day, the Court held a status conference.  (Dkt. No. 226.)  At the request of Defendant, the Court continued the trial to November 29, 2022.  (Id.)  On October 26, 2022, the Government filed a supplemental brief in support of the Additional Evidence MIL.  ("Government Additional Evidence Supplemental," Dkt. No. 225.)

The retrial is set for November 29, 2022, at 9:00 a.m.

## II.  LEGAL STANDARD

Motions in limine are a well-recognized judicial practice based in "the court's inherent power to manage the course of trials."  Luce v. United States, 469 U.S. 38, 41 n.4 (1984).  Regardless of its initial decision on a motion in limine, a court may revisit the issue at trial.  See Fed. R. Evid. 103, advisory comm. note to 2000 Amendment ("Even where the court's ruling is definitive, nothing in the amendment prohibits the court from revisiting its decision when the evidence is to be offered."); Luce, 469 U.S. at 41–42 ("[E]ven if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous in limine ruling.").  "[A] ruling on a motion in limine is essentially a preliminary opinion that falls entirely within the discretion of the district court."  United States v. Bensimon, 172 F.3d 1121, 1127 (9th Cir. 1999) (citing Luce, 469 U.S. at 41–42).

//

## III.   DISCUSSION

**A.   Impeachment MIL**

In the Impeachment MIL, the Government moves "to preclude the defense from suggesting that victims K.L. or N.B. made allegations against defendant because they were motivated by money and to exclude the previously admitted defense Exhibit 500, which was admitted in the previous trial over the United States' objection (RT 12/9/21 at 103)." (Impeachment MIL at 2.)  The Government attached previously admitted Exhibit 500 to the Impeachment MIL as Exhibit 1.  (Impeachment MIL Ex. 1.)

Defendant has taken the following positions on the matter: (1) He currently does not intend to elicit testimony relating to financial gain.  Should he desire to do so later, Mr. Olivas would raise the issue outside of the jury's presence.  (2) He requests permission to briefly *voir dire* N.B., outside of the jury's presence, regarding whether she has retained a civil law firm in connection with this case.  (3) Mr. Olivas believes he should be allowed to ask relevant questions concerning Exhibit 500, involving communications between the two named accusers in the case.  He asserts that questions about the communications, which may suggest "collusion," are relevant.  Moreover, precluding him from examining the accusers about statements made to one another would deprive Mr. Olivas of his Sixth Amendment right to confrontation and his Fifth Amendment right to due process.  (See Impeachment MIL Position.)

Because Mr. Olivas does not currently plan to cross-examine K.L. and N.B. about possible financial motives, the Court RESERVES RULING on whether he should be permitted to do so.  If the defense changes its mind, it must re-raise the issue outside the presence of the jury before cross-examining K.L. or N.B.

The Court will allow Defendant to briefly *voir dire* N.B. outside the jury's presence as to whether she has retained a civil law firm in connection with this case.  The issue is plainly relevant to her credibility.

The Court agrees with Defendant that Exhibit 500 remains admissible and that he should be permitted to ask relevant questions about it.  The Court already ruled on the matter in the first trial and stated its reasoning for doing so.  Nonetheless, the Court briefly reiterates its reasoning.

Under the Federal Rules of Evidence, "evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.  All relevant evidence is admissible, with certain exceptions, while evidence which is not relevant is not admissible. Fed. R. Evid. 402.  However, a court may exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice. Fed. R. Evid. 403.  "A witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character." Fed. R. Evid. 608(a).  Except for a criminal conviction, "extrinsic evidence is not admissible to

prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of (1) the witness; or (2) another witness whose character the witness being cross-examined has testified about." Fed. R. Evid. 608(b).

The Government argues that the Court should preclude admission of Exhibit 500 as improper impeachment material under Federal Rule of Evidence 608(b). (Impeachment MIL at 9.) The Government's argument is limited to the lack of evidence of a financial incentive, which it believes precludes admission of Exhibit 500, since "there is no evidence in the record to suggest that either K.L. or N.B. had a financial incentive to lie or that the text exchange concerned money[.]" (Impeachment MIL at 9.) As Mr. Olivas notes, however, Exhibit 500 is relevant for other reasons. It indicates that his two primary accusers communicated with one another at some length. While the Court does not adopt Defendant's theory as to the possible "collusion" of the two witnesses, it can discern how their relationship may shape their respective testimony. Defendant may wish to use Exhibit 500 to illustrate that either or both witness lacks credibility in part due to her relationship with the other. The Court finds that the probative value of Exhibit 500 outweighs any prejudice to the Government. Moreover, it is probative of the witnesses' character for truthfulness and is thus properly admitted under Federal Rule of Evidence 608(b).

