E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
ELI A. ALCARAZ (Cal. Bar No. 288594)
Assistant United States Attorney
Deputy Chief, Riverside Branch Office
     3403 Tenth Street, Suite 200
     Riverside, California 92501
     Telephone: (951) 276-6938
     Facsimile: (951) 276-6202
     Email:   Eli.Alcaraz@usdoj.gov
FRANCES S. LEWIS (Cal. Bar No. 291055)
Assistant United States Attorney
Public Corruption and Civil Rights Section
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-4850
     Facsimile: (213) 894-0141
     Email:   Frances.Lewis@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>           Plaintiff,<br><br>           v.<br><br>JOHN JACOB OLIVAS,<br><br>           Defendant. | ED CR No. 18-231-JGB<br><br>UNITED STATES' SENTENCING POSITION CONCERNING DEFENDANT JOHN JACOB OLIVAS; EXHIBITS 2-19<br><br>**[EXHIBITS 1, 20-22 FILED CONCURRENTLY UNDER SEAL]**<br><br>Hearing Date: March 13, 2023<br>Hearing Time: 2:00 p.m.<br>Location:     Ctrm. of the Hon.<br>              Jesús G. Bernal |

     Plaintiff United States of America, by and through its counsel

of record, the United States Attorney for the Central District of

California and Assistant United States Attorneys Eli A. Alcaraz and

Frances S. Lewis, files its Sentencing Position concerning defendant John Jacob Olivas.

This Sentencing Position is based on the attached memorandum of points and authorities and supporting Exhibits 1-22, where Exhibits 1 and 20-22 are filed concurrently under seal; the files and records in this case, including the United States Probation and Pretrial Services Office's Presentence Investigation Report and Recommendation Letter; and such further evidence and argument as the Court may permit.  The United States respectfully requests the opportunity to supplement its position or respond to defendant or the Probation Office as may become necessary.

Dated: February 22, 2023          Respectfully submitted,

                                  E. MARTIN ESTRADA
                                  United States Attorney

                                  MACK E. JENKINS
                                  Assistant United States Attorney
                                  Chief, Criminal Division


                                  _____
                                  ELI A. ALCARAZ
                                  FRANCES S. LEWIS
                                  Assistant United States Attorneys

                                  Attorneys for Plaintiff
                                  UNITED STATES OF AMERICA

# TABLE OF CONTENTS

**DESCRIPTION**                                                                      **PAGE**

I.    INTRODUCTION...................................................1

II.   FACTUAL BACKGROUND.............................................2

      A.   DEFENDANT'S STATUS AND TRAINING AS AN HSI SPECIAL
           AGENT....................................................3

      B.   ATTEMPTED RAPE OF K.L. UNDER COLOR OF LAW (COUNT ONE).....3

      C.   TWO RAPES OF N.B. (COUNTS TWO AND THREE).................6

III.  THE PSR AND THE UNITED STATES' OBJECTIONS AND COMMENTS........8

      A.   OFFENSE LEVEL............................................8

      B.   CRIMINAL HISTORY CATEGORY...............................11

      C.   PROBATION'S RECOMMENDED SENTENCE........................11

IV.   THE UNITED STATES' RECOMMENDED SENTENCE AND § 3553(a)
      ANALYSIS.....................................................11

      A.   NATURE, CIRCUMSTANCES, AND SERIOUSNESS OF THE OFFENSE....12

      B.   DEFENDANT'S HISTORY AND CHARACTERISTICS.................14

      C.   A "LIFE" SENTENCE DOES NOT LEAD TO SENTENCING
           DISPARITIES............................................17

           1.   Life Expectancy...................................18

           2.   Avoiding Sentencing Disparities...................19

      D.   NEED TO PROTECT THE PUBLIC, TO PROVIDE ADEQUATE
           DETERRENCE, AND TO PROMOTE RESPECT FOR THE LAW..........24

V.    VICTIM IMPACT STATEMENTS.....................................24

VI.   RESTITUTION..................................................25

VII.  CONCLUSION...................................................25

**TABLE OF AUTHORITIES**

Page(s)

**CASES**

United States v. Gonzalez,
  533 F.3d 1057 (9th Cir. 2008) ..................................... 23

United States v. Healy,
  583 F. App'x 661 (9th Cir. July 15, 2014) ........................ 21

United States v. Jim,
  804 F. App'x 895 (10th Cir. Feb. 25, 2020) ....................... 20

United States v. Kindley,
  2022 WL 17245115 (8th Cir. Nov. 28, 2022) ........................ 22

United States v. Longee,
  407 F. App'x 122 (9th Cir. Dec. 22, 2010) .................... 20, 21

United States v. Martin,
  528 F.3d 746 (10th Cir. 2008) .................................... 21

United States v. Mix,
  457 F.3d 906 (9th Cir. 2006) ................................. 19, 20

United States v. Perez,
  662 F. App'x 495 (9th Cir. Sept. 21, 2016) ....................... 23

United States v. Shaw,
  891 F.3d 441 (3d Cir. 2018) .................................. 23, 24

**STATUTES**

18 U.S.C. § 242.................................... 1, 10, 19, 22

18 U.S.C. § 2241.................................... 19, 20

18 U.S.C. § 3553(a)................... 2, 10, 11, 17, 19, 24

18 U.S.C. § 3583..................................... 24

18 U.S.C. § 3663A................................... 25

18 U.S.C. § 3664(d)(5)..............................................25

California Penal Code § 136.1(b)(1)..................................9


**RULES**

U.S.S.G. § 2A3.1....................................................10

U.S.S.G. § 2H1.1....................................................10

U.S.S.G. § 3C1.1.........................................8, 10, 11

U.S.S.G. § 3D1.4....................................................10

U.S.S.G. § 5A.............................................8, 10, 11


**OTHER AUTHORITIES**

United States Social Security Administration, "Retirement & Survivor
  Benefits: Life Expectancy Calculator"............................18

Centers for Disease Control, U.S. Life Tables......................19

1

## **MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.    INTRODUCTION**

3      Defendant John Jacob Olivas ("defendant"), a former Homeland

4  Security Investigations ("HSI") Special Agent, is a predator who

5  imposed nightmarish trauma on his romantic partners.  He willfully

6  abused and misused his federal agent power to cause physical,

7  psychological, and emotional pain, culminating in the attempted rape

8  of K.L. in January 2012 and two rapes of N.B. in September and

9  November 2012.  That his victims are suffering lifelong negative

10  effects of defendant's blatant abuse is an enduring tragedy.

