MEGHAN BLANCO (238171)
LAW OFFICES OF MEGHAN BLANCO
28202 Cabot Road, Suite 300
Laguna Niguel, California 92677
Telephone: (949) 296-9869
Facsimile: (949) 606-8988
E-mail: mblanco@meghanblanco.com

Attorney for JOHN OLIVAS

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>JOHN OLIVAS,<br>Defendant. | No. CR 18-CR-231-JGB<br><br>SENTENCING MEMORANDUM |

Defendant John Olivas, by and through his counsel of record, Meghan Blanco, files the attached sentencing memorandum. For the reasons stated below, Mr. Olivas seeks a 121-month sentence followed by a significant period of supervised release. He also requests that the Court refer him to the RDAP program (understanding he is ineligible for credit reductions) and recommend placement in a medical facility as close to Southern California or New Mexico as possible, to facilitate family visitation.

//

This memorandum and Mr. Olivas's sentencing recommendation are based on the attached memorandum of points and authorities, the files in this case, and any other argument of information the Court wishes to hear at the sentencing hearing.

Respectfully Submitted,

Dated: May 3, 2023

*//s// Meghan Blanco*
MEGHAN BLANCO
Counsel for Defendant
JOHN OLIVAS

MEMORANDUM OF POINTS AND AUTHORITIES

A. Introduction

Mr. Olivas respectfully submits to this Court that a 121-month custodial sentence, followed by a significant period of supervised release, is appropriate and in compliance with the tenets of section 3553a.

B. Facts

John Olivas was found guilty, following trial, of three counts of deprivation of rights under color of law. The court observed two trials, where the facts of the case were flushed out over several weeks. Mr. Olivas will not rehash the facts here. But in short, his convictions stem from allegations lodged against him by two former girlfriends: one live-in girlfriend (NB) and one he briefly dated over a decade ago (KL).

His relationships were undoubtedly tumultuous. They were marred by jealousy, explosive fights, and manipulative behavior. Often, the fights followed nights of heavy drinking. And often, the fights were the result of Mr. Olivas experiencing deep feelings of jealousy and insecurity. At the time, he did not have the emotional resources to appropriately handle his feelings, and he would lash out.

During the period he dated NB and KL, Mr. Olivas was dealing with financial pressures from being a single dad, messy custody disputes with his ex-wife, work-related

stresses, and medical issues that he did not want to confront. He suffered from low testosterone and was prescribed testosterone replacement medication. At some point, however, he began to use the medication in quantities that greatly exceeded his prescribed doses.

The artificial hormones certainly impacted Mr. Olivas's physical appearance and demeanor. He grew large, and when he became upset, his outbursts became more pronounced.

Mr. Olivas also struggled with the long-term impact of service-related injuries he sustained while in the Air Force. During a helicopter jump in his 20s, Mr. Olivas's parachute did not properly deploy, and he seriously injured his back. In the months that followed, he would forget things and notice that his mood had change. He experienced large gaps in his memory. However, he dreamed of becoming a law enforcement officer, and he feared that these changes may preclude him from achieving his dream. He received medical treatment for his back injuries but kept the rest of the injuries to himself, hoping they would go away on their own. They did not.

Around this time, his first marriage to CO deteriorated. He learned that she was pregnant with another man's child, and they quickly divorced. The betrayal he felt following the break-up of his first marriage stayed with him for years. Combined with other

stresses, injuries, and excessive testosterone injections, Mr. Olivas changed as a person.

C. Mr. Olivas's Arrest in Riverside

In 2014, the Riverside District Attorney's office charged Mr. Olivas with domestic violence and sodomy after NB made complaints that she had been abused and raped by Mr. Olivas. NB, KL, and RO were all listed as victims in the matter, and following a plea to a subset of charges, each woman gave a victim impact statement to the Court.

Mr. Olivas entered the plea reluctantly, after his counsel advised that he was doing so pursuant to *People v. West*. His decision was influenced by off-record representations by both the Court and his counsel that he was facing a severe penalty if he lost at trial, and that by pleading guilty, he could end the nightmare brought on by the allegations. His wife at the time, MO, urged him to plead guilty so they could put the matter behind them. The plea resulted in Mr. Olivas losing his job with ICE, losing his house, and being incarcerated in state prison for years. Shortly after his sentencing, his wife, MO, left and became pregnant with another man's child. This would mark the second time in Mr. Olivas's life that Mr. Olivas's wife would conceive another man's child.

However, unlike years earlier, when CO became pregnant during their marriage and Mr. Olivas allowed his anger and sadness to balloon into unchecked fear and distrust, when

Mr. Olivas was released from prison, he began to work on himself. He attended therapy sessions, began taking prescribed medication for anxiety, and stopped abusing steroids. Since he was no longer allowed to work in law enforcement, he obtained a job as a barber and in construction – occupations that were far less stressful than his previous career. He and MO rekindled their relationship. He lovingly fathered the daughter that she conceived with another man.