Accordingly, the Court RESERVES RULING on whether Defendant may ask K.L. and N.B. about financial motives. The Court will allow Defendant to briefly *voir dire* N.B. outside the jury's presence as to whether she has retained a civil law firm in connection with this case. The Court DENIES the Impeachment MIL with regard to Exhibit 500, which it finds admissible.

**B. Additional Evidence MIL**

In the Additional Evidence MIL, the Government seeks to admit additional evidence concerning witnesses M.O. and C.O. through broader direct examination than occurred in the first trial. (Additional Evidence MIL at 1.) Defendant has not filed an opposition to the Additional Evidence MIL. At the October 17, 2022 hearing, Defendant argued that the M.O. incidents were unduly prejudicial, but did not address the C.O. incidents.

Through M.O., the Government seeks to elicit additional testimony about "(1) when Defendant physically restrained her and held her over a pool until she agreed to go on a trip with him and (2) when Defendant threatened to use his service weapon against M.O. when they were sitting in a car together." (Id. at 5.) The Government asserts that these incidents are admissible under Federal Rule of Evidence 404(b) to establish "motive, identity, intent, modus operandi, and lack of accident or mistake . . . concerning the charged assaults." (Id.) The Court understands that the Government's primary theory of admissibility concerns an alleged modus operandi. (See id.)

Through C.N., the Government seeks to elicit additional testimony about three more categories of sexual assaults she suffered at the hands of Defendant in addition to those she previously testified to. (Id. at 8.) Pursuant to Rule 413 of the Federal Rules of Evidence, the Government seeks to admit testimony regarding "1) defendant regularly wanting anal sex and thereafter holding C.N. down by the back of her neck to force anal sex, (2) starting to force sex on C.N., but then stopping in the middle of an assault, and (3) numerous forced vaginal sex experiences following her marriage to defendant." (Id. at 8.)

The Court addresses these incidents in turn.

### 1. M.O. Incidents

The Government's argument for the admissibility of the two additional M.O. incidents rests on a chain of reasoning the Court summarizes as follows. First, at the last trial, M.O. testified about an incident in which Defendant led her to believe he called local law enforcement to prevent her from leaving his house following a night of drinking at a bar. (Id. at 5.) On cross-examination, the defense asked, "Going back to the incident following your fight at Killarney's, you indicated that Mr. Olivas told you he didn't want you to leave because he thought you'd been drinking too much, is that right?" (Id. at 6) (quoting RT 12/1/21 at 184-85.) She answered, "Right." (Id.) In the Government's view, "[w]ithout the additional context of other actions defendant took against M.O. during their relationship, the jury was left with an ambiguous impression of defendant's motivation and actions when he led M.O. to believe he called local law enforcement, which in turn undermined the Court's prior ruling on this 404(b) evidence." (Id.) Or, in other words, "there is an inference that Defendant could have been acting as a caring boyfriend who did not want M.O. to drive home after drinking, as opposed to him having an acute understanding about relying on and abusing his federal law enforcement power in interactions that should have been entirely divorced from his law enforcement power." (Id.)

Therefore, the Government asserts that the incident in which Defendant allegedly held M.O. over a pool until she agreed to go on a trip with him was similar to the incident where N.B. wanted to leave Mr. Olivas's house, but he stopped her by holding her and squeezing her until there was a pop. (Id.) As the Government puts it, "as opposed to Defendant being a caring boyfriend who accidentally invoked his law enforcement power to influence his personal, romantic relationships, M.O.'s additional testimony in light of testimony by N.B. and K.L., show that Defendant made no mistake when he led M.O. and the charged victims to believe his federal law enforcement power allowed him to influence and control local law enforcement." (Id.)

The Government also seeks the admission of an incident when Defendant allegedly threatened M.O. with his service weapon in a car, "which was a way he relied on his authority and power by virtue of his position as a federal agent." (Id. at 7.) The Government asserts that this is similar to N.B.'s lengthy testimony at trial about how Defendant "used his service weapon to intimidate and threaten her the night of the first charged rape in September 2012, which started with him pointing his service weapon at N.B. in a car." (Id.)

The Court is persuaded that both of these additional incidents are admissible.