11  Defendant is set to be sentenced on three counts of Deprivation of

12  Rights Under Color of Law, in violation of 18 U.S.C. § 242, which are

13  premised on attempted and completed aggravated sexual abuse.

14      On February 6, 2023, United States Probation and Pretrial

15  Services Office ("Probation") filed its Recommendation Letter ("RL,"

16  Dkt. 266) and Presentence Investigation Report ("PSR," Dkt. 267).

17  The PSR calculated a total Guidelines offense level of 43[1] and a

18  Criminal History Category of II, resulting in a Guidelines range of

19  life imprisonment.  (PSR ¶¶ 23-60, 62-70, 102.)

20      The United States respectfully requests, consistent with

21  Probation's recommendation and requests by the victims, that the

22  Court impose a custodial sentence of life on each of the three counts

23  of conviction.[2]  Defendant's sentence must include $300 in special

24

25      [1] Defendant's Total Offense Level is actually 47, higher than
the highest row in Guidelines Sentencing Table, but under Guidelines
26  § 5A, Application Note 2, if the offense level is more than 43, it is
to be treated as an offense level 43.

27      [2] As more fully detailed in Section IV.C, _infra_, conceptualizing
a "life" sentence in this context (where defendant is 48 years old),
28  roughly approximates 30-35 years' imprisonment, which is also
consistent with sentences imposed nationwide.

1   assessments and should have restitution to N.B. totaling $17,125.65.

2   If the Court imposes a custodial sentence less than life (it should

3   not), then it should impose five years of supervised release with the

4   terms in the Recommendation Letter.

5       This sentence is sufficient and not greater than necessary under

6   18 U.S.C. § 3553(a) to accomplish the goals of sentencing.  It fairly

7   balances the nature, circumstances, and seriousness of the offense

8   with defendant's history and characteristics and the need to protect

9   the public, provide deterrence, and promote respect for the law,

10  among other considerations.

11  **II.  FACTUAL BACKGROUND**

12      The following facts were presented during the 2021 and 2022

13  trials and are consistent with the facts in the PSR.  (PSR ¶¶ 7-18,

14  21.)  In 2011 and 2012, defendant was a Special Agent of United

15  States Immigration and Customs Enforcement ("ICE"), HSI, formerly

16  known as "ICE, Office of Investigations."  Instead of using his

17  badge, service firearm, and federal law enforcement power to better

18  his community, defendant used his position and power for his own

19  personal gratification: sexually abusing and attempting to sexually

20  abuse two of his intimate partners and preventing them from reporting

21  his sexual assaults, as well as other acts of violence, to law

22  enforcement.  Defendant's abuse of his federal law enforcement

23  authority violated the victims' constitutional rights, namely, their

24  rights to liberty and bodily integrity.  After a multi-week trial in

25  December 2022, defendant was found guilty of all three constitutional

26  violations charged in the Indictment.

27

28

**A.   DEFENDANT'S STATUS AND TRAINING AS AN HSI SPECIAL AGENT**

As part of his position as a Special Agent of ICE-HSI, and to enable him to carry out his responsibilities in that position, ICE-HSI issued defendant official government credentials, a badge, and firearms, including a Sig Sauer model P229, .40 caliber semiautomatic handgun, bearing serial number AEU00488 (the "service weapon"). During defendant's relationship with K.L., he also briefly had an M4 semi-automatic rifle.  Defendant, like all HSI agents, received extensive training on what he could and could not do with his badge and firearm, while both on and off duty.  Specifically, he was trained that he could never use his badge or credentials to exert undue influence or secure a favor, that he could not consume alcohol while carrying a firearm, that he had to store his firearm in a secure location at all times, and that as a representative of the United States he was subject to the highest ethical standards both on and off duty.

**B.   ATTEMPTED RAPE OF K.L. UNDER COLOR OF LAW (COUNT ONE)**

Beginning in approximately August 2011 and continuing to January 2012, defendant was in a romantic relationship with K.L.  During their relationship, defendant repeatedly exhibited escalating violent and controlling behavior and would use his position as a Special Agent to prevent K.L. from reporting his conduct to the police.  On their first few dates, he told her he could get into anyone's Facebook and that he could copy information from her phone by placing his next to hers.  He told her he couldn't disclose his job for her "safety" and that he was "not a cop," because he was "above a cop." Defendant told her he was "invisible" and "untouchable."  Defendant claimed he could track her on his phone, and after incidents of rage

3

or violence, told her that if she called the police that he would just make up false charges against her and also conspire with her ex-husband to take away her kids.  The police would believe his false charges against her, he said, because he was a federal agent.

On or about October 1, 2011, defendant and K.L. went to a water park.  When they arrived to a long line at the entrance, defendant cut in front with a group of individuals he appeared to recognize, whispering to K.L., "they're my informants."  When defendant and K.L. went to leave, defendant asked K.L. to drive home, but when she refused, defendant flew into a rage, smashing her phone and car doors.  He then demanded the keys and drove erratically and over 100 m.p.h. all the way back to K.L.'s apartment in Chino, California, in San Bernardino County, berating her during the drive.  When they arrived at K.L.'s house, K.L. hid in her room hoping defendant would leave, but he refused.  When K.L. eventually came downstairs, defendant surprised her and grabbed her by her face.  Defendant squeezed so hard he gave K.L. two black eyes.  Defendant then told her that law enforcement would not believe her if she reported the incident to them because he was above law enforcement.