D. Mr. Olivas's Post-Release Rehabilitation

The Court heard extensive testimony concerning what Mr. Olivas's relationships were like from the women he dated and married for the roughly decade between his divorce from CO in the early 2000s and the deterioration of his relationship with NB in 2012. But it did not hear about the changes Mr. Olivas made to his life after his release from prison.[1] How he took his conviction and sentence to heart and worked on his own rehabilitation. How he was a doting father and a supportive figure for MO's daughter from another relationship. How he would pick up MO in the middle of the night, after they divorced, when she fought with other men she dated. How

[1] MO testified positively about her then-current relationship with Mr. Olivas during trial, indicating that she and Mr. Olivas co-parented and got along. She also indicated it felt awkward testifying against him. The two remained in contact, and on good terms, for the duration of Mr. Olivas's case.

he would take his children and MO's daughter to school, games, and amusement parks.

He also cared for his elderly father, who is legally blind and in poor health. And he cared for his adult son when alcohol addiction consumed him. He volunteered with his local church and with youth sports.

But unbeknownst to Mr. Olivas, after his conviction in Riverside, the matter was still not over. The FBI continued to investigate the exact same allegations to which he already pleaded guilty and served a state prison sentence. Shortly after he was released from state custody, Mr. Olivas was indicted in this matter. Mr. Olivas remained on bond, without incident, for years.

D. Mr. Olivas should receive credit for the four-year sentence he served in the related state case

Mr. Olivas served a four-year state court sentence for some of the conduct alleged in this case. He should receive credit for that time against any sentence the Court imposes in this case.

E. A 121-month sentence is appropriate

A 121-month sentence and significant period of supervised release is sufficient but not greater than necessary to achieve the goals of sentencing.

Core principles in sentencing have now been resolved by the Supreme Court in *United States v. Booker*, 125 S. Ct. 738, (2005), *Gall v. United States*, 128 S.Ct. 586, 591

(2007) and *Kimbrough v. United States*, 552 U.S. 85, 128 S.Ct. 558(2007). The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable. *Nelson v. United States, 129 S.Ct. 890,891 (2009.) What the Supreme Court has described as the "overarching provision" of 18 USC section 3553(a) is set forth in that provision's very first sentence – that "the court* shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in subparagraph (2) of this subsection." *Kimbrough v. United States*, 128 S. Ct at 570. Thus, factors justifying a sentence outside the guideline are no longer required to be extraordinary." *Gall*, 128 S.Ct. at 595. Congress could not have been clearer in directing that no limitation ... be placed on the information concerning the background, character, and conduct of a Defendant that a district court may receive and consider for the purpose of imposing an appropriate sentence. *Pepper v. United States, 131 S. Ct. 1229, 1241 (2011)*. Stated differently, after *Booker*, a sentencing court must (1) correctly calculate the advisory guideline range and (2) determine a reasonable sentence by considering the sentencing range provided by the Sentencing Guidelines and the *§3553(a)* factors. *United States v. Talley, 431 F.3d 784, 786 (11th Cir. 2005)*.

While Mr. Olivas maintains his innocence to the allegations that he raped NB and attempted to rape KL, he accepts the fact that he was convicted of that conduct and must be punished for it. He also recognizes that the charges are extremely serious and warrant a significant punishment.

However, prior to his arrest in Riverside for some of the conduct at issue in the instant case, Mr. Olivas had never been arrested or served any time in custody. District courts have varied downward in sentencing where a defendant, regardless of criminal history points, has not previously served a significant custodial term. See, e.g., *United States v. Collington*, 461 F.3d 805 (6th Cir. 2006) (upholding sixty-month downward variance in part because defendant had only been incarcerated for seven months prior to his crime, despite being in Criminal History Category IV. For first-time offenders, long periods of incarceration can do more damage than good by isolating individuals from their communities. "When prison sentences are relatively short, offenders are more likely to maintain their ties to family, employers, and their community, all of which promote successful reentry into society. Conversely, when prisoners serve longer sentences, they are more likely to become institutionalized, lose pro-social contracts in the community, and become removed from legitimate

opportunities, all of which promote recidivism. *Valerie Wright, Deterrence in Criminal Justice, The Sentencing Project, at 7 (Nov. 2010)*. Indeed, studies reveal that low-risk offenders who are sentenced to long periods of incarceration are more likely to reoffend. *Id.* See also *United States v. Baker*, 445 F.3d 987 (7th Cir. 2006) (affirming downward variance justified in part by court's finding that prison would mean more to this defendant than one who has been imprisoned before).