The incident in which Defendant allegedly held M.O. over a pool until she agreed to go on a trip with him bears sufficient marks of similarity to the incident in which Defendant allegedly stopped N.B. from leaving Mr. Olivas's house by squeezing her until there was a pop. Both alleged acts involve similar criminal conduct (assault/battery and false imprisonment) arising out of disputes in which Defendant's intimate partner attempted to physically distance herself from Defendant and Defendant responded by physically confining the women until they complied with his demands.  The Court agrees that the pool incident provides useful context to the post-Killarney's incident which the Court previously allowed M.O. to testify about.  The Court acknowledges, however, that the Government's chain of reasoning here is somewhat attenuated: it seeks to prove that Defendant really did squeeze N.B. until there was a pop by (1) proving that Defendant prevented M.O. from leaving his house after a night of drinking and led her to believe he called local law enforcement to prevent her from doing so, which is in turn more likely because (2) Defendant had a pattern of such behavior, exemplified by another incident in which he held M.O. over a pool until she complied with a different demand.  The incident thus only has moderate probative value.  While the Court might therefore be inclined to exclude the pool incident if it found it particularly prejudicial, the prejudicial impact of the pool incident is likely very limited.  Holding M.O. over a pool, which by all accounts did not result in serious injury, is a far less serious accusation than the charged conduct or uncharged acts the Court has previously found admissible.

In comparison, the probative value of the incident in which Defendant allegedly threatened M.O. with his service weapon in a car is strong.  It is very similar, even nearly identical, to the lead-up to the night of the first charged rape in September 2012, in which Defendant allegedly threatened N.B. with a gun inside of a car before assaulting her.  The Government is correct to characterize this incident as part of Defendant's alleged modus operandi in which he assaulted women, using his gun and badge as the key instruments enabling him to do so.  Of course, threatening an intimate partner with a gun is a serious allegation, one with more potential for prejudice than the pool incident.  But it is no more inflammatory than the charged conduct, and indeed far less so in many ways.

Accordingly, the Court finds that the M.O. incidents are admissible under Rules 404(b) and 403.

### 2. C.N. Incidents

At the last trial, C.N. testified generally about her marriage to Defendant and two specific incidents, in which she was allegedly raped on her first date with Defendant and when he raped her when she had a UTI. (Additional Evidence MIL at 7-8.)  The Government asserts that the three additional "categories/sets of forced sexual assaults" satisfies the appropriate balancing test "because they are part of the same arc of defendant's conduct as the two incidents that the court already allowed C.N. to testify about, preceding and during C.N.'s marriage to defendant." (Id. at 8.)

"In a criminal case in which a defendant is accused of a sexual assault, the court may admit evidence that the defendant committed any other sexual assault. The evidence may be considered on any matter to which it is relevant." Fed. R. Evid. 413(a). Propensity evidence admissible through Rule 413 is subject to Rule 403 balancing. See Fed. R. Evid. 413(c); United States v. LeMay, 260 F.3d 1018 (9th Cir. 2001). In making such a determination, courts consider: "(1) the similarity of the prior acts to the acts charged, (2) the closeness in time of the prior acts to the acts charged, (3) the frequency of the prior acts, (4) the presence or lack of intervening circumstances, and (5) the necessity of the evidence beyond the testimonies already offered at trial." LeMay, 260 F.3d at 1028 (internal quotations and citations omitted).

The Court finds that the additional incidents the Government seeks to elicit through C.N. plainly fall within the definition of "sexual assault" as codified in Fed. R. Evid. 413(d). The relevance of these incidents to the charged conduct is also obvious and hardly needs spelling out. The only question is whether the acts are substantially more prejudicial than probative. During the last trial, the Court previously allowed C.N. to testify regarding two incidents and stated its reasoning for doing so at the time. The same analysis largely applies here, and the Court only briefly restates its inquiry.

The three charged acts involve alleged conduct that took place from August 2011 to November 2012. (See Indictment.) C.N. and Defendant were romantically involved from 1998 to 2002 and married from approximately 1999 or 2000 until they divorced. (See Dkt. 80 at 11.) The Court finds that the decade or so in between the charged and uncharged acts is a neutral factor in the analysis. They are not so remote in time from the charged acts that the defense has a compelling argument that they reflect a different period of Mr. Olivas's life altogether. That said, the uncharged acts clearly do not concern a period coextensive with the charged acts or one immediately preceding them. Similarly, the presence or lack of intervening circumstances does not cut in any particular direction. All the incidents involving C.N. predated Mr. Olivas's tenure as a federal agent; his subsequent federal employment could therefore be characterized as an "intervening circumstance" related to the elements the Government seeks to prove in this case. That said, during his involvement with C.N., Mr. Olivas had already begun his career trajectory in the military and law enforcement. According to C.N., Mr. Olivas took the test for the Los Angeles Police Department and then went to the Air Force, which led him (and C.N.) to move to Fort Bragg, North Carolina. (See Additional Evidence MIL, Ex. 1.) Some, but not all, of the "color of law" dynamics may have thus been at play during the uncharged incidents.