During another violent episode later in the relationship, in December 2011, defendant threw his badge at K.L. and refused to let her leave because he was "Homeland Security."  Throughout their relationship, defendant, in the presence of K.L. and in order to intimidate K.L., would show others his federal law enforcement credentials to security personnel or other people, including when they went to bars and restaurants.  Defendant also repeatedly asked to be added to K.L.'s Southern California Edison bill so he could move his child custody proceedings with his second wife, R.A., to San

4

1   Bernardino County.  When K.L. refused, defendant added his name to

2   the utility account without her knowledge or consent.

3       Defendant's violent behavior toward K.L. culminated with his

4   attempt to rape her in January 2012 after K.L. no longer was dating

5   defendant, but was still too scared to report his conduct because of

6   his claims about his federal position and authority, including that

7   he could make her "disappear."  Defendant contacted K.L. requesting

8   to apologize to her in person, and K.L. reluctantly agreed to go to

9   his house in the City of Riverside to hear his apology.  K.L. then

10  stayed to watch a movie, but made clear to defendant that she was not

11  interested in any physical or romantic contact.  Defendant then

12  disregarded her request and sat down on the couch next to K.L. and

13  began to initiate physical contact without K.L.'s consent, including

14  by trying to kiss her and put his hand up her shirt.  K.L. repeatedly

15  told him "no" and to "stop," but defendant was physically on top of

16  her.  Defendant pinned her down by the shoulders and tried to rip her

17  pants and underwear off, intending to force K.L. to have sex with

18  him.  As K.L. kicked and screamed, defendant continued to try and

19  force K.L. to have sex, but he was ultimately unable to remove her

20  pants and underwear because of the location of her knee, pinned

21  between her stomach and his chest.  Defendant eventually relented,

22  and K.L. went home.  During that attempted rape K.L. believed that

23  defendant, based on his prior actions and threats, was going to

24  sexually assault her, that he would make her disappear, and that he

25  would get away with these actions because of his status as an HSI

26  special agent.

27

28

### C.    TWO RAPES OF N.B. (COUNTS TWO AND THREE)

Within two months of attempting to rape K.L. in January 2012,[3] defendant began a romantic relationship with N.B.  Defendant exhibited the same violent, escalating, controlling, and intimidating behavior with N.B., that he had exhibited with K.L., which included defendant's repeated brandishing of HSI credentials to her and asserting that he was above the law and showing his credentials to third parties to demonstrate his authority.  In August 2012, after already having committed several acts of violence against N.B., defendant threatened to have a confidential informant physically attack N.B. and put her in the hospital if she were to ever cheat on him.

Throughout their relationship, defendant repeatedly used his status and powers as a federal agent to intimidate N.B. and dissuade her from reporting his abusive behavior to law enforcement.  For example, defendant at one point texted N.B. during an argument, "I'm a god damned federal agent. Do you honestly have anything to compare what I do to?  Didn't think so, so stop."  Defendant would also pretend to call "Sector," a clearing house for calls by HSI federal agents, and in front of N.B. would request that law enforcement disregard any potential calls from his house.

Defendant raped N.B. at gunpoint on or about September 28, 2012, at his house in the City of Riverside after a night at a local bar. Earlier in the evening, when leaving the bar, defendant and N.B. had an argument about who should drive them home, with defendant

---

[3] The PSR says that N.B. and defendant started dating in January 2012 (PSR ¶ 11), but N.B.'s trial testimony was that she and defendant had their first date on March 22, 2012.

insisting that he could drive despite consuming multiple alcoholic drinks.  As N.B. started to drive home, defendant took out his loaded HSI-issued service weapon and pointed it at N.B.'s head, asking, "What would you do if I pulled the trigger?"  When they arrived at defendant's house, defendant pressed his loaded service weapon into N.B.'s back while she struggled to get the keys into the door.  Once inside, defendant pushed N.B. onto the floor and dragged her across the room, flipping her onto her back and causing her arm to scrape the floor.  Defendant yelled at N.B. that she "better not bleed on my carpet, you stupid bitch!"

Defendant placed his service weapon that he just used to intimidate her and direct her movement on a table above them and proceeded to rip N.B.'s pants off while she was kicking and screaming at him to stop.  Defendant then forced N.B. to engage in vaginal intercourse with him without her consent.

Approximately a week later, on October 5, 2012, when N.B. attempted to leave defendant's house, he grew angry and violently choked her, slamming her into a wall until she could not breathe. Defendant would not let N.B. leave or make any phone calls other than to her longtime mentor, L.T. (who testified at the trials).

On or about November 4, 2012, defendant violently assaulted N.B. by squeezing her so hard her rib made a popping sound sending N.B. to the urgent care.  On or about November 10, 2012, at defendant's home in the City of Riverside, when N.B. was still trying to recover and was physically wearing a rib binder to protect her injured ribs, defendant again forced N.B. to engage in vaginal intercourse with him without her consent, causing her immense physical pain and additional injuries.  When defendant sexually assaulted N.B. in November 2012,

his HSI-service weapon was on the night stand next to the bed, within defendant's reach, and within N.B.'s line of sight.

## III. THE PSR AND THE UNITED STATES' OBJECTIONS AND COMMENTS

### A.   OFFENSE LEVEL

In the PSR, Probation concluded that the Total Offense Level is 43.  While the United States agrees with the ultimate Guidelines calculation, it believes that a two-level upward adjustment under § 3C1.1 for Obstructing or Impeding the Administration of Justice should apply to the adjusted offense level for Counts Two and Three, which affect the offense level before applying Application Note 2 to § 5A.  This Section's analysis begins by justifying the § 3C1.1 enhancement, and then explains the PSR's calculations, but with the two-level enhancement integrated into the PSR's analysis.

**Section 3C1.1 Adjustment:** A two-level upward adjustment applies when a defendant willfully obstructs or impedes the administration of justice, or attempts to do the same, concerning the investigation or prosecution of the instant offense of conviction and where the obstructive conduct concerns the offense of conviction and any relevant conduct or a closely related offense.  U.S.S.G. § 3C1.1. Explicitly covered by this provision is (1) "threatening, intimidating, or otherwise unlawfully influencing a . . . witness . . . directly or indirectly, or attempting to do so" and (2) "threatening the victim of the offense in an attempt to prevent the victim from reporting the conduct constituting the offense of conviction."  Id. (Application Note 4, Subsections (A), (K)).