The policy concerns justifying variances for individuals who have never served significant periods of incarceration are magnified in Mr. Olivas's case, as he will enter prison as both a person convicted of a sex-related crime and as a former law enforcement officer. He will be a target for attack by every individual in general population while he is in custody.

Mr. Olivas's conviction also renders him ineligible for many programing benefits while in custody, including any benefits under the First Step Act and RDAP programs. If released on his requested sentence, he will be almost 60 years old when he returns to society. All his children will be adults, and it is unlikely his father will still be alive. He will neither have the resources or opportunity to engage in any conduct described during either trial. And the Court's supervisions of Mr. Olivas will follow him well into his 60s. "Age and criminal history

exert a strong influence on recidivism," with college graduates who were over the age of 60 experiencing the lowest recidivism rates. https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207 Recidivism-Age.pdf (accessed May 1, 2023). "As the age of the offender increases, the likelihood of sexual recidivism tends to diminish."

Mr. Olivas's suggested sentence of 121-month is a significant punishment that meets the sentencing goals of 3553a.

F.Mr. Olivas's Medical Issues

Until his arrest in this case, Mr. Olivas received payments and services for service-related injuries he sustained during a jump accident in the Air Force.[2] While on pretrial release in this case, he underwent brain surgery for an aneurism. He still has a scar across the top of his head from that surgery.

Although Mr. Olivas is not able to seek compassionate release reductions at sentencing, this Court is able to consider his medical condition in its sentencing decision. Mr. Oliva's medical condition offers this Court a compelling reason to depart downward moderately from Mr. Olivas's Guideline's range.

In 28 U.S.C. § 994(t), Congress delegated to the Sentencing Commission authority to "describe what should

[2] Mr. Olivas also sustained significant hearing loss from faulty ear plugs distributed to his squadron.

be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." The policy statement issued in exercise of that authority, U.S.S.G. section 1B1.13, provides examples of "extraordinary and compelling reasons." The examples generally fall into four categories based on a defendant's (1) terminal illness, (2) debilitating physical or mental health condition, (3) advanced age and deteriorating health in combination with the amount of time served, or (4) compelling family circumstances. U.S.S.G. § 1B1.13, appl. note 1(A)-(C). The commentary also includes a fifth catch-all provision for "extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)" as determined by the BOP director. U.S.S.G. § 1B1.13, appl. note 1(D).

Mr. Oliva's service-related injuries are serious enough to warrant services and disability payments from the VA. Thus, Mr. Olivas's injuries qualify as a "extraordinary and compelling reason" for a moderate sentencing reduction in this case.

G.Mr. Olivas's Time in Custody

As noted above, Mr. Olivas's time in prison will be more difficult than a person convicted of just about any other crime. He will enter as a law enforcement officer who was convicted of a sex-related crime. As such, he

will have a mark on his back and will be the target of attacks while in custody. The court can and should consider the circumstances of Mr. Olivas's incarceration and depart downward accordingly.

H. Mr. Olivas is not deserving of a functional LWOP conviction

The probation department recommends a life sentence. Because there is no parole in the federal system, a sentence of life in the federal system is functionally the same as a sentence of Life Without the Possibility of Parole ("LWOP") in the state system. LWOP sentences in the state are reserved for individuals who commit murders under special circumstances. Those same individuals face an alternative penalty of death. Mr. Olivas's conduct of conviction is not on par with a person who commits murder under special circumstances. He should not be punished with the same severity.

Notably, as Mr. Olivas litigated in pretrial motions, the state was aware of all the allegations presented to the jury in his last two federal trials. Armed with that information, it determined that a negotiated sentence of 4-years was appropriate.

Mr. Olivas is asking for a sentence in this case, for conduct the state was fully aware of at the time of the negotiated sentence, that is 250% more than he received in the state. When combined with his state court sentence,

Mr. Olivas's recommended sentence is over 14 years. That is more than the statutory maximum sentence he faced in his state case. In other words, had Mr. Olivas proceeded to trial in his state case and lost, he would have received a shorter sentence than the cumulative sentences he received and is requesting now. And he would have served the state sentence at 66% instead of 85%.

A cumulative sentence of over 14 years in prison is appropriate. Mr. Olivas does not deserve to die in prison.

D. Conclusion

Mr. Olivas recognizes that he must be punished and that he *will* serve significant time in prison. But he does not deserve to die in prison. A sentence that will keep him in custody until he is almost 60 will ensure that the sentencing goals are met in this case.

Dated: May 3, 2023

*//s// Meghan Blanco*
MEGHAN BLANCO
Counsel for Defendant
JOHN OLIVAS