The remaining factors point in different directions for the three categories of evidence the Government seeks to admit. As the Court understands it, the Government first seeks to admit, in a generalized or amalgamated form, that Defendant regularly forced C.N. to have vaginal sex against her will. Such evidence could appropriately corroborate, or contextualize, the specific instances of vaginal assault that C.N. testified to, bolstering her credibility and helping to refute any suggestion that the specific instances were made up or exaggerated. The frequency of the acts would further support admissibility.

Second, the Government seeks to admit testimony that, on a few occasions, Defendant started to force sex on C.N., but for reasons unknown to C.N, he would stop in the middle of the assault. Third, and here the Court uses the Government's precise language, "possibly before but definitely after they were married, Defendant regularly wanted to have anal sex and would hold C.N. down by the back of her neck to force anal sex and if C.N. protested defendant would say that C.N. was his wife and continue to anally rape her[.]" (Id. at 4.) The Court finds that the additional vaginal sexual assaults are similar conduct to the three charged vaginal sexual assaults, two allegedly completed and one attempted. Whether framed in terms of propensity under Rule 413 or modus operandi, intent and lack of accident under Rule 404(b), these uncharged acts are highly probative of the charged conduct. This is less true of the other two categories of evidence. A pattern (if it can be characterized as such from a "few occasions") of beginning an assault and then voluntarily (and apparently inexplicably) stopping does not closely bear on the charged conduct. The Court understands the benefits to the Government in eliciting these acts; doubtless, in its view, the more assaults it establishes the better, and these ones, in which Defendant allegedly stopped partially through, perhaps additionally evince consciousness of guilt. But such logic, divorced from a tight factual nexus with the charged conduct, veers too close to the uncritical inquiry of asking the jury to find Defendant guilty because he is a rapist. The same is true of the alleged incidents of forced anal sex. Defendant is not charged with anal assaults. He is certainly not on trial for "regularly want[ing] to have anal sex," which the Government appears to suggest is an inextricable part of this category of evidence. The Court fears the potential of a mini-trial as to whether these events should be characterized as a marital dispute over differing sexual proclivities or a specific manifestation of Defendant's pattern of marital rape. Moreover, while to some jurors anal rape may be no more inflammatory than vaginal rape, and to others the differences of degree and not of kind, the Court finds the potential for significant prejudice.

Accordingly, the Court concludes that C.N. may testify that Defendant regularly assaulted her vaginally, in addition to the two specific assaults the Court previously allowed. She may not testify regarding instances in which Defendant began to assault her and then stopped. C.N. also will not be permitted to reference the proposed instances of anal rape. This result will allow the Government a fair opportunity to put on enough evidence necessary to meet its burden at trial. Further testimony would be cumulative, disproportionate to the three charged offenses and run the risk of undue prejudice to Defendant.

The Additional Evidence MIL is thus GRANTED IN PART and DENIED IN PART.

### C. Prior Statements MIL

During the first trial, this Court ruled that the Government could present evidence that (1) Defendant physically assaulted N.B. in November 2012; (2) pointed his service weapon at his father in November 2012; and (3) intimidated N.B. in March 2013 by threatening to send her father sexually explicit photos and videos of her. (Prior Statements MIL at 1.) The Government did not seek to introduce Defendant's convictions for this conduct, just the underlying facts,

unless Defendant testified. (Id.) N.B. testified about these incidents, which the defense vigorously challenged in its case-in-chief and on cross-examination. (Id.)

In the Prior Statements MIL, the Government seeks to admit Defendant's statements from a September 2015 state change of plea hearing in Riverside Superior Court. (Id.) During that hearing, the Government asserts that Defendant admitted this conduct was true. (Id.) The Government explains that it was not able to obtain the transcript of this hearing until after the first trial, and thus did not try to introduce the statements then. (Id.) The Government argues the statements are admissible under Federal Rule of Evidence 801(d)(2), the hearsay exception for an opposing party's statement. The Government does not seek to admit the fact of Defendant's convictions and proposes a stipulation in which the statements would be revised to remove any information that they were made as part of a state criminal proceeding. (Id. at 1-2.)

Defendant opposes the MIL. Mr. Olivas argues: (1) the statements are not admissible because they were made as part of a "People v. West" plea; (2) the statements were involuntary; and (3) his state court counsel was ineffective. (See Opposition to Prior Statements MIL.)