The Court is well aware of defendant's obstructing and impeding conduct that is the basis of this enhancement because the parties heavily litigated his state court admissions on the same.  Defendant

admitted to, and was convicted in Riverside Superior Court of, witness tampering, in violation of California Penal Code § 136.1(b)(1).  (Dkt. 204 at 2 and its Ex. 2 at 2.)  At his September 10, 2015 state change of plea hearing, defendant admitted that "on or about March 1st, 2013, through March 31st, 2013 . . . [defendant] did willfully and unlawfully attempt to -- or intimidate and dissuade [N.B.] from giving testimony in a criminal proceeding based on the fact that you asked her to not come forward with the information regarding the crimes that you committed against her by threatening to send a text video to her father of sexual acts."  (Dkt. 204, Ex. 1 at 4, 6-7, 8-9.)  This Court issued a written ruling that held "it is impossible to read the colloquy and accompanying plea documents as anything other than an admission of guilt" for the crimes discussed at the change of plea and listed in in plea documents.  (Dkt. 227 at 11.)  The Court heard N.B.'s testimony at two trials that her romantic relationship with defended lasted between approximately March and December 2012.  N.B. also consistently testified that she did not report defendant's criminal acts to local law enforcement until October 2013.  Defendant's conduct seven months before, in March 2013, was obstruction and attempted obstruction of the investigation and prosecution of the instant offenses.  That witness intimidation was ultimately charged by the state, and that N.B. initially reported to local law enforcement, does not mean defendant's conduct was intended to intimidate N.B. as to state crimes only[4]--his actions were intended to prevent her from coming to

---

[4] PSR ¶ 21 says that the obstruction concerned Riverside County case RIF1402028, but N.B. had not yet reported to any law enforcement when she was intimidated, so this narrow description in ¶ 21 is not consistent with the facts presented at trial and in this case.

9

law enforcement at all, for any of defendant's criminal conduct, which includes the offenses of conviction.  Section § 3C1.1 applies.[5]

**Integrated Calculations:** The three counts of conviction do not group (<u>see</u> § 3D1.2), accordingly it is necessary to separately calculate the Total Offense Level for each count of conviction to determine defendant's combined adjusted offense level.  <u>See</u> U.S.S.G. § 3D1.4.  The proper calculations follow:

**COUNT 1:**

| Base Offense Level: Deprivation of Rights (18 U.S.C. § 242) | | 36 | § 2H1.1(a)(1) |
|---|---|---|---|
| *Attempted Aggravated Sexual Abuse* | *30* | | § 2A3.1(a)(2) |
| *Use of Force* | *+4* | | § 2A3.1(b)(1) |
| *Serious Bodily Injury* | *+2* | | § 2A3.1(b)(4) |
| Offense Committed Under Color of Law: | | +6 | § 2H1.1(b)(1)(B) |
| Total Offense Level: | | 42 | |
| Units: | | | 1 |

(<u>See</u> PSR ¶¶ 24-33.)

**COUNT 2:**

| Base Offense Level: Deprivation of Rights (18 U.S.C. § 242) | | 36 | § 2H1.1(a)(1) |
|---|---|---|---|
| *Aggravated Sexual Abuse* | *30* | | § 2A3.1(a)(2) |
| *Use of Force* | *+4* | | § 2A3.1(b)(1) |
| *Serious Bodily Injury* | *+2* | | § 2A3.1(b)(4) |
| Offense Committed Under Color of Law: | | +6 | § 2H1.1(b)(1)(B) |
| Obstructing the Administration of Justice: | | +2 | § 3C1.1 |
| Total Offense Level: | | 44 | |
| Units: | | | 1 |

(<u>See</u> PSR ¶¶ 21, 34-43.)

**COUNT 3:**

| Base Offense Level: Deprivation of Rights (18 U.S.C. § 242) | | 36 | § 2H1.1(a)(1) |
|---|---|---|---|
| *Aggravated Sexual Abuse* | *30* | | § 2A3.1(a)(2) |
| *Use of Force* | *+4* | | § 2A3.1(b)(1) |
| *Serious Bodily Injury* | *+2* | | § 2A3.1(b)(4) |
| Offense Committed Under Color of Law: | | +6 | § 2H1.1(b)(1)(B) |

---

[5] Although § 3C1.1 does not affect the ultimate Total Offense Level due to U.S.S.G. § 5A, the enhancement is applicable and confirms just how egregious defendant's conduct is, resulting in an offense level of 47.  If the Court determines that § 3C1.1 does not apply, defendant's conduct is otherwise relevant conduct and under § 3553(a) it further supports the United States' requested sentence.

10

| Obstructing the Administration of Justice: | +2 | § 3C1.1 |
| Total Offense Level: | 44 | |
| Units: | | 1 |

(See PSR ¶¶ 21, 44-53.)

Using the group with the highest offense level (Counts 2 and 3: 44) and adding three Units (PSR ¶ 56), the Total Offense Level is 47, which gets adjusted to 43 under U.S.S.G. § 5A, Application Note 2.

### B.   CRIMINAL HISTORY CATEGORY

The PSR concluded that defendant is in Criminal History Category II because of a Criminal History score of three.  (PSR ¶¶ 62-70.) The United States has no objection to this calculation.

### C.   PROBATION'S RECOMMENDED SENTENCE

The Guidelines range for a total offense level of 43 with Criminal History Category II[6] is life.  (PSR ¶ 102.)

In its Recommendation Letter, Probation recommended the following sentence: (1) a lifetime custodial sentence on each count of conviction to be served concurrently, (2) $300 in special assessments, and (3) that all fines be waived.  (RL at 1.)  If the Court decides to impose a custodial sentence less than life, then Probation recommends that the Court impose five years of supervised release with various conditions.  (RL at 1-2.)

### IV.   THE UNITED STATES' RECOMMENDED SENTENCE AND § 3553(a) ANALYSIS

The United States recommends the following sentence: a custodial sentence of life, $300 in special assessments, and restitution to N.B. totaling $17,125.65.  If the Court imposes a custodial sentence less than life (it should not), then it should impose five years of supervised release with the terms in the Recommendation Letter.