Federal Rule of Evidence 410 bars the admission of evidence against a defendant of a "guilty plea that was later withdrawn" or a "nolo contendere plea." Fed. R. Evid. 410(a)(1-2). It also bars "a statement made during a proceeding on either of those pleas under Federal Rule of Criminal Procedure 11 or a comparable state procedure[.]" Fed. R. Evid. 410(a)(3). The parties appear to agree that a People v. West plea qualifies as a nolo contendere plea within the meaning of Rule 410, statements made during a West change of plea hearing constitute a "comparable state procedure," and therefore, if Mr. Olivas entered into a West plea in September 2015, the statements he made during the change of plea hearing would not be admissible. If, however, he made those statements at a guilty plea hearing, the statements are admissible. (See Prior Statements MIL at 7-8) (collecting cases).

In California, a People v. West plea is a type of nolo contendere plea arising from the California Supreme Court case People v. West, 3 Cal. 3d 595 (1970). The California Supreme Court has characterized a West plea as a plea of nolo contendere that "does not establish factual guilt." United States v. Vidal, 504 F.3d 1072, 1089 (9th Cir. 2007) (citation omitted). Defendant asserts that "such pleas are generally made without a factual basis, out of fear that a harsher penalty may be imposed if a guilty plea is not tendered." (Opposition to Prior Statements MIL at 6.) In the Government's view, at a "bare minimum when it concerns a plea between a defendant and the state of California," a West plea "requires that the district attorney consent to such a plea." (Government Prior Statements Supplemental at 2) (quoting West, 3 Cal. 3d at 599 ("[D]efendant, with the consent of the district attorney, pleaded nolo contendere . . . .") As noted below, defendants in Riverside County have occasionally entered West pleas as part of open pleas to the court and/or when the prosecution's objected was noted. (Id. at 4.)

The parties appear to agree on at least some aspects of the general practice in state criminal cases in Riverside County. West pleas apparently happen "from time to time" but are quite rare. (See Government Prior Statements Supplemental at 7; Greenberg Declaration ¶ 2.)

According to Mr. Greenberg, counsel for Defendant at his September 2015 change of plea hearing, "some judges, and most district attorneys [in Riverside], do not accept them." (Greenberg Declaration ¶ 2.)

In support of the MIL, the Government filed a declaration of deputy district attorney Tara Powell, née Foy, who prosecuted Defendant in the state case and appeared for the prosecution at the September 10, 2015 change of plea hearing. (Government Prior Statements Supplemental at 2.) According to Ms. Powell, it was her intent that Mr. Olivas plead guilty to the offenses. (Id. at 2; Powell Declaration ¶¶ 4, 9.) She did not consent to a West plea. (Id.; Powell Declaration ¶¶ 8-9.) Additionally, she asserts that she needed supervisory approval to enter into such a plea agreement, and she neither sought nor obtained such approval. (Id.; Powell Declaration ¶¶ 9-10.) According to the Government, based on further conversations with two Riverside deputy district attorneys, the Riverside District Attorney's Office has a policy against West *and* nolo contendere pleas and entering into such plea agreements require supervisory approval. (Id. at 2.)

Defendant does not directly challenge these facts. According to Mr. Greenberg, "Mr. Olivas pleaded guilty pursuant to People v. West." (Greenberg Declaration ¶ 3.) Mr. Greenberg's recollection of the events is as follows:

> Prior to entering a guilty plea, I participated in a lengthy, off record, discussion with the Court and prosecution. The Court advised Mr. Olivas of the penalties he faced if he lost at trial. Those penalties terrified Mr. Olivas. After nearly 5-hours of intermittent sidebars with Court, the District Attorney, and private discussions with Mr. Olivas and his family, Mr. Olivas agreed to enter a plea, but only if he could do so pursuant to People v. West. Given Mr. Olivas's trepidation, I was very reluctant to join Mr. Olivas's guilty plea, but I agreed to do so under the condition that it was made pursuant to People v. West. To the best of my recollection, I advised the Court and assigned District Attorney of this at sidebar. Neither the Court nor the assigned District [A]ttorney objected at the time or during the change of plea colloquy.
>
> I believed, at the time, that entering a plea pursuant to People v. West was in Mr. Olivas's best interest. At the time, I was unaware that the federal government had opened its own criminal probe into the exact same allegations that gave rise to Mr. Olivas's state prosecution.

(Id.)