---

[6] PSR ¶ 102 appears to have a typographical error, listing defendant's Criminal History Category a I, instead of II.

11

**A.   NATURE, CIRCUMSTANCES, AND SERIOUSNESS OF THE OFFENSE**

Defendant's conduct is abhorrent and an affront to the trust he was given as a Special Agent.  As briefly described in Section II, supra, and presented during two trials, the Court is well-aware that defendant repeatedly and methodically abused and misused his federal agent power, slowly wearing down K.L. and N.B. to submit to his authority.  In that process, he was a terror.  This Section highlights additional aggravating facts concerning his conduct.

**K.L.:** K.L. testified at trial that when defendant threatened that he could make her disappear one evening at her house during a violent fight, she froze.  The utter fright she felt that she might disappear, and that her children would never know what happened to her, led her to take photographs of some of defendant's physical abuse.  (Ex. 1 (Trial Ex. 46, Photos of Bruising) (under seal).)  K.L.'s demeanor changed during her testimony as she recoiled, looking at the photographs and describing them to the Jury.  The psychological and physical pain he caused was part and parcel of defendant's criminal conduct.

**N.B.:** Two recordings were introduced at the trial that highlight how defendant influenced N.B. with his power.  Early in their relationship, in May 2012, defendant had already begun to intimidate N.B. with his position, as shown by her mimicking his words back to him during an argument.  (Ex. 2 (transcript of Trial Ex. 231).)  By August, he was threatening to have a confidential informant put her in the hospital if N.B. were ever to cheat on defendant.  (Ex. 3 (transcript of Trial Ex. 283).)  Defendant was able to control N.B., not only through direct threats, but by essentially telling her that someone she doesn't know could attack her at any moment.

Additionally, defendant's sexual aggression is corroborated by texts from N.B. early in their relationship when she told him "Im always telling you no.. always telling you I don't feel well and to stop but you don't.. you continue to force yourself on me.. I fight with you to keep my panties and stuff on and you still fight me so I just give up and do it.  Imagine every time you had sex you felt pain.. would you want to fuck all the time?"  (Ex. 4 (Trial Ex. 239) at 1.)

**Others in His Life:** Defendant's misuse of his power, in particular, his HSI-issued service weapon, was not limited to his romantic partners.  As N.B. testified, during an early-November 2012 argument, defendant pointed his gun at N.B. as well as each of his parents.  While defendant pled guilty to pointing his gun at his father (see Section IV.B, infra), his mother was also a victim of his threats, as confirmed by a text message to N.B.  (Ex. 5 at 2.)

**Social Media:** N.B. was intimidated by defendant after their relationship ended, including in March 2013 when he threatened to send sexually explicit videos of him and N.B. to N.B.'s father. Around this time, while N.B. was deciding whether and how to report defendant's crimes, he made various social media posts that give insight into his paradigm and why N.B. struggled to gain the courage to report.  Exhibits 6-8 are screenshots that N.B. took of defendant's social media in the Spring of 2013 and that the United States was prepared to introduce into evidence (1) if defendant testified or (2) if N.B.'s delay in reporting was questioned.  His posts minimize rape as a "Snuggle with a Struggle" (Ex. 6), laugh at domestic violence (Ex. 7), and imply he is willing to go further with witness intimidation (Ex. 8).  To be clear, defendant was an HSI Special Agent when he made these social media posts.

13

1        **B.   DEFENDANT'S HISTORY AND CHARACTERISTICS**

2        Defendant's crimes against K.L. and N.B. are built on the

3  sexually violent horrors suffered by defendant's first wife, C.N.,

4  and second wife, R.A.  The record before the Court is that defendant

5  was a sexual predator and an otherwise physically, emotionally, and

6  psychologically abusive romantic partner for at least a dozen years

7  (1999-2012).  His boldness to commit violence grew as his power grew,

8  culminating as an HSI Special Agent and becoming "untouchable."  His

9  history and characteristics cannot ignore defendant's rapes of C.N.

10 and R.A.  Further, defendant's misuse of his power and gun did not

11 stop with K.L and N.B.--he terrorized his third wife M.S. as well.

12       **First Wife--C.N.:** The Court is familiar with C.N. (also referred

13 to as C.R.) from her testimony at the first trial, and the United

14 States' briefing on Rule 413 evidence related to her.  (See, e.g.,

15 Dkts. 80 at 2, 11; 193 at 4-5, Ex. 1.)  On their first date,

16 defendant "forced himself" on her and she got pregnant.  (Tr. 12/1/21

17 at 97-100.)  He also forced her to have sex when she had a UTI

18 infection while she was in "severe pain."  (Tr. 12/1/21 at 100-03.)

19 When he abused her, he'd tell her, "It's fine, you're my wife" and

20 would laugh cruelly.  (Tr. 12/1/21 at 111.)  Although defendant was

21 in the military when he was married to C.N. and was honorably

22 discharged (PSR ¶¶ 77, 89), the outward face he showed others hid his

23 criminal acts behind closed doors.  Indeed, his violence covered both

24 vaginal and anal rape.  (Dkt. 193, Ex. 1 at 1.)  As C.N. testified at

25 the first trial, it was hard for her to be in the same room as

26 defendant over 20 years after they separated because "[h]e's just

27 very intimidating."  (Tr. 12/1/21 at 97.)  C.N. was so traumatized by

28 defendant's sexual violence and abuse toward her that she essentially

ran away, forced to leave behind her young son rather than continue to endure such horrific violence.  The experience of testifying at the first trial resurrected so much pain for C.N. that she pleaded not to have to go through that experience again at the second trial. Her suffering has lasted decades, and defendant's sentence should reflect that.

**Second Wife--R.A.:** The Court is familiar with R.A. from her harrowing testimony at both trials, and the United States' briefing on Rule 413 evidence related to her.  (See, e.g., Dkt. 80 at 11-12.) The Court twice heard R.A.'s emotional testimony about defendant's violent rape, weeks after giving birth to the son she shares with defendant, while she still had stitches from the Cesarean section birth.  (See generally Tr. 12/1/21 at 43-68.)  During cross examination at both trials, defendant elicited testimony about other acts of physical, emotional, and psychological abuse committed by defendant against R.A., which led to two restraining orders.  This abuse is corroborated by a letter written by her sister.  (Ex. 17.) Further, R.A. testified on cross-examination that she never wanted anyone to know about the rape for reasons including shame and trauma.