The Court notes Mr. Greenberg's repeated acknowledgement that this was a *guilty* plea, characterizing it as a guilty plea "pursuant to People v. West." Defendant uses the same language, asserting that "Mr. Olivas entered into a guilty plea pursuant to People v. West[.]" (Prior Statements Opposition at 6-7). In Defendant's view, "West pleas do not require the entry of nolo contendere pleas, as evidenced by the transcripts in Mr. Olivas's state court case. Although the policy does not appear to be written publicly, Riverside County Superior Courts do not allow defendants to enter nolo contendere pleas." (Id. at 6.) Notably, the Declaration of Mr. Greenberg, who has nearly 50 years of experience as a prosecutor and defense attorney in Riverside County (Greenberg Declaration ¶ 2), does not say anything about such a policy. The key disagreement here is that Defendant appears to characterize a West plea as a species of *guilty* plea which, in Riverside County, circumvents an (unstated) policy of not accepting nolo contendere pleas. But that makes little sense. In the Court's understanding, a West plea is by definition a nolo contendere plea, arising from a case in which the defendant indisputably pleaded nolo contendere. See West, 3 Cal.3d at 600. The functional difference between a nolo contendere plea (or West plea) and a guilty plea is that in the latter the defendant admits to the factual basis of his guilt. The Government's explanation of the Riverside County District Attorney's Office policy makes much more sense: seeking to require defendants to admit the factual basis of their guilt, line attorneys are not allowed to enter into nolo contendere *or* West pleas without supervisory approval. Few deputy district attorneys ever do seek such approval, and management likely does not approve every request. As such, virtually every defendant who enters a plea in Riverside Superior Court pleads *guilty*.

The Court's review of the plea transcript confirms the Government's reading of the change of plea hearing: apart from a brief comment by Mr. Greenberg alluding to People v. West, it is impossible to read the colloquy and accompanying plea documents as anything other than an admission of guilt. For each of the three charges, Mr. Olivas answered "guilty" when the court asked how he pled. (Prior Statements MIL, Ex. 1 at 6-7.) The prosecutor read the factual basis for each count, and Mr. Olivas responded "true" to each question asking whether he committed the criminal acts. (Id., Ex. 1 at 8-9.) During the colloquy, the court repeatedly characterized what Mr. Olivas was doing as "pleading guilty" and Defendant repeatedly affirmed that he was pleading guilty. The Government's MIL accurately characterizes the relevant portions of the transcript:

> During the plea colloquy, the court referred to defendant's actions as "pleading guilty." (Ex. 1 at 3 ("Did you note, sir, that one of the consequences of your pleading guilty today could be . . . .").) Defendant responded, "Yes, Your Honor," when the court asked, "Did you initial, date, and sign the felony plea form in order to indicate to the Court that not only do you understand your legal and constitutional rights, but that you wish to waive them, **pleading guilty"** to the charged offenses? (Ex. 1 at 4 (emphasis added).) The Court also asked, "Do you still wish to waive your legal and constitutional rights in order to **plead guilty** to those counts?" and defendant responded, "Yes, Your Honor." (Ex. 1 at

> 6 (emphasis added).)  Even defendant's attorney described defendant's actions as "**guilty pleas.**" (Ex. 1 at 10.) Further, defendant initialed his change of plea form that "No one has made any threats to me or anyone close to me, or placed any pressure of any kind on me **in order to make me plead guilty**." (Ex. 2 at 1 (emphasis added).)  He also initialed that he "will enter a **guilty plea**" to three charges and his "**guilty pleas** are conditional on receiving" certain sentencing considerations, which he indeed received.  (Ex. 2 at 2 (emphasis added).)  He confirmed for the court during his plea colloquy that he "place[d his] initials on the felony plea form in order to indicate . . . that [he] understood everything that followed [his] initials." (Ex. 1 at 4.)  Further[,] defendant's abstract of judgment notes that the convictions were by "plea" (Ex. 3 at 1) and the criminal minutes for defendant's case note that his pleas to the three charges were "G" and "Guilty" (Ex. 4 at 1, 7).

(Prior Statements MIL at 9-10.)

The Court has also reviewed the documents Ms. Powell provided the Government regarding other pleas, in which a defendant entered a nolo contendere or West plea. (See Government Prior Statements Supplemental at 3.) In every such plea, the plea minutes and/or plea agreement form memorialize that the plea was a nolo contendere plea or entered pursuant to West. (See id. at 3.) Neither the minutes nor the plea agreement form in Defendant's case contains such a notation. (See id. Exs. 2, 4.) The Government once again accurately summarizes the contents of these documents and the conclusions that can be drawn from them:

> In the 2011 Cleaves documents provided by Ms. Powell, the change of plea minutes for both defendants list "Plea is to court per People v. West (sic)" and "Plea is to court and per People v.West (sic)." (Ex. 8 at 3, 11.) Defendant's minutes have no such notation.  It is important to note that the pleas in Cleaves were pleas to the Court and not part of a plea agreement with the State, as was the case with defendant.  At a minimum, plea agreements with the state require express consent to have a West resolution.  West, 3 Cal.3d at 599.  Relatedly, the plea forms in Cleaves are interlineated and expressly note "P. v. West" and "People v West Plea." (Ex. 8 at 6, 7, 15.)  No such notation is on defendant's felony plea agreement.
>
> In the 2009 Labora documents provided by Ms. Powell, the change of plea minutes list "PLEA ENTERED UNDER PEOPLE VS WEST." (Ex. 9 at 1.)  Defendant's minutes make no such notation.  While the Labora felony plea agreement form is not

interlineated to list People v. West, there is an interlineation that it was a "Plea to Court" without a district attorney signing the plea form. (Ex. 9 at 4.) No such notation is on defendant's plea agreement.

In the 2005 Lute documents provided by Ms. Powell, the change of plea minutes list "Pleads Nolo Contendere to All Counts," "Court Accepts Plea," and "People oppose plea." (Ex. 10 at 1.) Defendant's minutes make no such notation.

In the 2003 Townes documents provided by Ms. Powell, the change of plea minutes list "Pleads Nolo Contendere to count(s) 1-7," "Plea is Entered Pursuant to: People vs. West," and "This is a plea to the Court." (Ex. 11 at 2.) Defendant's minutes make no such notation.

Finally, the 2002 Powell documents provided by Ms. Powell (no relation), is the only West plea she could find where there was consent by the district attorney. (Ex. 12.) The ones without district attorney consent appear to be open pleas to the court and/or where the State's objection was noted. (Exs. 8 at 3; 9 at 5; 10 at 1.) The Powell change of plea minutes list "Plea is Entered Pursuant to: PEOPLE VS WEST." (Ex. 12 at 3.) Defendant's minutes make no such notation. And in Powell, where there was consent by the district attorney (which may have predated the Riverside County District Attorney's Office's policy against West or nolo contendere pleas which was in place in 2015 during defendant's case (Powell Decl. ¶ 9)), the felony plea agreement form is interlineated "Peo v. West plea." (Ex. 12 at 7.)

After reviewing these documents and comparing them to those in Defendant's case, the Court is satisfied that Mr. Olivas entered a guilty plea, not a West or nolo contendere plea. Mr. Olivas does not contend that he entered an open plea to the court. The transcript makes this abundantly clear: he reached a negotiated disposition with the District Attorney's Office, in which he agreed to plea in exchange for a reduced sentencing recommendation from roughly 14 years to four years. (Additional Statements MIL, Ex. 1 at 2.) While Mr. Greenberg contends that, "to the best of his recollection, [he] advised the Court and assigned District Attorney [that] . . . [he] agreed to . . . join Mr. Olivas's guilty plea . . . under the condition that it was made pursuant to People v. West" (Greenberg Declaration ¶ 3), Ms. Powell's recollection is far less equivocal: she did not, and would not have, agreed to the plea had it not been a guilty one. (Powell Declaration ¶¶ 4, 8-10.) On the record before it, the Court cannot conclude that the Court accepted Mr. Olivas's plea as part of an open plea to the Court or that the District Attorney's Office consented to a West plea. That alone defeats Defendant's argument, even if it were not further contradicted by numerous illustrations of his entry of a guilty plea in the documents filed by the

Government.  Doubtless, Mr. Olivas may have been deeply conflicted about whether to enter a plea.  He may very well have been "terrified . . . of the penalties he faced if he lost at trial." (Greenberg Declaration ¶ 3).  And, like any decent defense attorney, Mr. Greenberg may have been reluctant to join a plea when his client expresses such "trepidation."  (Id.)  But these are sentiments that defendants and their lawyers express every day in state and federal criminal courts.  A fear of the potential sentence following a loss at trial is the core reason why the overwhelming majority of cases resulting in convictions are accomplished through *guilty* pleas.  Mr. Olivas and the Riverside District Attorney's Office both weighed the risks and rewards of proceeding to trial.  Both sides decided to mitigate their risks through a negotiated disposition that reflected their assessment of their prospects at trial.  The prosecution secured a conviction and a 4-year prison sentence.  Mr. Olivas avoided the chance he might serve a decade further in a state penitentiary.  None of this is out of the ordinary or converts the plea into a West plea.

For these same reasons, the Court must reject Defendant's secondary arguments, that the plea was involuntary or that it should not be used against him because Mr. Greenberg provided ineffective assistance of counsel.  Beyond stating some basic principles of law, Defendant hardly develops the arguments and never attempts to apply any authority to the facts before the Court. (See Opposition to Prior Statements MIL at 6-8.)  The Court's review of the materials cited by Defendant and the Government indicates that Defendant's plea was no less voluntary than any other within the inherently coercive process of plea bargaining.