There is other evidence in the record, in particular, from defendant's phone, that affirms his abuse of R.A., specifically the rape.  In Trial Exhibit 289, which are text messages between N.B. and defendant, he explained to N.B. guilt he had about what he did to R.A.  (Ex. 9 at 2, 5-6.)  From the context of the texts, it is apparent that they are discussing infidelity and harms not including the rape.  (See generally Id.)  But then, defendant told N.B.--"I left out some key info[.]  Info I'm carrying to my grave.  You only have 1 side of the story[.]"  (Id. at 9 (emphasis added).)  The

15

1   information--the rape--has now come to light through R.A.'s

2   testimony.  Defendant's sentence should reflect his unspeakable acts

3   committed on R.A. and the lasting trauma caused.  (See Ex. 16.)

4        **Third Wife--M.S.:** Defendant's third wife, M.S. (also referred to

5   as M.H. and M.O.), testified at both trials about how defendant

6   abused and misused his federal agent power against her.  At the

7   retrial, she testified about (1) how defendant intimidated her from

8   calling the police by leading her to believe he spoke with the

9   Riverside Police Department and told them not to respond to 911

10  calls, (2) how he grabbed her, pinning her arms to her side, and

11  threateningly held her over a pool until she agreed to go on a trip

12  with him, and (3) how he once pointed his HSI-issued service weapon

13  at her during an argument to get her to comply.  (Cf. Dkt. 227 at 5-

14  6.)  M.S. testified to these events and also that sharing custody of

15  a minor child with defendant caused her stress in testifying.  The

16  Court observed her demeanor and can further credit her testimony

17  based on other sworn statements showing how defendant terrorized her.

18  In an August 30, 2016 divorce proceeding declaration, M.S. swore

19  (1) that defendant "has pointed his gun at me, and has told me that

20  'I will not leave this relationship alive,'" (2) that "[d]uring our

21  marriage, because [defendant] was a federal agent, I did not believe

22  that the police would help me" and when she told defendant "I was

23  going to call the cops, [defendant] would appear to get on the phone

24  with the Riverside Police Department, refer to himself as 'Special

25  Agent Olivas' and tell them to disregard any calls to his address,"

26  (3) that defendant was "controlling, manipulative and frightening,"

27  and (4) that she was "petrified" when defendant held her "over the

28

pool and threaten[ed] me that I better go on the trip with him."
(Ex. 10 at 2-3.)

Between N.B., K.L., C.N., R.A., and M.S., there is ample
evidence that the specifics of the case and defendant's history and
characteristics show a clear and present danger to women through
emotional, physical, psychological, and sexual abuse and violence.

**Countervailing Considerations:** Weighed against this mountain of
aggravating circumstances is the fact that, in 2015, defendant took
responsibility for some of his actions when he pled guilty in
Riverside Superior Court to assault with a deadly weapon against his
father and to a November 2012 domestic violence incident with N.B.
preceding the rape charged in Count Three.  (PSR ¶ 68; see Dkts. 204
at 5-6, Ex. 1 at 8, Ex. 2 at 2; 227 at 15.)  Defendant showed little
to no remorse at sentencing in that case and apologized to the
victims only through his attorney.  To be clear, he did not admit or
acknowledge any of the charges from this case and has never accepted
responsibility for his acts of sexual violence against any woman.  In
his prior state case, defendant was sentenced to four years in prison
(PSR ¶ 68) and served 21 months (RL at 4).  For these narrow criminal
acts in the long arc of conduct relevant to this case, defendant has
been held accountable.  In seeking a sentence of "life," the United
States is not relying on this conduct, which defendant has embraced.

At bottom, though, when considering the § 3553(a) factors,
defendant's prior plea does not meaningfully change the calculus--the
Court should impose a life sentence.

**C.   A "LIFE" SENTENCE DOES NOT LEAD TO SENTENCING DISPARITIES**

The United States, Probation, and the victims in this case all
request that the Court impose a custodial sentence of life.  All at

once, "life" is a low-end Guidelines sentence and the applicable statutory maximum sentence.  To help the Court crystalize its view of "life" in this case, the United States now provides (1) high-level information about life expectancy and (2) an array of relevant cases nationwide, where courts either imposed "life" or what life might roughly approximate in this case.  To be clear, the United States is not attempting to predict the future with mathematical certainty (and it is not asking that of the Court either).  Rather, in seeking such a significant within-Guidelines sentence, the United States believes that additional information should be presented and considered.

### 1.  Life Expectancy

In imposing a "life" sentence, the specifics of any defendant must be examined carefully.  Defendant is an educated, 48-year-old, white, Hispanic male, who was born in California and lived here for the vast majority of his life, among other things.  (PSR at 2-3.)

According to the United States Social Security Administration "Retirement & Survivor Benefits: Life Expectancy Calculator" (https://www.ssa.gov/cgi-bin/longevity.cgi), a man born in the United States in 1974, at defendant's current age, has an additional life expectancy of approximately 33.5 years.  While the calculator recognizes that the estimate does "not take into account a wide number of factors such as current health, lifestyle, and family history that could increase or decrease life expectancy," 34 years would mean that defendant would reach approximately 82 years old.

Relatedly, according to a report by the Centers for Disease Control, for Hispanic men who were 30 and 35 in 2006 (defendant was 32 that year), their average life expectancy was an additional 49.6 and 44.8 years, respectively. (Table G—

https://www.cdc.gov/nchs/data/series/sr_02/sr02_152.pdf.)  In other words, a Hispanic man who was 30 in 2006 was expected to live to be approximately 79.6 and a Hispanic man who was 35 in 2006 was expected to live to be approximately 79.8.  If this holds true for defendant, then a "life" sentence based on this assessment would be an approximately 31-year sentence (79-48=31).