As to whether Mr. Greenberg provided ineffective assistance of counsel, that question is not properly before the Court, and certainly not when considering a motion in limine.  Such an inquiry would require reconstruction of the state court record, evidentiary hearings that look beyond the record, supplemental argument, and so forth.  The current procedural posture does not permit the Court to make such a finding.  On the record before it, the Court must reject the argument.  The Court has not been provided a sworn declaration from Defendant that outlines what consequences he was advised about and when he was advised of them.  All that Mr. Greenberg states on the matter in his Declaration is the following: "I believed, at the time, that entering a plea pursuant to People v. West was in Mr. Olivas's best interest.  At the time, I was unaware that the federal government had opened its own criminal probe into the exact same allegations that gave rise to Mr. Olivas's state prosecution." (Greenberg Declaration ¶ 3).  While he professes no knowledge of the federal probe into Mr. Olivas's conduct, Mr. Greenberg does not specify in the Declaration what consequences he might have advised Mr. Olivas about.  He certainly appears unwilling to admit in a declaration that he failed to advise Mr. Olivas about any important consequences or that he was ineffective.  Moreover, the Government filed Exhibit 14, which contains an email exchange predating the change of plea hearing, in which Mr. Greenberg wrote to Ms. Powell, "I met with my client yesterday, and rather than trail the case, and in order to give me an opportunity to review the additional discovery from the FBI, we will agree to continue the Olivas matter." (Exhibit 14.)  This contradicts, or at least seriously calls into question, Mr. Greenberg's recollection that he and Defendant were unaware of the federal investigation when the plea was entered.  Of course, Exhibit 14 does not demonstrate that Mr. Greenberg lied in his Declaration; a likely explanation is that Mr. Greenberg may not fully remember the precise sequence of events that transpired seven years ago.  In any event, the

Court can hardly conclude on the record before it that Mr. Greenberg failed to discuss with Defendant the impending federal case and what consequences a state court plea might have on it.

Apart from Defendant's suggestion that Mr. Greenberg failed to advise him of the potentialities regarding a federal case, the Court has been provided no evidence that Mr. Greenberg was deficient in any other respects. The limited evidence before the Court points to the opposite. The state court approved Mr. Olivas's plea in part because it was "comfortable based upon what I know of the facts of this case from the two attorneys who I trust and respect." (Prior Statements MIL, Ex. 1 at 10.) Mr. Greenberg professes to have nearly 50 years of criminal law experience, to "have represented thousands of clients and [to] have served as lead counsel in hundreds of felony trials in Riverside County." (Greenberg Declaration ¶ 2).

But all of this is likely beside the point. Even if the Court accepted that Mr. Greenberg and/or Mr. Olivas were unaware of the pending federal case, or that with a full awareness of how the future may unfold, they might have made a different decision, it would not compel a different result. Defendant cites no authority, and the Court is not aware of any, that would require a defense attorney to advise a client of the extremely unusual circumstance that he could later be indicted in a federal case and the admissions he made as part of his plea could be used against him. This is particularly the case where, as here, the factual admissions in state court do not form the direct basis for federal charges. It is unfortunate that both Mr. Olivas and Mr. Greenberg may have come to regret the 2015 guilty plea in light of the instant federal case. But their regret does not supply a legal basis for barring the factual admissions Mr. Olivas made in his state change of plea hearing.

Accordingly, the Prior Statements MIL is GRANTED. The Government may admit evidence of Defendant's admissions with the language proposed in the MIL, which the Court finds satisfies Rule 403 balancing:

> "Defendant has previously admitted that on November 3, 2012, he willfully assaulted his father, Johnny Olivas, with a firearm."
>
> "Defendant has previously admitted that on November 3, 2012, he willfully inflicted a corporal injury resulting in a traumatic condition on N.B., who lived with him at the time."
>
> "Defendant has previously admitted that between March 1, 2013, and March 31, 2013, he willfully attempted to and did intimidate and dissuade N.B. from coming forward and giving testimony against him because defendant asked her not to come forward with information regarding the acts he committed against her when he threatened to send a text video to her father of sexual acts between defendant and N.B."

//

## IV.   CONCLUSION

For the reasons above, the Court RESERVES RULING ON IN PART and GRANTS IN PART the Impeachment MIL, GRANTS IN PART AND DENIES IN PART the Additional Evidence MIL, and GRANTS the Prior Statements MIL.

**IT IS SO ORDERED.**