Given the scope of information from these sources, a "life" sentence reasonably approximates a 30-year to 35-year sentence.

### 2.   Avoiding Sentencing Disparities

Section 3553(a)(6) requires a court to "avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."  As the Court has learned during two trials, and as shown by a literal "off-the-charts" Total Offense Level of 47, defendant is in a league of his own. Nevertheless, a review of 18 U.S.C. § 2241 sentences (concerning aggravated sexual abuse--the predicate constitutional deprivations here) and 18 U.S.C. § 242 sentences, shows that a "life" sentence for defendant is commensurate and satisfies the purposes of sentencing.

**18 U.S.C. § 2241 Sentences:** Section 2241 covers aggravated sexual abuse and as the Court instructed the Jury (Dkt. 262, Instrs. 17, 18), it needed to find that defendant committed and attempted to commit aggravated sexual abuse to convict him.  These section 2241 sentences cover core conduct in this case and are persuasive.

United States v. Mix, 457 F.3d 906 (9th Cir. 2006) (Dist. Ariz., CR-00-1163-PGR): The Ninth Circuit **affirmed a life sentence** (which was above the calculated Guidelines range) for a defendant who was convicted at trial of two counts of kidnapping, five counts of aggravated sexual abuse, and two counts of assault with a deadly

19

weapon committed on the Navajo Indian Reservation for "numerous violent acts of sexual and physical assault against his live-in companion between 1998 and 2000." 457 F.3d at 908-09, 910.  Besides the victim at that trial, "[t]wo other women testified that they had been physically and sexually abused by [the defendant] during their relationship with him." Id. at 909.  Among other things, the district court considered "at length the grisly circumstances of [the defendant's] offenses, including his long history of violence toward women." Id. at 910.  The Ninth Circuit held, "We conclude that in light of [the defendant's] seventeen-year history of unspeakably inhuman sexual abuse of women, and his continuing characterization of his conduct as unintentional, during the sentencing proceedings, the district court's imposition of a sentence outside the Guidelines range was well explained by the district court and justified the sentences imposed." Id. at 913.

United States v. Jim, 804 F. App'x 895 (10th Cir. Feb. 25, 2020) (D.N.M., CR 1:10-2653-JB, 347 F.Supp.3d 847): The Tenth Circuit **affirmed a life sentence** following a jury trial where the defendant was convicted of two counts of aggravated sexual abuse in the Navajo Nation.  804 F.App'x at 896, 900.  Defendant had a Total Offense Level of 43 (it was actually 44, but was reduced under § 5A) and a CHC of II, with a resulting Guidelines range of life. Id. at 896-97.

United States v. Longee, 407 F. App'x 122 (9th Cir. Dec. 22, 2010) (D. Mont., CR 09-065-GF-SEH): The Ninth Circuit **affirmed a life sentence** for a defendant who was convicted at trial of one count of aggravated sexual abuse, in violation of 18 U.S.C. §§ 2241(a), 1153(a), for violently raping his 63-year-old, wheelchair bound, mother-in-law.  407 F. App'x at 123.  Life was a "within the

Guidelines recommendation." <u>Id.</u> at 124.  Defendant was in his early-30s when sentenced.  (CR 09-065-GF-SEH, Dkt. 65 at 2.)

<u>United States v. Martin</u>, 528 F.3d 746 (10th Cir. 2008): The Tenth Circuit **affirmed a 30-year sentence** after a jury convicted the defendant of two counts of rape and two counts of assault for "brutally attacking his girlfriend in their shared home on the Navajo reservation" during a single evening.  528 F.3d at 748-49.  That defendant attacked the victim after inaccurately concluding that the victim was flirting with his friends.  <u>Id.</u> at 748.  "He began by beating her with his fists, kicking her, and throwing her into the bathroom.  There, he bashed her head against the sink faucet and started to strangle her.  He anally raped her, ignoring her pleas to stop." <u>Id.</u>  He also stabbed her genitals and body with a knife.  <u>Id.</u> at 749.  After the assault, the victim stayed in the same house as the defendant, but "[a]fraid to get blood on the bed, she fell asleep on the floor." <u>Id.</u>  While the defendant "admitted that he beat and stabbed [the victim], he claimed that their sexual relations had always been consensual, even after he attacked her." <u>Id.</u>  The Total Offense Level was 38 and the Criminal History Category was III, with a resulting Guidelines range of 292-365 months, and the Court imposed a near-high-end, 360-month sentence.  <u>Id.</u> at 749, 754.

<u>United States v. Healy</u>, 583 F. App'x 661 (Mem) (9th Cir. July 15, 2014) (D. Mont., 4:13-CR-007-DLC): The Ninth Circuit **affirmed a 327-month sentence** for a defendant who was convicted at trial of one count each of assault resulting in serious bodily injury, aggravated sexual abuse, and abusive sexual contact.  583 F. App'x at 661.  The Total Offense Level was 37, with CHC VI, with a resulting Guidelines range of 360 to life imprisonment.  (D.C. 4:13-CR-007-DLC, Dkt. 48 at

2.)  The defendant's conduct took place on a single evening during a heated argument, when he attacked the victim, knocked her over, strangled her, and raped her.  (<u>Id.</u> at 2-3.)  During the attack, she believed she was going to die.  (<u>Id.</u> at 3.)

These sentences show that imposing a "life" sentence, or its functional equivalent here, would not lead to disparities.  There is sufficient factual and legal overlap between these defendants and cases and this defendant to support the requested sentence.  What's more is that these sentences are underinclusive as they do not account for defendant's abuse and misuse of his federal agent power.

**18 U.S.C. § 242 Sentences:**  A survey of § 242 sentences affirms that a "life" sentence, with its rough approximation of 30-35 years, is appropriately imposed here.

<u>United States v. Kindley</u>, 2022 WL 17245115 (8th Cir. Nov. 28, 2022) (E.D. Ark., 4:17-CR-267-DPM): The district court sentenced the defendant to **life imprisonment** after a jury convicted him of two violations of § 242 based on aggravated sexual abuse and one violation of possessing a firearm in furtherance of a crime of violence.  2022 WL 17245115 at *1.  The defendant transported inmates facing criminal charges and during one transport he "forced the handcuffed and shackled A.M. to perform oral sex on him by grabbing her hair, pulling her forward him, forcing her face onto his erect penis, and pushing her head until he ejaculated in her mouth."  <u>Id.</u> at *1.  During another transport he "slammed [a second victim] against the van, grabbed her breast, digitally penetrated her vagina, and pressed his erect penis against her" then "demanded[ed] oral sex . . . threaten[ing] her . . . that 'all it takes is one bullet to the head.'"  <u>Id.</u>  Evidence was presented at trial that he sexually

1  assaulted other inmates and also otherwise abused other women.  <u>Id.</u>

2  at 2.  The Total Offense Level before the § 5A adjustment was 52 and

3  his Guidelines range was life.  (4:17-CR-267-DPM, Dkt. 148 at 4.)

4      <u>United States v. Gonzalez</u>, 533 F.3d 1057 (9th Cir. 2008) (C.D.

5  Cal., CR-04-1189-CAS): The Honorable Christina Snyder sentenced the

6  defendant to **30-years' imprisonment,** after a jury convicted him of

7  three § 242 violations for ordering victims to perform various sex

8  acts with him when he pulled them over and while he was dressed as a

9  police officer.  533 F.3d at 1059-060.  This was a mid-range sentence

10  (324-405) where the Total Offense Level was 41 and CHC was I.  (Govt.

11  Sent. Pos. in <u>Gonzalez</u>, attached as Dkt. 165-8 in 5:13-CR-087-VAP.)

12      <u>United States v. Perez</u>, 662 F. App'x 495 (9th Cir. Sept. 21,

13  2016) (C.D. Cal., 5:13-CR-087-VAP):  The Honorable Virginia Phillips

14  sentenced the defendant to **25-years' imprisonment,** after a jury

15  convicted him of three § 242 violations, where two were based on

16  aggravated sexual abuse and one was a misdemeanor violation.  (5:13-

17  CR-087, Dkts. 165 (Govt. Sent. Pos.), 185 (J&C).)  The defendant was

18  a San Bernardino Police Officer who forced sexual intercourse with

19  two sex workers and attempted to do the same to a third.  (<u>Id.</u>, Dkt.

20  104 (Trial Memo).)  The Total Offense Level was 48, which reduced to

21  43, with CHC I, for a resulting Guidelines range of life.  (<u>Id.</u>, Dkt.

22  165, at 6-7.)

23      <u>United States v. Shaw</u>, 891 F.3d 441 (3d Cir. 2018) (D.N.J., 2-

24  13-CR-660): The Third Circuit **affirmed a 25-year sentence** for a

25  correctional officer who was convicted at trial of one § 242

26  violation premised on aggravated sexual abuse and one count of

27  obstruction of justice.  891 F.3d at 444, 446.  The defendant "forced

28  himself" on the victim-inmate by "pressing down his hand on her chest

so she was unable to get up," and laid on top of her using "the weight of his body" to engage in forced sexual intercourse.  Id. at 445 (cleaned up).  The victim felt like she could not breathe.  Id.  The 25-year sentence was a downward variance from the Guidelines range of life.  Id. at 446.

### D. NEED TO PROTECT THE PUBLIC, TO PROVIDE ADEQUATE DETERRENCE, AND TO PROMOTE RESPECT FOR THE LAW

A "life" sentence will serve the purposes of sentencing under § 3553(a).  The evidence before the Court is that defendant has been a danger and menace to those in his life for many years.  Recidivism is a concern.  Congress explained when amending 18 U.S.C. § 3583 that "[s]tudies have shown that sex offenders are four times more likely than other violent criminals to recommit their crimes.  Moreover, the recidivism rates do not appreciably decline as offenders age . . . .  While any criminal's subsequent re-offending is of public concern, preventing sexual offenders from re-offending is particularly important, given the irrefutable and irreparable harm that these offenses cause victims and the fear they generate in the community."  H.R. Rep. 107-527.  The requested sentence will protect the public, provide adequate deterrence, and promote respect for the law.

### V. VICTIM IMPACT STATEMENTS

Attached as Exhibits 11-19, are victim impact statements from N.B.; D.B. (N.B.'s mother); C.B. (N.B.'s father); Beverly Van Santford (N.B.'s victim advocate and trusted emotional support person); K.L.; R.A. (defendant's second wife); M.P. (R.A.'s sister); I.P. (R.A.'s mother); and C.N. (defendant's first wife).  Overall, the victims consistently ask that the Court sentence defendant to life imprisonment and/or the statutory maximum.  There are two

important themes present in these letters.  First, they make clear that defendant's actions are something that will always affect the victims--that they will feel the effects of his vile actions for life.  Notably, they have highlighted that defendant has no remorse. Second, there are concerns that if defendant is ever released from prison, he will try to harm them.  The victims know defendant best and they should not have to live in fear years from now.  Defendant doesn't need his power as a federal agent to effectuate their fears. A life sentence is not something to be requested lightly, but these letters leave no doubt that one is appropriate for this defendant.

**VI.   RESTITUTION**

Restitution is mandatory under 18 U.S.C. § 3663A.  Exhibits 20-22 (filed under seal), total $17,125.65 in restitution for N.B., broken down as follows: costs for alarms in her residences, based on fear of defendant's retaliation (Ex. 20 ($7,620.03)); for counseling to deal with his abuse (Ex. 21 ($7,140)); and for medications associated with her counseling treatment (Ex. 22 ($2,365.62)).  If the Court determines that it needs additional information to set the appropriate restitution amount, then the United States asks, under 18 U.S.C. § 3664(d)(5), that the Court defer ruling on restitution until 60 days after sentencing so that additional filings can be made.

**VII. CONCLUSION**

In sum, the United States respectfully requests that the Court impose the following sentence: a custodial sentence of life, $300 in special assessments, and restitution to N.B. totaling $17,125.65.  If the Court imposes a custodial sentence less than life (it should not), then it should impose five years of supervised release with the terms in the Recommendation Letter.